## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. H-07-155 |
| | § | |
| MAZEN ABDALLAH, | § | |
| WESAM ABDALLAH. | § | |

## MEMORANDUM AND OPINION

Defendants Mazen Abdallah and Wesam Abdallah have moved to suppress evidence seized from Mazen Abdallah's home and business on the grounds that the affidavit in support of the search warrant contained materially false and misleading statements and omissions, the affidavit was insufficient to establish probable cause, and the government conducted an unjustified "all records" search of Mazen Abdallah's home. (Docket Entry No. 153). The United States has responded, (Docket Entry No. 162), and the Abdallahs have replied, (Docket Entry No. 164). The Abdallahs have also filed a supplemental motion to suppress, (Docket Entry No. 166), to which the United States responded, (Docket Entry No. 168), and the Abdallahs replied, (Docket Entry No. 169). This court held a hearing at which the motion to suppress was argued by counsel.

Based on the motions, responses and replies, the record, the arguments of counsel, and the applicable law, the Abdallahs' motions to suppress are denied. The reasons for this ruling are set out in detail below.

## I.    Background

This is a healthcare fraud case that has been designated complex.  It is scheduled to begin trial in January 2008.

The indictment alleges that in 2002, Ayad Fallah, Murad Almasri, and Raed Elmasri became the owners and operators of Americare Medical Service ("Americare"), a Houston company that provided ambulance transportation for Medicare and Medicaid dialysis patients to and from their dialysis treatments.  Americare is licensed in Texas as an Emergency Medical Service Provider and has a City of Houston Ambulance Service Permit and a Medicare provider number.  In June 2006, Mazen Abdallah and Will Smith purchased Americare from Fallah, Almasri, and Elmasri.  Mazen Abdallah and Wesam Abdallah operated Americare after June 2006.

Medicare and Medicaid pay a portion of claims submitted by healthcare providers such as Americare for ambulance transport of dialysis patients, but only under certain conditions.  The provider must be an approved supplier of ambulance services.  The transportation must be medically necessary and reasonable for the patient's condition.  The patient must be "bed confined"—unable to walk, sit in a chair or wheelchair, or get up from bed without assistance—or otherwise unable to use other means of transportation.

The defendants are charged with conspiracy to violate 18 U.S.C. § 1347 by submitting fraudulent claims for the ambulance transportation provided by Americare.  Almasri, Elmasri, and the Abdallahs are also charged with violating 42 U.S.C. § 1320a-7b(b)(2)(A), the anti-kickback statute, by paying to obtain patients who will use Americare for transportation to and from dialysis treatments.  In addition, Fallah, Almasri, Elmasri, and

Mazen Abdallah are charged with conspiracy to launder funds under 18 U.S.C. § 1956(h). The Abdallahs are alleged to have participated in the illegal activities even before they acquired Americare in 2006.

On July 11, 2007, the government applied for a search warrant allowing it to seize evidence from Mazen Abdallah's home and Americare's office. A supporting affidavit from FBI Special Agent Christine Arciola accompanied the warrant application and provided details about seven dialysis patients who had either received ambulance transport from Americare or had been solicited to use Americare ambulance services by one of the defendants or an Americare medic. The affidavit alleged that these patients did not qualify for ambulance transport under the Medicare regulations. The affidavit also provided information about the claims Americare had submitted to Medicare, how much Medicare had reimbursed Americare, and the results of a review of Americare's billing conducted by TrailBlazer Health Enterprises, a third-party contractor reviewing Medicare billings.

The Abdallahs move to suppress the evidence seized from Mazen Abdallah's home and Americare's office. The Abdallahs argue that the affidavit was misleading because it falsely suggested that the TrailBlazer investigation revealed that Americare had submitted nearly ten million dollars in fraudulent Medicare claims; it failed to disclose that TrailBlazer benefitted financially from investigating and disclosing improper Medicare billing; it minimized the medical conditions of patients who accepted ambulance services from Americare; it misstated the rules governing Medicare reimbursement and the requirements for Certificates of Medical Necessity ("CMNs"); and it falsely stated that Mazen Abdallah

3

told government agents that he kept Americare documents in his home. The Abdallahs also argue that the affidavit was insufficient to establish probable cause because it did not provide proof that the defendants knowingly or intentionally submitted false information to Medicare; it failed to establish the reliability of its sources; and it was based on stale information. The United States argues in response that suppression is unnecessary because the affidavit was neither misleading nor insufficient to establish probable cause. The United States also argues that the good-faith exception to the exclusionary rule, *United States v. Leon*, 468 U.S. 897 (1984), applies. The United States contends that the magistrate judge was not misled by knowingly false information; the magistrate judge did not abandon his judicial role; the affidavit was not lacking in indicia of probable cause; and the affidavit was not facially deficient. The United States argues that because the defendants have not made a substantial showing of deliberate falsehood or reckless disregard for the truth, an evidentiary hearing is not required under *Franks v. Delaware*, 438 U.S. 154 (1978). The United States also argues that Wesam Abdallah does not have standing to object to the search of Mazen Abdallah's home.

## II.     The Legal Standards

A valid search warrant may be issued only on a finding of probable cause. *United States v. Perez*, 484 F.3d 735, 740 (5th Cir. 2007) (citing *United States v. Brown*, 941 F.2d 1300, 1302 (5th Cir. 1991)). The information necessary to show probable cause must be

contained within a written affidavit given under oath.  *Id.*  Probable cause does not require proof beyond a reasonable doubt.  A magistrate judge must have a substantial basis for concluding that a search would uncover evidence of wrongdoing.  A magistrate judge's determination that probable cause exists is entitled to deference.  *Id.*; *see also United States v. Leon*, 468 U.S. at 914.  In doubtful cases, the search under the warrant should be sustained. *Id.*

An affidavit used to support a search warrant is presumed valid.  *Franks v. Delaware*, 438 U.S. at 171; *Mason v. Lowndes County Sheriff's Dept.*, 106 Fed.Appx. 203, 206 (5th Cir. 2004).  The affidavit's veracity may be attacked by showing deliberate falsehood or reckless disregard for the truth by the affiant.  *Franks*, 438 U.S. at 154.  To meet this burden, the challenger must make a substantial showing that (1) allegations in a supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) after the false statement are removed or the improper omissions added, the affidavit is not sufficient to support a finding of probable cause. *Brown*, 298 F.3d at 395 (citing *United States v. Dickey*, 102 F.3d 157, 161–62 (5th Cir. 1996)).  In determining whether an officer acted intentionally or with reckless disregard for the truth, a court considers the materiality of the misrepresentation, whether exigency or haste preceded the affidavit, the officer's level of training and experience, whether the officer consulted with an attorney, and whether the officer disclosed the facts underlying any conclusory statements in the affidavit.  *See United States v. Gallegos*, 239 Fed. Appx. 890, at 895 (5th Cir. 2007); *United States v. Alvarez*, 127 F.3d 372, 375 (5th Cir. 1997); *United States v. Namer*, 680 F.2d 1088, 1094 (5th Cir. 1982).

The defendant bears the burden of showing, by a preponderance of the evidence, that a misstatement was made with more than mere negligence. *Id.* (citing *United States v. Runyan*, 290 F.3d 223, 234 n.6 (5th Cir. 2002)).   Even if the defendant can show that the affiant made deliberately false statements or made statements with reckless disregard for the truth, the defendant is not entitled to a hearing if, when these statements are set to one side, the warrant affidavit supports a finding of probable cause. *Id.* (citing *Dickey*, 102 F.3d at 161–62; *United States v. Privette*, 947 F.2d 1259, 1261 (5th Cir. 1991)).   To determine whether facts omitted from a warrant affidavit are material to the determination of probable cause, courts insert the omitted facts into the affidavit and ask whether the reconstructed affidavit would still support a finding of probable cause. *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006).   If the challenger can make such a showing, a suppression hearing is necessary. *Franks*, 438 U.S. at 171; *Mason*, 106 Fed.Appx. at 207.

The Fourth Amendment does not require the suppression of evidence obtained as a result of objectively reasonable reliance on a warrant, even if the warrant is subsequently invalidated. *Leon*, 468 U.S. at 922; *United States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999).   In considering a Fourth Amendment challenge to a search conducted under a warrant, a court determines whether the seizure falls under the good-faith exception to the exclusionary rule. *United States v. Gibbs*, 421 F.3d 352, 355 (5th Cir. 2005); *United States v. Davis*, 226 F.3d 346, 350–51 (5th Cir. 2000).   Under the good-faith exception, evidence obtained by law enforcement officials acting in objectively reasonable good-faith reliance on a search warrant is admissible, even though the affidavit on which the warrant was based

6

was insufficient to establish probable cause.  *Davis*, 226 F.3d at 350 (citing *United States v. Shugart*, 117 F.3d 838, 843 (5th Cir. 1997)).  The good-faith exception applies unless the judge issuing the search warrant was "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;" the judge "wholly abandoned his judicial role" in such a manner that "no reasonably well trained officer should rely on the warrant;" the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence unreasonable;" or the warrant was facially invalid.  *Leon*, 468 U.S. at 923; *Gibbs*, 421 F.3d at 355.  If the defendant can establish intentional falsity or reckless disregard for the truth by a preponderance of the evidence, a court should excise the offending language from the affidavit or insert the omitted facts and determine whether the reconstructed affidavit would have established the necessary probable cause.  *United States v. Tillman*, 84 Fed.Appx. 464, 465–66 (5th Cir. 2004) (citing *United States v. Cavazos*, 288 F.3d 706, 710 (5th Cir. 2002)); *Kohler*, 470 F.3d at 1113.

## III.   Analysis

### A.   Does Wesam Abdallah Have Standing to Object to the Search of Mazen Abdallah's Home?

The United States argues that Wesam Abdallah does not have standing to object to the search of his brother's home.  Relying on *Rakas v. Illinois*, 439 U.S. 128, 143 (1978), the United States asserts that a criminal defendant seeking to challenge a search or seizure under the Fourth Amendment must show that he has a legitimate expectation of privacy in the

property searched or seized.  The United States contends that Wesam Abdallah has not made such a showing.  The Abdallahs have not responded in writing to this argument.

To establish standing to contest the validity of a search under the Fourth Amendment, a defendant must prove that he has a reasonable expectation of privacy in the place being searched or the items being seized.  *United States v. Gomez*, 276 F.3d 694, 696–97 (5th Cir. 2001) (citing *United States v. Cardoza-Hinojosa*, 140 F.3d 610, 614 (5th Cir. 1998).  Fourth Amendment rights are individually held and cannot be asserted by reference to a particular place.  They may be enforced only by persons whose own protection under the Amendment has been violated.  *United States v. Vega*, 221 F.3d 789, 797–98 (5th Cir. 2000).  The Fifth Circuit has recognized that a privacy interest can be established in the residence of another when that interest "is based on a visit which represents a longstanding social custom that serves functions recognized as valuable by society," that is, the custom of "staying overnight in the home of another."  *Vega*, 221 F.3d at 798 (citing *Minnesota v. Olson*, 495 U.S. 91 (1990)).

The record does not show that Wesam Abdallah had a privacy interest in Mazen Abdallah's residence.  The motion to suppress evidence seized from the home is denied as to Wesam Abdallah.

### B.    Was the Affidavit Misleading?

The Abdallahs argue that the affidavit underlying the search warrant materially misled the magistrate judge.  The grounds for the argument are addressed below.

### 1.    The TrailBlazer Post-Payment Billing Review

8

The Abdallahs assert that the affidavit misleadingly suggested that as a result of the TrailBlazer analysis of Americare's reimbursement submissions, the United States had evidence of "pervasive fraud" at Americare.  (Docket Entry No. 153 at 4).  The Abdallahs argue that the affidavit indicates that the TrailBlazer review revealed that Americare had billed Medicare almost ten million dollars in fraudulent claims.  The Abdallahs contend that Agent Arciola knew but failed to include in the affidavit statements that TrailBlazer had not concluded that Americare's billing practices violated any law but instead had found only "billing irregularities, such as incomplete, unclear and illegible information in the handwritten run-sheets filled in by Americare's emergency medical technicians."  (*Id.* at 4).  The Abdallahs also argue that the affidavit misled the magistrate judge by reporting that TrailBlazer sent several letters to Americare in 2005 warning about false information in Medicare claims.  The Abdallahs contend that TrailBlazer sent these advisory letters to many providers, not just Americare.  The Abdallahs contend that the letters did not accuse the providers of submitting fraudulent claims, but rather warned about billing  documentation that did not show that the services were medically necessary for reasons that included incompleteness or illegibility.  The Abdallahs argue that if the affidavit had included the information that TrailBlazer had advised Americare, with other Medicare ambulance-transport providers, of billing irregularities such as illegible run sheets as opposed to fraudulent billing, the magistrate judge would have found, "at most, that Americare record keeping and billing was perhaps inadequate but not criminal." (Docket Entry No. 153 at 27).  The Abdallahs also argue that the government failed to inform the magistrate judge that

9

TrailBlazer benefitted financially from investigating and disclosing improper Medicare billing procedures.

Contrary to the Abdallahs' argument, the affidavit does not state that TrailBlazer singled out Americare's billing practices or concluded that they were fraudulent. The affidavit states that TrailBlazer sent a letter to "notif[y] providers of potential over-utilization of ambulance service" and a letter to "provide information identifying potential billing errors and/or documentation deficiencies and to provide education to assist the provider in appropriately billing for ambulance service." (Docket Entry No. 153, Ex. A at 12). The affidavit did not suggest that Americare was the only provider to receive such a letter.

The affidavit states that TrailBlazer conducted a postpayment medical review of Americare, analyzing twenty claims. The review concluded that all these claims would have been denied if they had been reviewed before Medicare reimbursement because the claims did not show that the ambulance service was medically reasonable and necessary. In September 2005, TrailBlazer sent a third letter to "notif[y] [Americare] that several documentation errors were noted [in TrailBlazer's review] and that [Americare's] documentation did not support Medicare's requirement for medical necessity." (Docket Entry No. 153, Ex. A at 12–13). The third letter also "reiterated Medicare's coverage policy for ambulance service and identified the most common billing errors amongst ambulance providers." (*Id.*, Ex. A at 13). The affidavit does not suggest that "Americare was repeatedly warned that the claims it was submitting contained false information," as the Abdallahs argue. (Docket Entry No. 153 at 24).

The United States asserts that TrailBlazer and other Medicare billing contractors are paid a fixed rate and that any money recovered from fraudulent or improper billing goes to the public treasury. The Abdallahs did not dispute this fact and agreed in court that TrailBlazer is not paid on an incentive basis that would encourage it to disclose payments based on improper billing. To the contrary, Medicare and Medicaid have criticized billing contractors such as TrailBlazer for not being more aggressive in performing their billing and review duties. The Abdallahs have failed to show that the affidavit was misleading in failing to disclose more information about TrailBlazer's performance of its postpayment review of Americare claims or how Trailblazer was compensated for that review. The Abdallahs have not shown deliberate falsity or reckless disregard for the truth by Agent Arciola as to the TrailBlazer postpayment billing review.

### 2.     The Patients' Conditions, Medicare Regulations, and Whether the Patients' Ambulance Transport was Medically Necessary

The Abdallahs argue that the affidavit misrepresented to the magistrate judge the rules governing Medicare reimbursement and the circumstances under which a patient qualifies for nonemergency ambulance transport. Contrary to the affidavit's statement that a patient must have a CMN from his or her attending physician for using ambulance service, the Abdallahs assert that a patient may obtain a CMN authorizing ambulance service from a nurse or other medical care provider up to 48 hours after the transportation. The Abdallahs also argue that the affidavit is misleading in stating that a patient qualifies for ambulance services if the services are "medically necessary and reasonable for the condition of the

11

patient and the condition of the patient contraindicates transportation by other means."

(Docket Entry No. 153, Ex. A at 8).  The Abdallahs contend that the affidavit should have

quoted 42 C.F.R. § 410.40(d), which states:

> Nonemergency transportation by ambulance is appropriate if
> either: the beneficiary is bed-confined, and it is documented that
> the beneficiary's condition is such that other methods of
> transportation are contraindicated; or, if his or her medical
> condition, regardless of bed confinement, is such that
> transportation by ambulance is medically required.  Thus, bed
> confinement is not the sole criterion in determining the medical
> necessity of ambulance transportation. It is one factor that is
> considered in medical necessity determinations.

The Abdallahs argue that the affidavit also misleadingly minimized the seriousness

of the medical conditions of the patients whom the FBI interviewed.  Although the affidavit

stated that some patients had walkers, scooters, or wheelchairs, the affidavit did not state

whether the patients were able to use these mobility aides and it failed to clarify that patients

who qualify for a scooter are unable to use a manual wheelchair.  Similarly, the affidavit did

not state whether these patients were able to walk or use non-ambulance transportation at the

time of their dialysis treatments.  The Abdallahs emphasize that all the patients had end stage

renal disease with related and other medical conditions that caused severe problems.  The

Abdallahs also assert that the affidavit placed too much importance on statements provided

by caregivers who were not medically trained, such as social workers and dialysis treatment

center employees, and that the affidavit failed to disclose to the magistrate judge that certain

patients were cooperating witnesses who "had criminal exposure and a reason to curry favor"

under "a real threat of criminal prosecution."  (Docket Entry No. 153 at 22).  The Abdallahs

contend that a fuller disclosure of the patients' medical conditions and a full statement of the regulation would have shown that the patients qualified for nonemergency ambulance transportation to and from their dialysis treatments.

The Abdallahs' argument that the affidavit is misleading because it misrepresented the requirements for a CMN fails. Title 42 C.F.R. § 412.40(d)(3) provides:

> Medicare covers medically necessary nonemergency, scheduled, repetitive ambulance services if the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements of paragraph (d)(1) of this section are met. The physician's order must be dated no earlier than 60 days before the date the service is furnished.

The affidavit states:

> For non-emergency, scheduled, repetitive ambulance service, the provider obtains a written order from the beneficiary's attending physician certifying that the ambulance transportation is medically necessary. This certificate, more commonly known as a Physician Certification Statement (PCS) or a Certificate of Medical Necessity (CMN), must be obtained before the service is provided and must be dated no earlier than 60 days before the date the service is furnished.

The Abdallahs have not shown that by this statement, Agent Arciola acted intentionally or with reckless disregard for the truth or that the affidavit misled the magistrate judge as to the necessary certification for nonemergency, scheduled, repetitive ambulance service.

The Abdallahs' argument that the affidavit was misleading by minimizing the severity of the patients' conditions and misrepresenting the regulatory requirements for medically necessary ambulance transport similarly fails. The affidavit stated, and the Abdallahs do not

dispute, that the Americare claims stated that each patient had end stage renal disease, "had to be transported by stretcher only," and "was bed-confined before and after the transport." (Docket Entry No. 153, Ex. A at 14, 15, 16, 18–19).[1]  The affidavit stated that the claims Americare submitted for Rosie Brown's ambulance transport for dialysis treatments indicated that she also had congestive heart failure, general weakness, hypertension, and difficulty breathing; the claims for Moses Kiggundu stated that he suffered from pain and weakness; the claims for Mary Martinez indicated that she had had a stroke and suffered from weakness; and the claims for Margarita Gomez indicated that she had had a stroke and suffered from angina pectoris, diabetes, and general weakness.  The Abdallahs do not contend that the affidavit misrepresented the claims that Americare submitted for these patients.  In interviews with the FBI, each of these patients stated that they were not bed-confined and could use other means of transportation.

The Abdallahs contend that the affidavit was misleading in stating that ambulance services are covered only if they are medically necessary and if the patient's condition contraindicates transportation by other means.  The Abdallahs contend that 42 C.F.R. § 410.40(d)(1) allows reimbursement for patients who are not bed-confined.  The Abdallahs argue that if the affidavit had provided the correct legal standard and disclosed the full

---

[1]The TrailBlazer review corroborates this statement for patient Rosie Brown, noting that the "[m]edical Hx on [Brown's] run sheet . . . mentions that she is bed confined."  (Docket Entry No. 153, Ex. N at AMS-TriC-001102).

14

severity of the patients' conditions, the magistrate judge would have found that ambulance transport was medically necessary for the patients.

The affidavit did not state that bed confinement was the only basis for Medicare reimbursement and did not materially misrepresent the legal standard under the regulation. Nor did the affidavit materially misrepresent some of the patients' medical conditions, as the Abdallahs argue.  Citing the FBI's record of an interview with Mary Martinez, the Abdallahs argue that Agent Arciola misleadingly omitted from the affidavit that Mary Martinez "has seizures approximately three times per month," she "fears walking even short distances because she fears falling as her legs get shaky," she "needs oxygen while en route to the dialysis clinic," and "she switched to Americare, because the ambulance service she was using, dumped her due to the fact that they had to wait for 'bleeding to subside' after dialysis, and it 'could take up to an hour' [to] staunch the flow."  (Docket Entry No. 153 at 19).  The Abdallahs also argue that the affidavit failed to state that Martinez's attending physician "had signed numerous CMNs that state Martinez was bed-confined."  (Docket Entry No. 164 at 15).  Contrary to the Abdallahs' assertions, the interview record stated that Martinez "can walk short distances without any problems, but is afraid she may fall if her legs get 'shaky.' As a result, Martinez uses the aid of a walker or a motorized scooter" instead of a manual wheelchair, which "causes her arm to bleed at the graft site."  (Docket Entry No. 153, Ex. D at 1).  The interview record also states that Martinez "[o]ccasionally, Martinez needs oxygen while en route to the dialysis clinic.  If she does not get it during the ride, she will receive oxygen at the clinic."  (*Id.*, Ex. D at 1).  According to the interview record, an ambulance

company named "St. John's discontinued Martinez's service because she lived too far away. They also did not want to wait for the bleeding in her arm to subside, which on occasion could take up to an hour." (*Id.*, Ex. D at 1). After St. John's discontinued its service, Martinez did not begin using Americare's ambulance service, but instead "was transported to dialysis by Yellow Cab for approximately three months" and then by "LaFleurre" taxi service for approximately nine months. (*Id.*, Ex. D at 2). The interview record noted that a "supervisor at the dialysis clinic recommended that she use an ambulance service for transportation" and that Martinez "has no knowledge whether [Americare] secured the necessary approval" for her to use ambulance transport. (Docket Entry No. 153, Ex. E at 2–3). The interview record did not show whether a physician signed CMNs on Martinez's behalf.

Similarly, the Abdallahs contend that Agent Arciola failed to inform the magistrate judge that Margarita Gomez "reported that she experiences charley horses, pain in her back and pressure in her kidneys while standing," and that "Gomez became nauseated and suffered sever[e] swelling in her legs upon standing." (*Id.* at 20). The FBI's record of Gomez's interview stated that "[s]ometimes after receiving dialysis, she will experience charley horses, pain in her back and pressure in her kidneys while standing." (*Id.*, Ex. E at 2). The record also stated that "[f]or the past 1 ½ months, she has been experiencing swelling in her legs while standing or walking, When Gomez sits, everything below her waist starts swelling. When she lays down, the swelling subsides." (*Id.*, Ex. E at 3). The Abdallahs have failed

to show that the affidavit materially misrepresented Martinez's and Gomez's medical conditions.

The Abdallahs fault the affidavit for reporting the statements and observations of nonlicensed providers, such as social workers, and not obtaining additional information about the patients from their treating doctors and nurses.  The observations of some of these third parties corroborated the patients' own statements that they were ambulatory and not bed-confined.  For patients Margarita Gomez and Richard Didsbury, statements by social workers and dialysis center employees confirmed that these patients did not have CMNs authorizing ambulance transport.  The Abdallahs argue that the affidavit failed to disclose that Gomez's physician gave her "authorization to ride," (Docket Entry No. 153, Ex. E at 2), but the record does not show that Gomez had a signed CMN from her physician.  The Abdallahs also argue that Agent Arciola misleadingly reported only "the unquestioned and unqualified opinion of a social worker" instead of "seeking out Didsbury's physician."  (*Id.*  at 421).

An officer may be negligent in failing to conduct a sufficiently thorough investigation so as to discover exonerating facts, "but that does not rise to the level of reckless disregard for the truth."  *United States v. Garza*, No. SA-06-CR-284, 2007 WL 708604, at *3 (W.D. Tex. March 7, 2007).  "Although . . . police departments are far from perfect . . . sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment."  *Id.* (citing *Hill v. California*, 401 U.S. 797, 804 (1971)).  The Abdallahs have not shown that Agent Arciola's failure to interview or provide statements in her affidavit from the patients'

physicians resulted in material misrepresentations or rose to the level of reckless disregard for the truth.

The Abdallahs have also failed to show that "the allegedly false statement[s] [in the affidavit are] necessary to the finding of probable cause." *Franks*, 438 U.S. at 156.  If the affidavit excluded the statements to which the Abdallahs object and included the statements that the Abdallahs argue were improperly omitted, it would support a finding of probable cause under *Franks*.  Even with a more detailed and fuller disclosure of the patients' medical conditions, the magistrate judge could have reasonably found in a "commonsense" reading of the affidavit that the patients were not consistently bed-confined, that the claims that Americare submitted contained false information, and that the ambulance transport did not comply with the Medicare requirements for reimbursement.  *Ventresca*, 380 U.S. 102, 108 (1965).

The Abdallahs' argument that the affidavit misled the magistrate judge as to the patients' conditions and the requirements for ambulance transport fails.

### 3.    Evidence at Mazen Abdallah's Home

The Abdallahs also assert that the affidavit falsely stated that the government had information showing that Mazen Abdallah kept Americare documents at his home at 8670 Meadowcroft, Houston, Texas.  In the affidavit, Agent Arciola stated that she learned on November 2, 2006 that investigator Joey Ancelet had spoken to Mazen Abdallah and that Mazen Abdallah had told Ancelet that he kept Americare records at his home.  The Abdallahs assert that Mazen Abdallah did not move to 8670 Meadowcroft until November

1, 2006, and that he did not speak to Ancelet after he moved.  The Abdallahs dispute that Mazen Abdallah  told Ancelet or anyone else that he kept Americare records at his home.

The Abdallahs' argument is not persuasive.  The United States provides a record of a November 3, 2006 interview between an FBI investigator and Joey Ancelet.  In the interview, Ancelet stated that he had visited Americare and had spoken to Mazen Abdallah on November 2, 2006, one day after the Abdallahs assert that Mazen Abdallah moved to 8670 Meadowcroft Drive.  Ancelet asked Mazen Abdallah where Americare's records were located.  Mazen Abdallah answered that records were kept at Americare's business office and that some records, including ambulance run sheets, were kept at his home.  The record does not show deliberate falsity or reckless disregard for the truth by Agent Arciola as to whether Americare records were stored at Mazen Abdallah's home.

The Abdallahs have not made a substantial showing that allegations in the supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth.  *Brown*, 298 F.3d at 395.  An evidentiary hearing is not necessary.  *Franks*, 438 U.S. at 171; *Mason*, 106 Fed.Appx. at 207.  Nor have the Abdallahs shown that the magistrate judge was misled by false information, that the judge wholly abandoned his judicial role, that the affidavit was so lacking in indicia of probable cause as to render official belief in its existence unreasonable, or that the warrant was facially invalid.  *Leon*, 468 U.S. at 923; *Gibbs*, 421 F.3d at 355.

### C.    Did the Affidavit Fail to Show Probable Cause?

### 1.    The Issue of Specific Intent

The Abdallahs argue that the affidavit failed to show probable cause because it did not include a basis to show that any defendant knowingly or intentionally submitted false information.  The Abdallahs argue that the affidavit failed to identify the individuals who gathered and submitted the allegedly fraudulent information to Medicare.  The affidavit did not allege that either Abdallah or Americare knew the applicable Medicare regulations, knew that the billing claims contained false statements, or knew the actual condition of the patients named in the affidavit.  The Abdallahs rely on *Edgerly v. City and County of San Francisco*, 495 F.3d 645, 691 (9th Cir. 2007), for the proposition that an officers "need not have probable cause for every element of the offense, but they must have probable cause for specific intent when it is a required element."  (Docket Entry No. 153 at 31).

The United States argues that probable cause for a search warrant does not require the proof of *mens rea* that the defendants contend is necessary.  (Docket Entry No. 162 at 27).  Instead, "[a]ll the affidavit must show is that a premises may have evidence of a crime."  (*Id.* at 27).  The United States distinguishes *Edgerly* on the ground that it addressed probable cause to arrest without a warrant, not probable cause to search a premises with a warrant.

The Abdallahs' argument that the affidavit was insufficient to support a finding of probable cause because it failed to allege specific intent or knowledge is unpersuasive.  The Supreme Court has acknowledged that the term "probable cause " means "less than evidence which would justify condemnation," *Ventresca*, 380 U.S. at 107 (citing *Locke v. United States*, 7 Cranch 339, 348 (1813)), and that "[t]here is a large difference" between guilt and probable cause, "the tribunals which determine them, and "the quanta and modes of proof

required to establish them," *id.* at 108 (citing *Jones v. United States*, 362 U.S. 257,  272 (1960)); *see also United States v. Froman*, 355 F.3d 882, 889 (5th Cir. 2004) ("Probable cause does not require proof beyond a reasonable doubt, but only a showing of the probability of criminal activity.").   As a result, "[t]echnical requirements of elaborate specificity . . . have no proper place in this area." *Ventresca*, 380 U.S. at 108.  When an affidavit details the underlying circumstances of the alleged crime, "and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. . . . [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Id.* at 109.

The Abdallahs' reliance on *Edgerly* is misplaced.  *Edgerly* concerns the showing necessary to support probable cause for a warrantless arrest.  495 F.3d at 651.  This case concerns the showing necessary to support probable cause for a search warrant.  Probable cause to arrest exists "when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001) (citing *Spiller v. Texas City*, 130 F.3d 162, 165 (5th Cir. 1997)).  A probable cause determination for the issuance of a search warrant is a "practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Cavazos*, 288 F.3d at 710 (quoting *United States v. Byrd*, 31 F.3d 1329, 1340 (5th

Cir.1994)).  "In the case of arrest, the conclusion [that probable cause exists] concerns the guilt of the arrestee, whereas in the case of search warrants, the conclusions go to the connection of the items sought with the crime and to their present location."  2 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 3.1(b) (4th ed. 2004).

The Abdallahs cite *Greene v. Reeves*, 80 F.3d 1101 (6th Cir. 1996), to support their argument that the same quantum of proof is necessary to establish probable cause to arrest an individual and to establish probable cause to search for and seize evidence.  (Docket Entry No. 154 at 3–5).  Unlike *Edgerly*, which involved a warrantless arrest, and this case, which involves a search pursuant to a warrant, *Greene* involved both search and arrest warrants. After being alerted to a mailed postcard that showed a six-year-old girl with her unclothed genital area exposed, a mail specialist prepared affidavits and an application for search and arrest warrants, which a state judge approved.  Police officers went to the home of the two people who had sent the postcard and found photographs and videotapes of nude or partially nude children and adults.  After the search, the officers arrested both individuals.  The defendants sued the officers under 42 U.S.C. § 1983, alleging Fourth Amendment violations. The district court found that the officers were entitled to qualified immunity with respect to the allegations involving the search warrant, but not with respect to the arrest warrant.  On appeal, the Sixth Circuit reversed and found that the officers were entitled to qualified immunity as to the claims involving both.  The court acknowledged that "the focus of the arrest inquiry is different from that of the search inquiry," but noted that under the facts of the case, "both findings [of probable cause to arrest and probable cause to search] must

22

ultimately stand or fall on the same evidence." *Greene*, 80 F.3d at 1106 (citing 1 LaFave § 3.1(b)).  Based on the initial postcard, "[i]f it was reasonable to obtain a search warrant, it had to be equally reasonable to obtain the arrest warrant."  *Id.  Greene* does not stand for the proposition that an affidavit in support of a search warrant must establish probable cause on the element of specific intent.  Nor does *Greene* stand for the proposition that the same quantum of proof is always necessary to establish probable cause to arrest and probable cause to search.  The Abdallahs have not shown that the affidavit was insufficient to support a finding of probable cause because it failed to allege specific details on the element of intent.

### 2.        The Issue of the Allegations of a Kickback Offense

The Abdallahs argue that because the affidavit "does not specifically allege a kickback offense or ask that the Magistrate issue a warrant to seize evidence in support," any evidence of a kickback offense, such as a list of patients allegedly paid to use Americare ambulance transport, should be suppressed  (Docket Entry No. 153 at 34).  The United States argues that the warrant "specifically sought evidence of payments to patients" and that records of patient names, addresses, and notations were lawfully seized under *Horton v. California*, 496 U.S. 128, 136–37 (1990).  (Docket Entry No. 162 at 31–32).

Officers may seize property not specifically described in a warrant if the property exhibits a sufficient nexus to the crime under investigation.  *United States v. Loe*, 248 F.3d 449, 460–61 (5th Cir. 2001).  A sufficient nexus exists between evidence showing payments to dialysis patients and the crime under investigation in this case, a scheme to defraud Medicare by submitting false claims for ambulance transport.  Officers may also seize

23

property not specifically described in a warrant when they search a given area for specified objects and in the course of the search come across other items of incriminatory character. "The property is then seizable under the plain view doctrine." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Bills*, 555 F.2d 1250, 1251 (5th Cir. 1977)). The plain-view doctrine will justify such a seizure if: (1) the officers lawfully entered the area where the items could be plainly viewed; (2) the incriminating nature of the items was immediately apparent; and (3) the officers had a lawful right of access to the items. *Id.* (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)). The Abdallahs have not identified specific seized evidence to which the plain-view doctrine should not apply. The Abdallahs' argument that evidence of a kickback offense should be suppressed fails.

### 3.    The Issue of "Unreliable" and "Stale" Evidence

The Abdallahs contend that information in the affidavit was stale because it pertained to events ten months to four years before the government applied for the search warrant. The Abdallahs also contend that the affidavit did not provide details necessary to establish the reliability of its sources or to support probable cause. The Abdallahs argue that the affidavit did not establish the reliability or authority of TrailBlazer's postpayment review of Americare's billing practices or contain information about the methods that either TrailBlazer or the FBI agent used in reviewing Americare's Medicare claims. Because none of the allegedly fraudulent claims is identified by date or subject matter, the Abdallahs argue that the magistrate judge could not reasonably conclude that the patients' conditions at the time they were interviewed by the FBI accurately reflected their conditions when Americare

provided ambulance transport.  The Abdallahs also contend that the affidavit failed to establish probable cause for a kickback offense because none of the people interviewed by the FBI provided reliable information as to the identity of the individual who allegedly solicited them for a kickback.

In response to the Abdallahs' argument that the affidavit failed to support a finding of probable cause because it relies on stale evidence, the government points out that the search warrant "was written to cover more than four years of billing by these Defendants and their company," and that the search warrant "samples patients from 2003, 2004, 2005, 2006" in the interests of "thoroughness."  (Docket Entry No. 162 at 24).  The Fifth Circuit has held that information reaching back over long periods may be used to support an affidavit if the information in the affidavit clearly shows a long-standing, ongoing pattern of criminal activity.  *United States v. Rojas Alvarez*, 451 F.3d 320, 332 (5th Cir. 2006) (citing *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1130 (5th Cir. 1997)).  Such information may also be used in an affidavit when the type of evidence sought is the sort that can reasonably be expected to be kept for long periods of time in the place to be searched.  *Id.*  Under these circumstances, a court should be "more tolerant of dated allegations."  *Id.*  This case presents such circumstances.  The indictment alleges a long-standing, ongoing conspiracy dating over four years.  The evidence sought in the warrant included Americare's business records.  The government stated that it submitted information extending over a long period to support a finding of probable cause for the entire duration of the alleged conspiracy.  The age of some of the information in the affidavit does not defeat a probable cause showing.  *See, e.g.*, *Rojas*

*Alvarez*, 110 F.3d at 332 (affirming finding of probable cause based on dated information in affidavit alleging ongoing drug trafficking activity); *Pena-Rodriguez*, 110 F.3d at 1130 (affirming finding of probable cause based on dated information in affidavit alleging "large-scale and ongoing drug-distribution enterprise"); *United States v. Webster*, 960 F.2d 1301, 1307 (5th Cir. 1992) (affirming finding of probable cause based on dated information in affidavit alleging long-standing, ongoing drug sales and money laundering).

The Abdallahs' challenge to the reliability of information in the affidavit is also unpersuasive. A probable-cause determination is based on the "totality of the circumstances" rather than isolation of "each factor of suspicion." *United States v. Saucedo-Munoz*, 307 F.3d 344, 351 (5th Cir. 2002); *see also Illinois v. Gates*, 462 U.S. 213, 230 (1983) (holding that an informant's veracity, reliability, and basis of knowledge are all "highly relevant in determining the value of his report" but are not "understood as entirely separate and independent requirements to be rigidly exacted in every case."). There is no set requirement that to be considered credible, all tips and information provided by third parties must be corroborated by subsequent police investigation. Whether subsequent corroboration is necessary must be determined in light of the totality of the circumstances presented by the particular facts. *Rojas Alvarez*, 451 F.3d at 332. "[A]n affidavit need not present a watertight criminal case to support good-faith reliance on a warrant." *Cherna*, 184 F.3d at 410–11.

Patricia Suerte, Patricia Williams, and Richard Didsbury each told the FBI that he or she had been solicited by one of the defendants or an Americare employee. Absent specific

reasons for police to doubt his or her truthfulness, a individual who provides information to police during an ongoing investigation may be presumed credible without subsequent corroboration. *United States v. Blount*, 123 F.3d 831, 835 (5th Cir. 1997). Even if the affidavit should have included information that Ray Stevenson was "crooked" and "unreliable," the affidavit is sufficient without such information or his statements to support a finding of probable cause. *Brown*, 298 F.3d at 395.

The Abdallahs have also failed to show that the investigation that TrailBlazer performed was unreliable. The observations of Agent Arciola and other law enforcement officers corroborated the information that TrailBlazer provided. Probable cause may be based on information within the affiant's own knowledge, *Franks*, 438 U.S. at 165, and on observations made by fellow officers in a common investigation, *Ventresca*, 380 U.S. at 111. Such information is presumptively reliable. *Ventresca*, 380 U.S. at 111.

The Abdallahs' challenge to the sufficiency of the affidavit based on the staleness and unreliability of the evidence fails.

### 4.    The Issue of Evidence at Mazen Abdallah's Home

The Abdallahs also argue that the affidavit did not show probable cause to search for Americare records at Mazen Abdallah's home. The Abdallahs argue that the evidence of conversations supporting such a search is stale and that the affidavit's health care fraud allegations rely on events that occurred before Mazen Abdallah purchased Americare. The United States argues that probable cause existed to search Mazen Abdallah's home because he told Joey Ancelet that he kept copies of Americare records at his home.

The Abdallahs have not shown that the magistrate judge erred in finding probable cause that Americare documents were stored in Mazen Abdallah's home. The November 3, 2006 interview between an FBI investigator and Joey Ancelet shows that Ancelet had visited Americare and had spoken to Abdallah on November 2, 2006, one day after the Abdallahs assert that he moved to 8670 Meadowcroft Drive. Ancelet asked Abdallah where Americare's records were located. Abdallah answered that records were kept at Americare's business office, located at 6250 Westpark, and at his home. The magistrate judge did not err in finding probable cause to search Abdallah's home for Americare records.

### D.   Was an "All Records" Search Warranted?

The Abdallahs argue that the search warrant "encouraged unlimited rummaging through Mr. Abdallah's belong[ing]s and papers" in violation of the Fourth Amendment, which requires a search warrant to "describe things to be seized with sufficient particularity." (Docket Entry No. 153 at 38). As a result, "law enforcement felt at liberty to ransack Mr. Abdallah's home." (*Id.* at 39). Citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963), the Abdallahs seek to suppress all documents seized from his home other than those records that Medicare and Medicaid require providers to maintain.

"Where probable cause exists to believe that an entire business was merely a scheme to defraud, or that all the records of a business are likely to constitute evidence, a warrant authorizing the seizure of all such records of a business are likely to constitute evidence, a warrant authorizing the seizure of all such records and describing them in generic terms is sufficient to meet the particularity requirement of the fourth amendment." *Williams v. Kunze*,

806 F.2d 594, 598 (5th Cir. 1986) (citations omitted).  Warrants using generic categories of evidence are adequate if the crime being investigated is likely to require all a business's records.  *United States v. Davis*, 226 F.3d 346, 352 (5th Cir. 2000).  In addition, the Fifth Circuit has upheld all-records searches of homes in cases involving business fraud that is alleged to be pervasive and overlap between the defendant's personal and business lives. *Davis*, 226 F.3d at 352 (finding that a warrant authorizing seizure of "broad categories of financial documents" was "supported by the affidavit, which suggested [the defendant's] business was nothing but a confidence scheme"); *Cherna*, 184 F.3d at 409 (upholding an all-records search of a residence in a wire and mail fraud case in which the defendant operated his fraudulent businesses from his home); *United States v. Humphrey*, 104 F.3d 65, 69 (5th Cir. 1997) (holding that an all-records search warrant "was valid in light of the pervasive nature of the fraud, the considerable overlap of the [defendants'] business and personal lives, and the limitation of the warrant to records pertaining to financial transactions.").

The Abdallahs and their codefendants are charged with conspiracy to violate the healthcare fraud statute by submitting fraudulent claims for ambulance transportation provided by Americare.  Agent Arciola's affidavit stated that Americare "submitted numerous false claims to Medicare and Medicaid, and continues to submit false claims for ambulance transportation of dialysis patients."  (Docket Entry No. 153, Ex. A at 11).  The affidavit alleged that Americare's entire business was a scheme to defraud, such that all its records were likely to constitute evidence.  The affidavit also supported probable cause to believe that records were stored at Mazen Abdallah's home based on his statements to an

investigator that he kept ambulance run sheets and billing records at his home.  Because the warrant was limited to records pertaining to Americare's business and the alleged fraudulent scheme, a sufficient nexus exists between the seized property and the crime under investigation.  *See Loe*, 248 F.3d at 460–61.  Information in the affidavit connected Abdallah and Americare's business records to the home and to alleged criminal activity.  *See United States v. Sibley*, 448 F.3d 754, 758 (5th Cir. 2006).  The Abdallahs have not shown that suppression of the evidence seized at his home is warranted.

## IV.    Conclusion

A magistrate judge's determination that probable cause exists is entitled to deference by reviewing courts.  *Perez*, 484 F.3d at 740.  In doubtful cases, a search warrant should be sustained.  *Leon*, 468 U.S. at 914.  Affidavits used to support a search warrant are presumed valid.  *Franks*, 438 U.S. at 171.  The Abdallahs have not rebutted this presumption by making a substantial showing of deliberate falsehood or reckless disregard for the truth by the affiant.  *Id.* at 154.  The Abdallahs have not shown that the *Leon* good-faith exception does not apply or that the officers who executed the warrant did not reasonably rely on the warrant.

The Abdallahs' motion to suppress is denied.

SIGNED on December 7, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

30