**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. H-07-155 |
| | § | |
| MAZEN ABDALLAH, | § | |
| WESAM ABDALLAH. | § | |

**MEMORANDUM AND OPINION**

This Medicare and Medicaid fraud case arises out of ambulance transportation of individuals to and from regularly scheduled, nonemergency dialysis treatments. The individuals transported all suffered from renal disease. The government alleged that Mazen and Wesam Abdallah, brothers who purchased and operated an ambulance service from the codefendants, committed fraud and conspiracy to defraud by submitting claims for payment by Medicare and Medicaid for regularly scheduled nonemergency ambulance transports to and from dialysis of patients whose medical conditions did not make them medically eligible for the service. The government also alleged that Wesam Abdallah violated the statutory "antikickback" provisions prohibiting soliciting ambulance riders by paying them or someone else to obtain the business, and that Mazen Abdallah committed money laundering using the proceeds of the healthcare fraud.

Two codefendants, Ayad Fallah and Murad Almasri, pleaded guilty to conspiracy to commit health care fraud. After a five-week trial in which the codefendants were among over forty witnesses, the jury convicted Mazen and Wesam Abdallah of conspiracy to defraud Medicare and Medicaid programs and to obtain money from Medicare and Medicaid by false billing, in violation of 18 U.S.C. § 1347. The jury acquitted Mazen Abdallah of the substantive healthcare fraud counts and acquitted him of the money laundering charge. The jury convicted Wesam Abdallah of four substantive counts of healthcare fraud and one count of violating the antikickback statute. Both

defendants moved for a judgment of acquittal or in the alternative for a new trial. They argue that the evidence was insufficient and that prosecutorial misconduct, *Brady* violations, and the court's erroneous legal rulings infected the trial.

Based on a careful review of the motions, response, and replies; the record; the evidence presented at trial; and the applicable law, this court denies the Abdallahs' motions for acquittal and new trial. The reasons for these and related rulings are explained in detail below.

## I.    Background

### A.    The Medicare Statute and Regulations

The Medicare Act, 42 U.S.C. § 1395 *et seq.*, established a federally subsidized health insurance program. Part A of the Act provides insurance for the cost of hospital and related postdischarge services. 42 U.S.C. § 1395c *et seq.* Part B establishes a program of "supplemental medical insurance" covering physicians' charges and other medical services, including ambulance service. 42 U.S.C. §§ 1395k, 1395(1), and 1395x(s); 42 C.F.R. § 410(40)(a)(2). The Medicare program is run by the United States Department of Health and Human Services (HHS). HHS delegated the operation of Medicare to its component entity, the Centers for Medicare and Medicaid Services (CMS). CMS contracts with insurers in various regions of the country to act for HHS in reviewing, processing, and paying Medicare claims. These insurers act as HHS's agents for the purposes of auditing claims for reimbursement by, and administering payments to, Medicare contractors. CMS is responsible for issuing guidance and instructions about the rules for beneficiaries' eligibility for coverage and the criteria for payment. CMS issues such instructions through newsletters, bulletins, manuals, and other contractor publications. Both Medicare regulations and CMS instructions address the payment of claims submitted by ambulance transport

companies for providing nonemergency, regularly scheduled ambulance service for beneficiaries traveling to and from dialysis treatments.

Medicare regulations provide for payment of part of the reimbursement claims submitted by ambulance transport companies for taking dialysis patients to and from treatment, under certain conditions. The ambulance transport service provider must be an approved supplier of ambulance services with a unique Medicare provider number. The transport must be medically necessary. The general rule is that Medicare will pay for ambulance transports "only if they are furnished to a beneficiary whose medical condition is such that other means are contraindicated. The beneficiary's condition must require both the ambulance transportation itself and the level of service provided in order for the billed service to be considered medically necessary." 42 C.F.R. § 410.40(d)(1). For nonemergency ambulance transportation to be "appropriate," the beneficiary must be either "bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated," or have a medical condition "regardless of bed confinement" "such that transportation by ambulance is medically required." *Id.* Bed-confinement is one factor in determining medical necessity, but not the "sole criterion." *Id.* The regulation states that "[f]or a beneficiary to be considered bed-confined, the following criteria must be met: (1) The beneficiary is unable to get up from the bed without assistance. (2) The beneficiary is unable to ambulate. (3) The beneficiary is unable to sit in a chair or wheelchair." *Id.*

A special rule for nonemergency, scheduled, repetitive ambulance services, such as the dialysis transports at issue in this case, states: "Medicare covers medically necessary nonemergency, scheduled, repetitive ambulance services if the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician

3

certifying that the medical necessity requirements of paragraph (d)(1) of this section are met."  42

C.F.R. § 410.40(d)(2).  These physician orders, known as Certificates of Medical Necessity (CMN),

must be dated "no earlier than 60 days before the date the service is furnished."  *Id.*  A separate

special rule, § 410.40(d)(3),  covers nonemergency ambulance services that are either unscheduled

or scheduled on a nonrepetitive basis.  Subsection 410.40(d)(3)(v) states: "In all cases, the provider

or supplier must keep appropriate documentation on file and upon request, present it to the

contractor.  The presence of the signed certification statement . . . does not alone demonstrate that

the ambulance transport was medically necessary.  All other program criteria must be met in order

for payment to be made."[1]

---

[1]  The "medical necessity requirements" subsection in the regulation states as follows:

> (1) General rule. Medicare covers ambulance services, including fixed wing and rotary wing ambulance services, only if they are furnished to a beneficiary whose medical condition is such that other means of transportation are contraindicated. The beneficiary's condition must require both the ambulance transportation itself and the level of service provided in order for the billed service to be considered medically necessary. Nonemergency transportation by ambulance is appropriate if either: the beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required. Thus, bed confinement is not the sole criterion in determining the medical necessity of ambulance transportation. It is one factor that is considered in medical necessity determinations. For a beneficiary to be considered bed-confined, the following criteria must be met:

> (i) The beneficiary is unable to get up from bed without assistance.

> (ii) The beneficiary is unable to ambulate.

> (iii) The beneficiary is unable to sit in a chair or wheelchair.

> (2) Special rule for nonemergency, scheduled, repetitive ambulance services. Medicare covers medically necessary nonemergency, scheduled, repetitive ambulance services if the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements of paragraph (d)(1) of this section are met. The physician's order must be dated no earlier than 60 days before the date the service is furnished.

4

For administrative efficiency, carriers typically authorize payment for a provider's claims on receipt, absent glaring irregularities.  Carriers may conduct postpayment audits to verify that the payments were proper.  *See* 42 U.S.C. § 1395u; 42 C.F.R. § 421.200(a)(2).

## B.     The Evidence at Trial

In 2002, Ayad Fallah, Murad Almasri, and Raed Elmasri became the owners and operators of Unico International, Inc., dba Americare Medical Service ("Americare").  Americare provided

---

(3) Special rule for nonemergency ambulance services that are either unscheduled or that are scheduled on a nonrepetitive basis. Medicare covers medically necessary nonemergency ambulance services that are either unscheduled or that are scheduled on a nonrepetitive basis under one of the following circumstances:

(i) For a resident of a facility who is under the care of a physician if the ambulance provider or supplier obtains a written order from the beneficiary's attending physician, within 48 hours after the transport, certifying that the medical necessity requirements of paragraph (d)(1) of this section are met.

(ii) For a beneficiary residing at home or in a facility who is not under the direct care of a physician. A physician certification is not required.

(iii) If the ambulance provider or supplier is unable to obtain a signed physician certification statement from the beneficiary's attending physician, a signed certification statement must be obtained from either the physician assistant (PA), nurse practitioner (NP), clinical nurse specialist (CNS), registered nurse (RN), or discharge planner, who has personal knowledge of the beneficiary's condition at the time the ambulance transport is ordered or the service is furnished. This individual must be employed by the beneficiary's attending physician or by the hospital or facility where the beneficiary is being treated and from which the beneficiary is transported. Medicare regulations for PAs, NPs, and CNSs apply and all applicable State licensure laws apply; or,

(iv) If the ambulance provider or supplier is unable to obtain the required certification within 21 calendar days following the date of the service, the ambulance supplier must document its attempts to obtain the requested certification and may then submit the claim. Acceptable documentation includes a signed return receipt from the U.S. Postal Service or other similar service that evidences that the ambulance supplier attempted to obtain the required signature from the beneficiary's attending physician or other individual named in paragraph (d)(3)(iii) of this section.

(v) In all cases, the provider or supplier must keep appropriate documentation on file and, upon request, present it to the contractor. The presence of the signed certification statement or signed return receipt does not alone demonstrate that the ambulance transport was medically necessary. All other program criteria must be met in order for payment to be made.

5

ambulance transportation in Houston, Texas, primarily for Medicare beneficiaries who needed dialysis treatment on a regularly scheduled, nonemergency basis. Raed Elmasri, Americare's president, was responsible for complying with the licensing and paperwork requirements imposed by Medicare and the Texas Department of Health. Murad Almasri, Raed's younger brother, was the vice-president. He handled marketing and advertising. Ayad Fallah, who had trained as a doctor in Lebanon and Russia and was a licensed EMT, directed Americare's day-to-day operations. Americare had a City of Houston Ambulance Service Permit, a Texas Emergency Medical Service Provider license, and a Medicare provider number.

Each Americare EMT filled out a run sheet for each trip, documenting the EMT's information about each patient's medical condition at the time of the transport. A run sheet included a brief statement of medical history and identified the patient's condition using descriptions such as diabetes, end-stage renal disease, shortness of breath, or general weakness. A run sheet also indicated by using specified codes whether each patient was bed-confined and required movement by stretcher between the home or the dialysis center and the ambulance. Americare EMTs turned the run sheets in to the Americare office, which in turn submitted the sheets to a billing office. The billing office prepared the claims for submission to Medicare for payment to Americare. The billing office used the run-sheet information and codes to bill Medicare for the ambulance transport.

Americare initially used a company called Express Billing to perform billing services. After roughly one year, Americare switched to Structure Billing, which it used from 2003 to 2005. Evelyne Almasri, Murad's wife, began doing Americare's billing in 2005. Evelyne Almasri used a computer software program called Medisoft that was set up to bill Medicare based on the diagnosis codes entered on the run sheet for each ambulance transport. During the relevant period, Medicare

would pay healthcare providers such as Americare approximately $225 for each trip, or $450 for each round-trip transport, for ambulance transport services.

When Fallah and Murad Almasri owned Americare, Almasri was in charge of obtaining patients to use Americare's ambulance transport service. When Americare began operating in 2002, Murad Almasri looked for potential patients at dialysis centers, nursing homes, and hospitals. Dialysis patients typically have three appointments per week that require some form of transportation. Many of the dialysis patients that Murad Almasri recruited to ride in Americare ambulances were initially clients of other ambulance companies. Fallah testified at trial that the ambulance transport business in Houston was highly competitive. In 2002, when Americare began operating, there were approximately 60 ambulance companies in Houston, and by 2007, there were approximately 300 companies. When Murad Almasri had difficulty recruiting patients to switch from the ambulance company they were using to Americare, he offered them cash payments as an incentive. These cash payments were made on a monthly basis for as long as the patient used Americare for ambulance transport to their dialysis treatments. Fallah testified that Murad Almasri was paying approximately one out of ten Americare patients to use Americare's ambulance service.

Murad Almasri testified that in 2005, he recruited a man named Leobaldo to use Americare for ambulance transport to and from dialysis. At the time, Leobaldo was using another ambulance company. Leobaldo's son-in-law, Sameh, was a friend of Murad Almasri's and had worked at Americare for a brief period. Murad Almasri paid Sameh $1,000 up front, then $200 to $300 a month while Leobaldo used Americare for transportation to dialysis. Almasri also testified that in late 2005 or early 2006, he began paying Margarita Gomez $200 a month to use Americare's ambulance service. Gomez began using Americare in 2004 and received treatment at Fondren

Dialysis Center.  She was referred to Americare by Kelvin Washington, a nursing home administrator whom Americare paid to solicit dialysis patients.  A social worker at Fondren Dialysis believed that Americare's clients were not medically eligible for ambulance transport to dialysis and stated that Americare could no longer transport Fondren patients to treatments.  Gomez stopped using Americare for transportation to dialysis.  After Murad Almasri told Washington that some of his referrals, including Gomez, were not being allowed to be transported to Fondren Dialysis Center, the Center began allowing Americare to transport patients there again.  Murad Almasri convinced Gomez to return to Americare's service by giving her the $200 monthly payment.  These payments subsequently increased to $250 a month.  Almasri testified that he paid cash to about seven patients (or their family members), including Leobaldo and Gomez, to use Americare's ambulance service.

Murad Almasri testified that he met a City of Houston Metro-Lift driver named Mohamed while recruiting patients for Americare at a dialysis center.  Metro-Lift is a public transportation service.  It picks individuals up at their home or other designated place and provides curb-to-curb transportation service using specially equipped vans and sedans.  The service is for individuals whose physical condition precludes them from using conventional public transportation.  Using Metro-Lift requires physician approval.  Metro-Lift is not an ambulance and does not provide ambulance service.  Murad Almasri paid Mohamed for his current Metro-Lift "manifest" or a list of the patients he drove to and from dialysis on a regularly scheduled basis.  Almasri initially paid Mohamed $30 for each name of a dialysis patient on the manifest who used a wheelchair.  (Docket Entry No. 374, at 24).  Murad Almasri did not initially ask Mohamed for the names of other types of Metro-Lift customers.  (*Id.*).  Murad Almasri's attempts to recruit patients from these Metro-Lift lists were largely unsuccessful.  He then asked Mohamed to continue providing updated Metro-Lift

manifests and agreed to pay Mohamed $400 for every patient from those manifests who signed up to ride to dialysis with Americare instead of Metro-Lift.  From 2004 to 2006, Murad Almasri paid Mohamed for approximately eight or nine patients who had been on the Metro-Lift manifests and agreed to use Americare ambulances to go to and from dialysis treatment on a regularly scheduled, nonemergency basis.

Fallah also paid to solicit individuals to ride to and from dialysis on Americare ambulances. Fallah testified that he entered into an arrangement with Kelvin Washington, the administrator of Sugar Land Nursing Home (SLNH), to pay Washington to have patients at the nursing home use Americare ambulances to travel to and from their dialysis treatments.  Fallah met Washington while Fallah was driving Americare ambulances as an EMT.  Washington told Fallah that SLNH's agreement with another ambulance service company was about to expire.  Washington and Fallah entered into an agreement that Americare would be the primary provider of ambulance services for SLNH patients.  This arrangement gave Americare access to a new source of customers.  Dialysis patients typically did not stay at SLNH long term.  Once these patients returned home, Americare would recruit them to continue using the ambulances to ride to and from dialysis.

Americare paid Washington for these patients.  America initially agreed to pay Washington $500 for every new dialysis patient who came to SLNH and who would ride on America ambulances to and from dialysis.  Americare made the first payment by check on November 11, 2003. Washington suggested that the memo notation on this check state "petty cash."  The notation on subsequent checks from Americare to Washington stated "commission."  By early 2006, Americare was paying Washington $1,000 for every dialysis patient at SLNH who rode to and from treatment on Americare ambulances.  At trial, the government presented several of these "commission" checks

made out to Washington between November 2003 and June 2006.

In late 2004, Tina, the owner of Structure Billing, told Fallah about problems with the run sheets being filled out by Americare EMTs. Fallah testified that according to Tina, Medicare had denied several claims because of information the EMTs had put on the run sheets about the patient's condition. The information included details like observing the patient sitting in a wheelchair on arrival. Tina told Fallah that if a run sheet indicated that the patient was able to sit in a wheelchair, Medicare would likely deny the claim. Fallah testified that he asked Tina to explain the run sheet mistakes to the Americare EMTs. Tina subsequently came to Americare and told the EMTs how to fill out the run sheets to avoid having them declined by Medicare.

The jury heard evidence that during the period of Raed Elmasri, Murad Almasri, and Fallah's ownership, some of the clinical social workers at dialysis centers believed that some of Americare's clients were not medically eligible for Medicare-provided ambulance transport to dialysis treatments. The evidence showed that Murad Almasri knew of these concerns. Almasri testified that in late 2005 or early 2006, a social worker at Fondren Dialysis Center told Americare it could not transport patients there any more. Vanessa Beltran, a social worker at a DaVita Kidney Dialysis center, testified that her observations of a patient named Richard Didsbury led her to conclude that he did not need an ambulance to get to dialysis. She told Didsbury that she did not believe that he qualified for ambulance transport under Medicare's criteria.

By late 2005, Americare was transporting, each month, approximately 29-31 patients by ambulance to and from their regularly scheduled dialysis treatments. At trial, the government presented evidence that some of these patients could walk or sit in a wheelchair at the time of transport. The government also presented evidence that some of Americare's clients were medically

able to travel to dialysis treatments by means other than ambulance. Several of the patients transported by Americare, including Leobaldo Pereznegron, had been using, and were able to use, Metro-Lift for transportation to dialysis. Fallah testified that when Americare did not have an available ambulance and he could not get a back-up ambulance from another company, Americare's owners transported the patient to or from dialysis in private cars. Fallah knew of two occasions on which Murad Almasri had picked up Margarita Gomez in his own car – not an ambulance – and taken her home from her dialysis treatment.

Mazen and Wesam Abdallah are first cousins of Murad Almasri and Raed Elmasri. The Abdallah brothers came to Houston from New Orleans in the fall of 2005 after their family's home and business were destroyed in Hurricane Katrina. When they arrived in Houston, the Abdallahs did not have jobs and stayed at Raed Elmasri's apartment. Mazen Abdallah was a recent law-school graduate. While at Americare's office, Mazen Abdallah met Fallah and asked him about the ambulance service business in Houston. Fallah told Mazen Abdallah that the business was good and that Americare was making more than a million dollars a year in profit. Mazen and Wesam Abdallah told Raed Elmasri that they wanted to start their own ambulance company to transport dialysis patients. Raed Elmasri told the Abdallahs that it typically took up to one year for a new ambulance company to obtain the necessary licenses, certifications, and Medicare provider number. He recommended that the Abdallahs begin recruiting patients to Americare while they worked on obtaining the necessary documents. Any patients the Abdallahs recruited would use Americare until the Abdallahs opened their own company. Raed Elmasri offered Mazen and Wesam Abdallah 25% of all amounts paid by Medicare for these patients. Once the Abdallahs obtained the necessary documents to start their own ambulance company, they would take these patients with them.

11

Murad Almasri taught the Abdallahs how to recruit dialysis patients to use a particular ambulance service to ride to and from dialysis.  At trial, Almasri testified about taking Mazen and Wesam Abdallah with him, separately, to show them how to recruit dialysis patients to be Americare clients.  Almasri testified about two specific instances when he and Mazen Abdallah went to visit a potential customer.  One was to Edna Anderson, a dialysis patient who was using another ambulance service.  Almasri testified that before this visit, he told Mazen Abdallah that Americare paid patients to ride in Americare ambulances to and from dialysis.  During the visit, both Murad Almasri and Mazen Abdallah talked with Edna Anderson about Americare's ambulance service.  Anderson's daughter, Patricia Williams, testified at trial that she and her mother were approached by Murad Almasri and Americare's lawyer, whose name she could not recall, and that Almasri offered her mother money to use Americare's ambulance transport service.  Anderson was offered $1,000 to switch to Americare.  According to Almasri, Mazen Abdallah identified himself as Americare's attorney and told Anderson that she didn't have to worry because Americare was a legitimate company and everything was legal.  Anderson rejected the offer and did not switch to Americare.  The other visit was to an elderly woman whose name and address Murad Almasri had obtained from Mohamed at Metro-Lift.  Almasri could not recall the woman's name at trial.  Before the visit, Murad Almasri told Mazen Abdallah about his arrangement with Mohamed and that the woman's name and address had come from a Metro-Lift manifest.  During the visit, Almasri did most of the talking with the woman, although Mazen Abdallah did talk with the woman's daughter.  Murad Almasri testified that the woman rejected their offer of payment to use Americare.

Murad Almasri also told Wesam Abdallah that Americare paid patients to use its ambulance service for regular dialysis treatment transportation and about recruiting patients from Metro-Lift

manifests obtained from Mohamed.  (Docket Entry No. 374, at 67–68).  Shortly thereafter, in November 2005, Wesam Abdallah began working as a van driver for Metro-Lift.  He worked at Metro-Lift for a few months.  Almasri testified that Wesam Abdallah began obtaining Metro-Lift manifests from work and recruiting his own ambulance patients from those manifests.  Murad Almasri was still obtaining Metro-Lift manifests from Mohamed.

Before purchasing and operating Americare, Mazen and Wesam Abdallah recruited approximately seven patients to ride with Americare.  At trial, the government presented several commission checks for the Abdallahs's 25% share for these patients.  All the checks were made out to Wesam Abdallah.  Fallah testified that although some of the patients had been recruited by Mazen Abdallah, he wanted all the commission checks in his brother Wesam's name.  According to Fallah, Mazen Abdallah still received his share of the commissions from his brother.

 In late March or early April 2006, Fallah told Mazen Abdallah that he, Raed Elmasri, and Murad Almasri were interested in selling Americare.  Mazen Abdallah had discussions with all three men about buying Americare.  Fallah testified that during one of the discussions, he told Mazen Abdallah about Americare's agreement to pay Washington $1,000 for every dialysis patient he brought to SLNH.  Fallah took Mazen Abdallah to meet Washington at SLNH in May 2006.  At the meeting, Fallah told Washington that Mazen Abdallah would be the new owner of Americare.

On June 16, 2006, Mazen Abdallah and Will Smith[2] purchased Americare from Raed Elmasri, Murad Almasri, and Fallah for $2.2 million.  Mazen Abdallah drafted the legal documents for the sale.  One of the documents, titled "Unico International, Inc., Waiver of Notice of Meeting

---

[2]   Smith is a professional football player and Mazen Abdallah's friend.  He has not been charged in connection with this case.

and Unanimous Consent of Shareholders in Lieu of Meeting," stated that Mazen Abdallah was elected president, secretary, and registered agent of the corporation and that Smith was elected vice-president. The document stated that Raed Elmasri and Fallah would each relinquish their one-third ownership of the corporation's stock. Murad Almasri would relinquish his one-third stock ownership but would retain a one-percent ownership interest. Both Murad Almasri and Fallah testified that Mazen Abdallah included the one-percent retained-ownership provision so that Americare's new owners could continue to receive Medicare payments. (Docket Entry No. 374, at 108–13). If Americare had completely new ownership, Medicare would stop paying claims until the new owners applied for and received a new Medicare provider number. (*Id.* at 111–12). Murad Almasri testified that he never received payment or compensation for the one-percent ownership he retained in Americare, which was intended to allow the Abdallahs to continue to use the existing Medicare provider number. (*Id.* at 111).

Fallah testified that Americare typically received Medicare payments three weeks after a particular transport. The parties agreed at the time of sale that Raed Elmasri, Murad Almasri, and Fallah would receive the Medicare payments received for transports performed before June 16, 2006. To help the new owners cover Americare's operating expenses until they received Medicare payments for transports conducted after the sale date, Raed Elmasri, Murad Almasri, and Fallah gave Mazen Abdallah a $100,000 loan. According to Fallah, Mazen instructed Fallah and Murad Almasri to write Americare checks to themselves and to pay him with cashier's checks. At trial, the government introduced two checks written from Americare's account totaling $100,000. One was payable to Fallah for $34,000 and signed by him, and the other was payable to Murad Almasri for $66,000 and signed by him. Murad Almasri testified that they cashed these checks and gave Mazen

Abdallah the $100,000 loan in a cashier's check.  The loan was to be repaid in August 2006.

After the sale, Mazen and Wesam Abdallah operated Americare.  Mazen asked Fallah to stay at Americare as a consultant for up to two months.  Fallah worked as a consultant at Americare for two weeks after the sale.  He helped to schedule the ambulance transports and ensure that the run sheets and CMNs were in order.

Fallah testified that during this transition period, he and Mazen Abdallah were in Americare's office reviewing and discussing CMNs or prescriptions for ambulance transport to and from regular dialysis treatments.  Mazen Abdallah asked Fallah what to do if the patient's nephrologist refused to sign the certification form.  Fallah said that he should ask the patient's primary care doctor to sign the CMN.  Mazen Abdallah told Fallah that there was a patient for whom neither doctor would sign the medical necessity form.  Fallah told Mazen Abdallah that sometimes they called "easy" doctors who would look at a patient's medical file and sign a CMN for ambulance transport.  During this conversation, Mazen Abdallah was holding an unsigned CMN in front of him.  Fallah testified that Abdallah gestured with his pen as if to sign the form and said, "What if we sign it by ourselves?"  Fallah responded that Medicare could audit the company and discover that it was not the doctor's signature.  At trial, Fallah testified that while reviewing the medical necessity forms the very next day, the unsigned CMN Mazen Abdallah had been holding was signed.  Fallah testified he did not know for sure if it was signed by Mazen Abdallah but that it had a signature and was in the stack of signed CMNs.

On June 30, 2006, Mazen Abdallah met with Washington and Raed Elmasri and Murad Almasri at a Houston restaurant to discuss continuing the relationship between SLNH and Americare.  At the meeting, Raed Elmasri brought up the fact that Americare had been paying

Washington $1,000 for every dialysis patient he brought to SLNH.  According to Fallah and Murad Almasri, Mazen did not object or disagree with continuing this arrangement.

After the Abdallahs were indicted, FBI agents searched Mazen Abdallah's home pursuant to a warrant on June 13, 2007.  A Quicken log obtained from a computer during the search references a lunch meeting with the "SLNH Administrator" on June 30, 2006.  (Government's Trial Exhibit 113).  At trial, the government presented evidence that Americare continued to pay Washington after Mazen Abdallah bought the company.  Mazen Abdallah signed a $1,000 "commission" check made out to Washington on July 20, 2006.  (Government's Trial Exhibit 1.12.1d).  A $1,000 commission check signed by Mazen Abdallah and dated August 25, 2006 was for patient M.H.  (Government's Trial Exhibit 1.12.1e).  Marine Hanchett was a patient at SLNH from August 28, 2006 to November 25, 2006.  (Government's Trial Exhibit 61).  The government presented CMNs for Marine Hanchett signed by Dr. Kurt Merkelz, who worked at SLNH, dated September 13, 2006, February 2, 2007, and April 2, 2007.  Each of these CMNs stated that Marine Hanchett was bed-confined.  (Government's Trial Exhibit 1.12.3).  Dr. Merkelz testified that he had never treated or seen Marine Hanchett and that he signed the form without any information about her medical condition.  Dr. Merkelz, who spent several hours each week at SLNH, testified that he had signed similar forms for patients he did not treat or know.  Dr. Anil Thacker, who also worked on a part-time basis for the nursing home, gave similar testimony.

The government presented evidence that Americare obtained a number of signed CMNs from Washington at SLNH, signed by Dr. Merkelz and Dr. Thacker, for patients they had not seen. Americare EMTs Michael Montalbano and Kathleen Bell testified that Wesam Abdallah gave them envelopes to deliver to Washington at SLNH.  Bell testified that the envelopes she received were

16

sealed and she did not know what was in them.  (Docket Entry No. 354, at 44:2–18).  Montalbano testified that on one occasion, he opened an envelope that Washington gave him to bring back to Wesam Abdallah.  Montalbano testified that the envelope contained CMNs for Americare clients signed by Dr. Merkelz and Dr. Thacker.  Some of these CMNs were for clients Montalbano had been transporting.  Montalbano knew that these clients were not SLNH residents.

The government also presented evidence that some of the CMNs found at Americare had photocopied physician signatures.  Stormy Kelly, an employee of the Texas Medicaid Fraud Control Unit, testified that in reviewing the CMNs she found forms on which inspection showed that the doctor's signature had been photocopied from a prior CMN and only the dates had been changed. Kelly came to this conclusion by holding the CMNs up to the light and finding that the signatures "lined up exactly."  (Docket Entry No. 364, at 25:5–16).

In addition to clients obtained through Washington at SLNH, Americare clients also came from Metro-Lift manifests.  Government's Exhibit 1.15 is a group of documents found in a folder in the garage of Mazen Abdallah's home during that search.  Exhibit 1.15 includes Metro-Lift manifests and typed lists of client names.  Beneath each name are blanks for the client's address, dialysis treatment center, "condition," and "comment."  The medical conditions listed include "wheelchair," "cane," "blind," and "ambulatory."  The comments describe the level of interest in ambulance transport with Americare, such as: "Possibility: Mother Against It"; "Former Client. Social Worker Drama"; "Will subscribe once Bisonnet Dialysis opens"; and "Wife Ain't Having It!" One patient, Johnny Brooks, has "wheelchair" listed next to his condition, but the comment states "He Walks."

Government's Exhibit 1.9, referred to at trial as "The List," was found in Mazen Abdallah's

home office during the search.  The "List" is of Americare clients and the amounts paid to each, both an initial sign-up payment and a monthly payment.  There is a heading for "miscellaneous" payments made to several clients.  There are also payments set out under a heading for "Kelvin Washington."  Some of the clients on the list, like "Leobaldo– $200 (monthly); $1000 (saving sign up)," began using Americare before June 2006, but continued using the service after the change of ownership.  And other clients on the list, like Ray "Stevenson– $200 (monthly)," began using Americare only after the Abdallahs bought the company in June 2006.

Additional evidence about Wesam Abdallah's involvement in making payments to clients to recruit them to ride to and from dialysis treatments in Americare ambulances came from Murad Almasri's testimony.  (Docket Entry No. 374, at 100).  He stated that Wesam Abdallah asked him and David, a Salvadorian mechanic who worked for Americare, to visit a Spanish-speaking woman to convince her to use Americare's services.  Murad Almasri testified that he speaks a little Spanish and that David's English was not very good.  (*Id.*).  When the three men arrived at the home, the woman was not there, so they spoke with her husband, Alfredo Garcia.  Murad Almasri testified that at Wesam Abdallah's urging, they offered the husband cash payments if his wife agreed to be transported by Americare.  Garcia testified that he was opposed to accepting any money, but left the decision up to his wife, Estella Garcia.  She decided to accept a $500 initial payment and began using Americare for transportation to dialysis.  Garcia's name is on "The List," with the notation "$500 (initial sign up)."  (Government's Trial Exhibit 1.9).

Evelyne Almasri formed A&A Billing on June 19, 2006 to perform the billing services for Americare after the sale to the Abdallahs.  (Docket Entry No. 355, at 5).  Evelyne Almasri earned a salary from Americare when she did the billing in-house, but after the sale to the Abdallahs, she

was paid a percentage of the total billings. Typically, Wesam Abdallah or Americare EMTs gave Evelyne Almasri the completed run sheets, which she used to enter the codes into the computer billing system to prepare the bills and submitted those bills to Medicare or Medicaid. (*Id.*, at 24–25). Evelyne Almasri testified that if a run sheet did not indicate that the patient was bed-confined, she would call Wesam Abdallah and ask him whether that patient was bed-confined. According to Evelyne Almasri, Wesam Abdallah never told her that he would have to check the patient's records. Instead, he always immediately responded that the patient she had inquired about was bed-confined. Evelyne Almasri testified that either because the run sheet showed that the patient was bed confined or because Wesam Abdallah told her that was the patient's condition, she marked bed-confined on the bill for each and every Americare patient for whom she billed Medicare for an ambulance transport when the Abdallahs owned and operated the company. She also testified that within months of the sale to the Abdallahs, the number of patients Americare was transporting increased from around 25-30 to approximately 50.

As the August 2006 due date for the $100,000 loan approached, Mazen and Wesam Abdallah told Murad Almasri that they felt that they had overpaid for Americare and would not pay back the loan. Murad Almasri told Fallah about the Abdallahs' intentions. Fallah called Mazen Abdallah the day before the due date to discuss repayment. Fallah recorded this phone call, and the government played the recording at trial. During the conversation, Fallah and Mazen had an argument about the number of patients the Abdallahs received as a result of the sale of Americare. Before the sale, Americare had an arrangement with a man named Naief Abukhalid to recruit clients, identical to the arrangement with the Abdallahs. Abukhalid was also interested in starting his own ambulance company. He recruited clients for Americare while he waited for the necessary licenses

19

and Medicare provider number for his own company, which became American Care EMS.  In the interim, those clients rode with Americare and Abukhalid was paid for recruiting them.  After Abukhalid's company, American Care, became licensed, the clients would shift to the new company. Fallah testified that everyone knew at the time of the Americare sale to the Abdallahs that there were 42 patients, 31 who "belonged to" Americare and were part of the sale to the Abdallahs and 11 who "belonged to" Abukhalid and would eventually ride with American Care.  In the phone call, Fallah said that he and Raed Elmasri and Murad Almasri had given the Abdallahs everything they bargained for and reminded Mazen that he had introduced him to Washington, a source of new clients.  After the call ended, Fallah called back and said that he forgot to tell Mazen  that "the process Americare is doing right now, it might get you in trouble with FBI, TDH, or [unintelligible] like your brother is [unintelligible]."  (Government's Trial Exhibit 1.11.1.a).

In the summer of 2006, an EMT named Brooke Mahalec left her job at Care Plus EMS, an ambulance transport company, and began working at Americare.  While working at Care Plus, Mahalec had successfully recruited Ray Stevenson, a dialysis patient, to switch from riding on Freedom EMS to Care Plus.  Stevenson had been riding with Care Plus for about four months when Mahalec went to work for Americare.  While using Care Plus, Stevenson had applied for a permit to use Metro-Lift but was denied on the basis of medical ineligibility.  Mahalec asked Stevenson to switch to Americare so that she could earn a commission from "Wesam," who she described as Americare's owner.  Mahalec told Stevenson that if he began using Americare's service, she would split her $1,000 commission with him.  Stevenson used Americare for a few weeks in July 2006 and then switched back to Care Plus.  He received no payment from Mahalec.  After Stevenson returned to using Care Plus, he was approved for transportation by Metro-Lift but did not immediately switch

to that shared-ride service.

On August 2, 2006, the FBI contacted Stevenson and asked for his help in getting information about Americare.  Stevenson agreed to set up a meeting with Wesam Abdallah.  Stevenson subsequently called Mahalec, obtained Wesam's contact information, and scheduled a meeting with him for September 1, 2006 at Stevenson's apartment.  Before the meeting, FBI agents set up recording equipment in Stevenson's apartment and gave him a recording device to keep in his pocket.

Stevenson had a lengthy medical history, including severe diabetes that had led to the amputation of several toes.  Stevenson had been in a coma for approximately seven months during 2004 and for several months afterward had difficulty walking and other severe medical problems.  He required dialysis several times each week.  Stevenson testified that at the time of this meeting, in August and September 2006, he was capable of walking, driving, and going up and down the stairs of his second-floor apartment.  He occasionally used a cane when pain in his right foot, the result of his toes being amputated, bothered him enough that he needed to use it.

At trial, the jury was shown a videotape of the meeting between Wesam Abdallah and Ray Stevenson.  The meeting lasted about 15 minutes and was only between the two men, in Stevenson's apartment.  Stevenson is shown walking with his cane at the beginning, then sitting, unaided, on the couch.  After Stevenson said that he was using Care Plus for transportation to dialysis, Wesam Abdallah said "They're not giving you nothing?"  Stevenson testified he understood Wesam Abdallah was asking whether Care Plus was paying him for using that ambulance transport service.

After a few minutes, Wesam Abdallah said he was feeling "uncomfortable" and asked to step outside of the apartment onto the front steps.  Stevenson got up from the couch without help and

walked outside with Wesam Abdallah and they continued their conversation.  Abdallah told Stevenson, "I'll take care of you.  I mean, I don't do business with the whole world.  Do you understand?"  Stevenson understood this to be an offer to pay him to use Americare's ambulance service.  Wesam Abdallah continued, saying, "[I]f you want to deal with me, man, it has to be between me, you, and God.  Nobody else.  You have to keep it that way.  Look, I've got too much to lose.  You understand?  I've got too much to lose for you or everybody else."  Abdallah stated, "Either way it goes with her, now whether or not we get that signature or not, okay, I'm going to guarantee 500.  All right?  I'm going to guarantee it for you . . . If you don't get it done, we'll help you.  We'll find one.  All right. Whatever it takes."  Stevenson testified this meant regardless of what Mahalec did, Wesam Abdallah would pay Stevenson $500 if he was able to get a signed CMN prescribing ambulance transport to and from dialysis, and that if Stevenson was unable to get one of his two doctors to sign a CMN, Wesam Abdallah would find a doctor who would do so.  Abdallah also told Stevenson, "Secondly, I'll slip you two a month. All right?"   Stevenson testified that Wesam Abdallah would pay him $200 a month as long as Stevenson used Americare.

Stevenson's name was on Government's Exhibit 1.9, the list of clients found in the study of Mazen Abdallah's home.  This list had notations about payments next to the client names, such as "$200 (monthly); $500 (initial sign up)." (Government's Trial Exhibit 1.9).  Next to Stevenson's name was a hand-written notation of "$200 (monthly)," consistent with what Wesam Abdallah told Stevenson in their videotaped meeting about "slipping" him "two a month."  (*Id.*).

After the September 1, 2006 meeting with Wesam Abdallah, Stevenson began riding with Americare again.  When the Americare EMTs picked Stevenson up from his apartment, they gave him blank CMNs to take to his doctors.  Stevenson's doctors included a cardiologist, Dr. Shenoy,

and a nephrologist at Acres Homes Dialysis Center, Dr. Malya.  When Stevenson was using Freedom EMS, he had received signed CMNs for ambulance transport from Dr. Malya.  There was evidence that as late as March 2006, Stevenson had received a signed CMN from Dr. Shenoy for ambulance transport by Care Plus.  Stevenson saw Dr. Shenoy in April 2006 for chest pains and pains in his legs, and in June 2006 for chest pains, pains in his hip, and dizziness.  In September 2006, Stevenson took the blank CMNs he received from Americare to his two doctors.  Neither doctor would sign the CMN authorizing Stevenson as medically eligible for Medicare transport.  Dr. Malya threw the form in the trash.  Dr. Shenoy told Stevenson that he would not sign it because Stevenson did not need ambulance transport.

On October 3, 2006, Wesam Abdallah told Stevenson that he knew a doctor in Sugar Land who made house calls and, if needed, would evaluate Stevenson and sign a CMN stating that he needed ambulance transport to and from dialysis.  Stevenson testified that no doctor ever came to evaluate him at his apartment.

The government presented evidence that Americare transported Stevenson to and from dialysis treatments on July 18, 2006, November 7, 2006, and December 2, 2006.  Stevenson testified that on those days, like all other days on which Americare transported him, he could walk and would enter and exit his second-floor apartment to get to and from the ambulance by using the stairs.  The government introduced into evidence a CMN for Stevenson signed by Dr. Merkelz and dated October 20, 2006 which states that ambulance transport was medically necessary because Stevenson was bed-confined and other means of transportation were contraindicated.  (Government's Trial Exhibit 30.8).  There was no evidence that Stevenson was ever a resident at SLNH.  (Government's Trial Exhibit 61).  At trial, Dr. Merkelz testified that he never saw or treated Stevenson.  Americare

23

billed Medicare $1,388.00 for the trips on July 18, 2006, $1,388.00 for the trips on November 7, 2006, and $1,388.00 for the trips on December 2, 2006. (Government's Trial Exhibit 1.47-28). Medicare paid Americare $435.90 for each of these three dates. (*Id.*).

After Stevenson quit using Americare for the second time, he began using Metro-Lift for transportation to and from his dialysis treatments. He continued to use Metro-Lift up until the time of trial.

The government also presented testimony from other Americare clients, including Estella Garcia and Reginald Batiste, about payments they received to use Americare. Murad Almasri and Wesam Abdallah paid Garcia $500 to begin using Americare. Garcia's name is on "The List," with the notation "$500 (initial sign up)." (Government's Trial Exhibit 1.9). Exhibit 1.15, the type-written list of Americare clients found in Mazen Abdallah's home, stated that Garcia used a wheelchair. The run sheets for Garcia stated that she was bed-confined. Batiste testified that Wesam Abdallah paid him to begin using Americare. The "List" shows that Batiste was paid $100 on August 17, 2006. (*Id.*). Batiste had diabetes, end-stage renal disease, was blind, and a double amputee. The government presented evidence that, notwithstanding his ailments, he was able to and did use a wheelchair during the period of Americare transports. The run sheets for Batiste stated that he was bed-confined.

Batiste testified that Wesam Abdallah also offered to pay him if he referred other dialysis patients to Americare. Batiste referred Joseph Yanowski, but never received money for the referral and was not sure if Yanowski ever used Americare. Under the heading "Miscellaneous" on "The List," it states "Reginald Batiste – $ ___ (Commission for Yanowski)." (*Id.*). Americare transported Yanowski to his dialysis treatments between September and November 2006. Yanowski had end-

stage renal disease, diabetes, and hypertension.  Due to his diabetes, he had one foot amputated and

lost some toes on his other foot.  The government presented evidence that, notwithstanding his

ailments, in fall 2006 he was able to and did use a wheelchair.

Sophronia Ladmirault, Lucendia Reed, and Oranell Lee were also paid to use Americare.

On "The List" it states "Sophronia – $200 (monthly); $500 (initial sign up)."  (Government's Trial

Exhibit 1.9).  Ladmirault had renal disease and was recovering from leg surgery during the time

period Americare transported her to dialysis.  There was evidence that she was able to sit in a chair

or wheelchair during this time frame.  The government presented a CMN for Ladmirault signed by

Dr. Merkelz of SLNH on April 2, 2007.  It was undisputed that Ladmirault was never a patient at

SLNH.  With respect to Lucendia Reed, "The List" stated "Lucendia – $250 (monthly); $500 (initial

sign up)."  (*Id.*).  Reed had renal disease but was able to walk.  The government presented evidence

that her attending physician had described her walking pattern and her ability to stand without

holding onto anything as normal.  Several CMNs signed by Dr. Merkelz certified that Reed was

medically eligible for ambulance transport.  It was undisputed that Reed too was never a patient at

SLNH.  With respect to Lee, "The List" stated "Oranell Lee – $250."  (*Id.*).  The government

presented evidence that Americare transported Lee to dialysis treatments between June 2006 and

July 2007.  The run sheets stated that Lee was bed-confined.  Lee had renal disease and had hip

replacement surgery in March 2006.  She underwent rehabilitation and was unable to walk without

help but was able to use a wheelchair during the relevant time frame.  Dr. Debra Patterson, the

government's expert witness, testified that Lee's medical records showed that she was not bed-

confined, as defined by the Medicare regulations, and transportation by other means was not

contraindicated.

The government also presented evidence about Americare's transport of Yolanda Vargas. Vargas testified that when Americare ambulances came to pick her up in 2006 and 2007, she often walked out of her house, down the front stairs, and onto the stretcher.  After she moved to the back of her house, Americare EMTs began helping her walk down the back stairs and onto the stretcher. For all of her transports, upon arrival at the dialysis center Vargas was transferred from the stretcher to a wheelchair and wheeled inside for treatment.  Vargas testified that during this period of time, she walked to the grocery store two blocks from her home about four times.  She also testified that one time she walked to a store that was "around the corner" from her dialysis center.  Vargas testified that she used an ambulance service for transportation to dialysis because she had extreme difficulty walking and could not "catch a bus."  By the time of trial in April 2008, Vargas's condition had worsened and she was using a wheelchair when she testified in court.

At trial, Dr. Patterson testified for the government about Vargas's numerous medical ailments, including diabetes, high blood pressure, end-stage renal disease, abnormal blood protein, and deep vein thrombosis.  (Docket Entry No. 311, at 23–25).  She also testified that Vargas's medical records showed a history of asthma, shortness of breath, and depression.  (*Id.*).  Patterson testified that based on the information available to her, despite these medical conditions, Vargas was not medically eligible for Medicare coverage for ambulance transport to and from dialysis. Patterson stated that, based on her review of the run sheets for the transports on November 23, 2006 and January 11, 2007, there was no indication that Vargas was bed-confined or that transportation by other means was contraindicated.  Vargas's dialysis treatment records for those two dates show that Vargas arrived at and left the dialysis center sitting unassisted in a wheelchair.  The government

26

presented a video taken after Vargas's dialysis treatment on January 11, 2007 which showed her walking from the ambulance up the front steps to her door with minimal assistance.

Vargas's two treating doctors testified that her medical condition was not such as to make ambulance transport to and from her regularly scheduled dialysis treatments medically necessary. Dr. Patel, her nephrologist, testified that he refused to sign a CMN for ambulance transport for Vargas.  Dr. McColloster testified that Vargas walked to his clinic for treatment and was not medically eligible for Medicare coverage for ambulance transport.  Americare used CMNs for Vargas signed by Dr. Thacker and Dr. Merkelz.  (Government's Trial Exhibit 2.8).  Vargas was never a resident at SLNH, (Government's Trial Exhibit 61), and Dr. Merkelz testified that he never saw or treated Vargas.  The Abdallahs presented an expert witness, Dr. Evans, who reviewed Vargas's medical records and opined that, based on her numerous ailments and diseases, ambulance transport to her dialysis treatments was medically necessary.

Some of the health care fraud counts in the indictment were based on Americare's transports of Vargas on October 31, 2006, November 23, 2006 and January 11, 2007.  Americare billed Medicare $1460.00 for the trips on each of these three dates. (Government's Trial Exhibit 1.47-30). Americare received $464.94 for the October 31 trips,  $464.94 for the November 23 trips, and $472.60 for the January 11 trips.  (*Id.*).

EMT Kathleen Bell testified that from November 2006 to April 2007, Wesam Abdallah was mainly responsible for the day-to-day operations of Americare, including scheduling, making sure the run sheets were collected, filled out, and submitted to the billing company, and obtaining CMNs. Evelyne Almasri testified that Mazen Abdallah was out of town during much of that period.

In January 2007, Mazen Abdallah and Will Smith entered into a purchase agreement to buy American Care from Naief Abukhalid and from Murad Almasri's parents.  Financing was obtained and the sale completed on March 26, 2007.  Evelyne Almasri testified that after Mazen Abdallah purchased American Care, he brought her the run sheets for American Care's clients.  (Docket Entry No. 355, at 27).  Evelyne Almasri testified that she dealt with Mazen Abdallah, not Wesam, in doing American Care's billing because Wesam was operating Americare.  (*Id.*, at 26).  In addition to bringing her the run sheets, Mazen Abdallah would pick up American Care's Medicare remittance notices.  Medicare remittance notices show the claims paid for each beneficiary under a particular check or electronic-funds transfer.

In early 2007, Murad Almasri went to Wesam Abdallah's apartment to talk to Mazen about problems with the Americare sale.  Both Mazen and Wesam Abdallah were present.  While there, Murad Almasri saw a stack of Metro-Lift manifests, approximately six inches high.  Murad Almasri knew that Wesam Abdallah was no longer working at Metro-Lift and asked where the manifests came from.  Wesam Abdallah replied that he had a connection with the dispatch people at Metro-Lift.  (Docket Entry No. 374, at 91–94).

On April 23, 2007, the Aballahs, along with Raed Elmasri, Murad Almasri, and Fallah, were charged with conspiracy to violate 18 U.S.C. § 1347 by submitting fraudulent claims for the ambulance transportation provided by Americare.  On October 15, 2007, a superseding indictment alleged that "[i]t was [the] object of the conspiracy that defendants unlawfully enriched themselves by false and fraudulently representing the conditions of Medicare and Medicaid beneficiaries in order to bill Medicare and Medicaid for transport by ambulance to regularly scheduled non-emergency dialysis treatments, when in fact defendants well knew that the beneficiaries did not

qualify for these transports." (Docket Entry No. 126). Raed Elmasri, Murad Almasri, and Fallah were charged with multiple counts of health care fraud under 18 U.S.C. § 1347 and § 2 for the dialysis transports of several patients. Mazen and Wesam Abdallah were charged with seven counts of health care fraud under 18 U.S.C. § 1347 and § 2 for dialysis transports of Yolanda Vargas, Mary Martinez, and Ray Stevenson. (*Id.*).

Wesam Abdallah, Raed Elmasri, and Murad Almasri were also charged with violating 42 U.S.C. § 1320a-7b(b)(2)(A), the antikickback statute, by paying to obtain patients who would use Americare. Raed Elmasri, Murad Almasri, Fallah, and Mazen Abdallah were charged with conspiracy to launder funds under 18 U.S.C. § 1956(h).

Murad Almasri and Fallah pleaded guilty to conspiracy to commit health care fraud and testified for the government at trial. Raed Elmasri remains a fugitive. The Abdallahs proceeded to trial. Mazen Abdallah was convicted of conspiracy to commit health care fraud and acquitted on the substantive health care fraud and money laundering counts. Wesam Abdallah was convicted of conspiracy to commit health care fraud, four substantive counts of health care fraud, and one violation of the antikickback statute. The four substantive counts of fraud were Counts 31 and 32, for Americare's ambulance transports of Stevenson on November 7, 2006 and December 2, 2006, respectively, and Counts 3 and 4, for the ambulance transports of Yolanda Vargas on November 23, 2006 and January 11, 2007, respectively.

The motions for acquittal, or in the alternative, a new trial, followed.

## II.     The Motion for Judgment of Acquittal

### A.     Legal Standard

"A motion for judgment of acquittal challenges the sufficiency of the evidence to convict." *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005) (quoting *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998)).  When the defendant challenges the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also United States v. Lopez-Urbina*, 434 F.3d 750, 757 (5th Cir.) (applying *Jackson*), *cert. denied*, 546 U.S. 1024, 126 S.Ct. 672, 163 L.Ed.2d 541 (2005).  The court considers the evidence, all reasonable inferences drawn therefrom, and all credibility determinations in the light most favorable to the prosecution.  *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008); *see also United States v. Resio-Trejo*, 45 F.3d 907, 910–11 (5th Cir. 1995).  The court's role does not extend to weighing the evidence or assessing the credibility of witnesses.  *Ramos-Cardenas*, 524 F.3d at 605.  The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence.  *Id.*; *see also Resio-Trejo*, 45 F.3d at 911.  The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001) (citation and internal quotation marks omitted).

**B.    Analysis**

**1.    Conspiracy to Commit Health Care Fraud**

The superseding indictment alleged that the Abdallahs conspired to violate the health care fraud statute and that "[i]t was an object of the conspiracy that defendants unlawfully enriched

themselves by falsely and fraudulently representing the conditions of Medicare and Medicaid beneficiaries in order to bill Medicare and Medicaid for transport by ambulance to regularly scheduled non-emergency dialysis treatments, when in fact defendants well knew that the beneficiaries did not qualify for those transports."  (Docket Entry No. 126, at 7).  As part of the conspiracy, the Abdallahs allegedly paid dialysis patients or their family members  to ride with Americare, regardless of whether the patients had conditions that made ambulance transport medically necessary.  The indictment alleged that the Abdallahs "falsely present[ed] prescriptions to nursing home staff in order to secure staff physicians' signatures for ambulance transports of dialysis patients who had never been under the care of the nursing home." (*Id.* at 9).  The indictment alleged several overt acts of the conspiracy, including the substantive counts of the indictment.

The Abdallahs argue that the evidence was insufficient to support a jury finding beyond a reasonable doubt that: 1) the individuals they transported were ineligible for Medicare coverage for ambulance transport; 2) the Abdallahs knew the patients were ineligible; or 3) they intentionally and falsely misrepresented the patients' medical conditions to Medicare.

To support a conviction for conspiracy under 18 U.S.C. § 371, the government must prove: (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.  *United States v. Dadi*, 235 F.3d 945, 950 (5th Cir. 2000).  To support a conviction for health care fraud under 18 U.S.C. § 1347, the government must prove that the defendant: (1) knowingly and willfully executed, or attempted to execute, a scheme or artifice; to (2) defraud a health care benefit program or to obtain by false or fraudulent pretenses any money or property

31

under the custody or control of a health care benefit program; (3) in connection with the delivery of or payment for health care benefits, items, or services.

To prove conspiracy, "[t]he government must prove the same degree of criminal intent as is necessary for proof of the underlying substantive offense." *Dadi*, 235 F.3d at 950.  Circumstantial evidence can support a finding of specific intent.  *Id.* (conspiracy); *see also United States v. Hughes*, 230 F.3d 815, 821 (5th Cir. 2000) (money laundering); *United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996) (fraud).  The government need not prove that a defendant was aware of specific regulations, nor need it introduce evidence that would conclusively demonstrate a defendant's state of mind.  It suffices to show facts and circumstances from which the jury reasonably could infer that a defendant knew his conduct was unauthorized and illegal.  *United States v. Bordelon*, 871 F.2d 491, 494 (5th Cir. 1989); *see also United States v. Forcada*, 206 Fed. App'x 969, 971 (11th Cir. 2006) (rejecting defendant's argument of insufficient evidence for conviction of conspiracy to commit health care fraud where there was circumstantial evidence sufficient to permit a jury to infer "that the defendant acted with the specific intent to defraud").

When proving conspiracy, "[a]n express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice." *United States v. Infante*, 404 F.3d 376, 385 (5th Cir. 2005).  "[A]ssent to a conspiracy may be inferred from acts which furthered the purpose of the conspiracy." *United States v. Marx*, 635 F.2d 436, 439 (5th Cir. 1981).  "Because secrecy is the norm, each element may be established by circumstantial evidence." *United States v. Farias*, 469 F.3d 393, 398 (5th Cir. 2006); *see also United States v. Holmes*, 406 F.3d 337, 351 (5th Cir. 2005) ("The Government need not rely on direct evidence of a conspiracy; each element may be proven by circumstantial evidence.") (quoting *United States v. Mulderig*, 120 F.3d 534, 547

(5th Cir. 1997)).  "Juries are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence."  *United States v. Flores-Chapa*, 48 F.3d 156, 161 (5th Cir. 1995).  "In cases of conspiracy, deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel."  *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004) (internal quotation and citation omitted).

The Abdallahs first assert that because the object of the conspiracy was framed in terms of patient ineligibility for Medicare coverage for ambulance service, the government had to prove the Abdallahs knew that Americare's clients did not satisfy the medical necessity requirements of 42 C.F.R. § 410.40(d)(1).  The object of a conspiracy is an element of the offense of 18 U.S.C. § 371, and all facts necessary to establish the object of the conspiracy must be proven beyond a reasonable doubt.  *See United States v. Bush*, 70 F.3d 557, 561 (10th Cir. 1995); *United States v. Arlt*, 252 F.3d 1032, 1034 (9th Cir. 2001); *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992) ("Without question, the object of a conspiracy constitutes an essential element of  the conspiracy offense" defined by 18 U.S.C. § 371).  The Abdallahs argue that the evidence was insufficient to prove that the ambulance transports for Americare clients were not "medically required" or to prove that the Abdallahs knew that Americare's clients were not medically eligible for Medicare coverage for their ambulance transports.

The Abdallahs contend that the government's proof at trial focused on Americare clients who were not bed-confined or could use other means of transportation and "completely neglected the second prong of the definition," that the clients had medical conditions "regardless of bed

confinement" "such that transportation by ambulance is medically required."  (Docket Entry No. 349, at 7).  The Abdallahs argue the evidence at trial showed that the transports at issue were medically required because "each beneficiary Americare transported suffered from numerous, serious, degenerative diseases, including end stage renal disease."  (Docket Entry No. 349, at 11).  They contend that the evidence showed patients needed assistance to move, and "even the best off [sic] patients transported by Americare had difficulty getting around under their own power."  (*Id.* at 12).  According to the Abdallahs, a reasonable juror would conclude that for someone like Reginald Batiste, a diabetic blind amputee who had recently broken his leg, ambulance transport to dialysis was "obviously medically required."  (Docket Entry No. 349, at 9).  With respect to Vargas and Stevenson, the Abdallahs argue that the evidence showed that ambulance transport was medically required because of their medical histories and conditions.  The Abdallahs point to the testimony of the government's expert, Dr. Patterson, that Vargas was "devastated" by her illnesses, including anemia, retinopathy, neuropathy, deep-vein thrombosis, diabetic gastroparesis, end-stage renal disease, and diabetes mellitus.  They argue that no reasonable juror could find that ambulance transport to and from regular dialysis appointments was not medically required for Vargas in light of these conditions.  With respect to Stevenson, the Abdallahs contend that although he could sit and walk, he could not walk longer than a quarter block because of shortness of breath, dyspnea on exertion, and severe peripheral vascular disease with severe muscle cramps.  According to the Abdallahs, "[a] conclusion that ambulance transportation for Ray Stevenson was medically required was eminently reasonable."  (Docket Entry No. 349, at 13).  The Abdallahs point to the testimony of Dr. Evans, their expert witness, that based on his review of the medical records, ambulance transport was medically required for both Vargas and Stevenson because it was in the "best interest

of the patient."

The Abdallahs challenge the sufficiency of the evidence that they knew patients were not eligible for ambulance transport.  Mazen Abdallah argues there was no evidence he knew that any individuals Americare transported did not qualify for Medicare coverage for ambulance transport. He asserts he did not play a role in the day-to-day operations of Americare, and points to the testimony that he was out of town from November 2006 to April 2007.  Mazen Abdallah asserts that the testimony of Americare clients showed that none of them knew or had even seen him before. Mazen Abdallah contends that the government did not show that he reviewed documents indicating Americare patients were ineligible.  He asserts that the run sheets and billing records found in the search of his home showed that ambulance transport was medically required for these patients because each patient was listed as having serious medical ailments.  Mazen Abdallah also asserts that there was no evidence anyone told him the individuals Americare was transporting were not qualified for Medicare coverage for regularly scheduled nonemergency ambulance transport.

Contrary to the Abdallahs' arguments, the government provided ample evidence that Americare provided ambulance transports for clients whose conditions did not qualify them for Medicare coverage for such transports.  The evidence showed that although the clients were sick – they all had end-stage renal disease that required regularly scheduled repetitive dialysis treatment – that is not sufficient for Medicare coverage for ambulance transport to obtain such treatment. Instead, the regulations state that Medicare will pay for ambulance transports "only if they are furnished to a beneficiary whose medical condition is such that other means are contraindicated. The beneficiary's condition must require both the ambulance transportation itself and the level of service provided in order for the billed service to be considered medically necessary."  42 C.F.R.

§ 410.40(d)(1).  For nonemergency ambulance transportation to be "appropriate," the beneficiary must be either "bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated," or have a medical condition "regardless of bed confinement" "such that transportation by ambulance is medically required." *Id.* Bed-confinement is one factor is determining medical necessity, but not the "sole criterion." *Id.* The regulation states that "[f]or a beneficiary to be considered bed-confined, the following criteria must be met: (1) The beneficiary is unable to get up from the bed without assistance. (2) The beneficiary is unable to ambulate. (3) The beneficiary is unable to sit in a chair or wheelchair. *Id.*

The Abdallahs argue that a client is eligible for Medicare coverage for ambulance transport to regularly scheduled nonemergency repetitive dialysis appointments if it is in the "best interests" of the client.  That is not what the statute or regulations provide.  The statute states that covered medical services include "ambulance service where the use of other methods of transportation is contraindicated by the individual's condition, but . . . only to the extent provided in the regulations." 42 U.S.C. § 1395x(s)(7).  The regulations state: "Nonemergency transportation by ambulance is appropriate if either: the beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required." 42 C.F.R. § 410.40(d)(1).  The jury heard ample testimony to support the conclusion that Americare billed Medicare for transporting clients who were not medically eligible for Medicare-covered ambulance service.

The Abdallahs are correct that at trial, the government's direct examination questions for Dr. Patterson focused on whether the Americare clients whose records she reviewed were bed-confined

or had conditions that contraindicated transport by other means and did not expressly ask whether ambulance transport was "medically required." But Dr. Patterson testified that the clients whose records she had reviewed and who could ambulate or could sit in a wheelchair were not qualified for Medicare coverage for nonemergency ambulance transport under 42 C.F.R. § 410.40(d)(1) not only because they were not bed-confined but because "the record did not demonstrate that they had *a condition otherwise for which ambulance transportation was required*." (emphasis added). The jury also heard testimony from Vargas's treating physicians that although she had serious medical problems, her condition did not medically require ambulance transport. Dr. Patel testified that he refused to sign a CMN for Vargas and Dr. McColloster testified that he would not have done so. Video testimony showed Vargas walking part of the way from the ambulance to her house. Ray Stevenson testified that his two doctors, Dr. Shenoy and Dr. Malya, refused to sign a CMN for ambulance transport. The jury saw a videotape showing Ray Stevenson walking and sitting unaided on his couch and getting up unaided from the couch. The jury heard testimony that Americare successfully recruited clients from Metro-Lift manifests; a patient who was able to ride Metro-Lift, a shared-ride van service with no medical personnel available, is not a patient for whom ambulance transport is medically required. The jury instructions set forth the requirements of 42 C.F.R. § 410.40(d)(1), including the "medically required" prong. The jury's verdict shows that it chose to credit the testimony of Vargas and Stevenson's treating doctors that ambulance transport was not medically necessary over that of Dr. Evans, who never treated or saw either individual.

The evidence was also sufficient to find that both Wesam and Mazen Abdallah knew that some of the clients Americare transported did not qualify for Medicare coverage of ambulance transports for nonemergency regularly scheduled dialysis trips. The analysis as to Wesam Abdallah

is easy and straightforward.  The videotape of his meeting with Ray Stevenson shows that he had personally observed Stevenson's ability to walk and sit.  Wesam knew that Stevenson was able to use other means of transportation to get to and from dialysis and that ambulance transport was not medically required.  Wesam told Stevenson that if his doctors would not sign a CMN, he would arrange it.  The evidence also showed that Wesam Abdallah recruited clients from Metro-Lift manifests and that he knew that such clients were not medically limited to ambulance transport.  The evidence also showed that Wesam arranged for every run sheet to show that the client was "bed-confined" by telling Evelyne Almasri to show this condition on run sheets that did not so state.  Americare EMTs testified about the envelopes of false CMNs Wesam Abdallah exchanged with Washington at SLNH.

With respect to Mazen Abdallah's knowledge that Americare was billing Medicare for clients whose conditions did not medically require ambulance transport, the evidence is admittedly circumstantial.  There is no evidence that Mazen Abdallah had face-to-face meetings with clients whose physical condition showed that they were ineligible for Medicare coverage for ambulance transport to and from regular dialysis treatments.  There was evidence that in late 2006 and early 2007, Mazen Abdallah was not in Houston.  But circumstantial evidence may provide evidence of knowledge.  *See Holmes*, 406 F.3d at 351.  In that respect, the government provided ample evidence from which a reasonable jury could conclude that Mazen Abdallah was aware that Americare was transporting clients who were not bed-confined, who were able to use other forms of transport, and for whom ambulance transport was not medically required.

The evidence showed that before the Abdallahs purchased Americare, Murad Almasri taught both Mazen and Wesam Abdallah about using Metro-Lift manifests as a source for Americare

38

clients.  Mazen Abdallah accompanied Murad Almasri to visit a Metro-Lift client to recruit her to ride Americare ambulances to and from her dialysis treatments.  Two exhibits found during the search of Mazen Abdallah's home are further evidence of his knowledge that patients were ineligible.  Government Exhibit 1.9, "The List," is a list of Americare clients and the amounts paid to each, both an initial sign-up payment and a monthly payment.  Exhibit 1.15, a list of Americare clients, included notations next to names that indicated at least questions as to whether ambulance transport was appropriate under Medicare.  Next to the name Johnny Brooks was a notation stating "He Walks." Next to the name Richard Didsbury was the notation,"Former Client; Social Worker Drama"; the jury heard testimony that Didsbury had been told by a social worker that he did not qualify for ambulance transport.  The jury could infer that Mazen Abdallah either made or saw both lists.  And the government played the audio recording of Fallah telling Mazen Abdallah that "the process Americare is doing right now, it might get you in trouble with FBI, TDH, or [unintelligible]."  (Government's Trial Exhibit 1.11.1.a).  The jury could infer that Mazen Abdallah knew that Americare was recruiting clients for whom ambulance transport was not medically required.

The jury heard evidence that both Mazen and Wesam Abdallah knew that each client's attending physician had to provide a written order certifying that the medical necessity requirements were met.  The jury also heard evidence showing that both Abdallahs were involved in obtaining, or knew about the use of, false CMNs.  Fallah testified about his conversation in late June 2006 with Mazen Abdallah about what should be done if a patient's doctors refused to sign a CMN.  Mazen Abdallah asked Fallah "What if we sign it by ourselves?" while making a gesture to sign the blank CMN form in front of him.  Fallah testified that the CMN Mazen Abdallah had pretended to sign

had a doctor's signature on it the very next day.  The jury heard evidence that many of Americare's CMNs dated during the time Mazen and Wesam Abdallah owned and operated the company were signed by Dr. Merkelz or Dr. Thacker at SLNH, where Mazen Abdallah was paying Kelvin Washington for every dialysis patient who rode with Americare.  The evidence showed that the CMNs signed by Dr. Merkelz and Dr. Thacker were for patients they had never seen and in some cases for patients who were not and had not been SLNH residents.  The evidence showed that Wesam Abdallah assured Ray Stevenson that if his own doctors refused to sign a CMN, Abdallah would take care of it.  The evidence showed that other clients, including Vargas, had CMNs signed by Dr. Thacker or Dr. Merkelz after these clients' own doctors refused to sign CMNs for nonemergency ambulance transport to and from dialysis.  The evidence also showed that a number of the CMNs at Americare had photocopied physician signatures.  There was sufficient evidence at trial from which the jury could conclude that Americare was transporting clients whose conditions did not make ambulance transport to and from dialysis treatment on a regularly scheduled, nonemergency, repetitive basis medically necessary and that Mazen and Wesam Abdallah were aware of it.

A review of the case law supports the conclusion that the evidence at trial was sufficient to allow the jury to conclude that the Abdallahs knew the patients they were transporting did not qualify for Medicare payment.  In *United States v. Mauskar*, 557 F.3d 219 (5th Cir. 2009), a physician convicted of conspiracy to defraud Medicare by falsely certifying that patients met the medical eligibility requirements for motorized wheelchairs argued that the evidence presented at trial was insufficient to sustain his conviction.  *Id.* at 229.  He argued that there was no evidence that he knew that patients did not need the wheelchairs or that durable medical equipment (DME)

companies were delivering less expensive scooters while billing Medicare for wheelchairs. *Id.* at 230. The Fifth Circuit affirmed the conviction. *Id.* at 223. It was undisputed that the defendant prescribed a motorized wheelchair to a patient who was jogging twice a day at the time. That patient testified that he used the scooter he received for "recreational purposes." *Id.* at 230. The court held that this evidence was sufficient to establish that the defendant knew patients were not eligible for wheelchairs. *Id.* The record also showed that the defendant had asked one of the patients whom he had prescribed a wheelchair if she was interested in a scooter. Another patient testified that she had come to "see the physician about a motor scooter." *Id.* The court held that this evidence was sufficient to establish that the defendant knew the DME companies charged the government for wheelchairs and delivered less expensive scooters. *Id.*

In *United States v. Beverly*, 284 Fed. App'x 36 (4th Cir. 2008), the defendant owned a business designed to help individuals with mental illnesses. After the business became a licensed Medicaid provider of psychosocial rehabilitative services (PSSR) under Medicaid, the state Medicaid agency conducted an audit and determined that it "was billing [the agency] and receiving payments for dozens of recipients who were not eligible" to receive these services. *Id.* at 38. The agency informed the defendant of the eligibility problems and explained why the patients' mental and physical conditions did not qualify for PSSR. *Id.* at 39. Thereafter, the defendant continued to bill Medicaid "on behalf of individuals for whom no documented health evaluation was performed and for individuals suffering from the same physical and mental infirmities" the agency discussed with the defendant. *Id.* at 40. The court held that the evidence was sufficient to allow a jury to conclude that the defendant engaged in a scheme to defraud Medicaid. *Id.*

The defendant in *United States v. Morgan*, 505 F.3d 332 (5th Cir. 2007), was convicted of

twelve counts of health care fraud and one count of conspiracy to defraud Medicare by signing CMNs for motorized wheelchairs for patients that she did not examine and who were not medically eligible for wheelchairs.  The evidence showed that the owner of a DME company had approached the defendant, a physician, and offered to pay her $250 for every wheelchair CMN that she completed and signed.  *Id.* at 336.  The DME company owner brought the defendant "patient information on ten to forty patients each time he saw her, but he never took a patient to see her." *Id.*  He paid the doctor in cash once or twice a week for all of the signed CMNs.  *Id.*  The twelve counts of health care fraud were based on twelve different patients.  None of the twelve had seen the defendant, and five testified that they did not need a wheelchair.  *Id.* at 342.  The court held that "a reasonable jury could have concluded that Morgan sold prescriptions for the purposes of billing Medicare without seeing patients" and that she "conspired with [the DME owner] to defraud a health care benefit program."  *Id.*

And in *United States v. Boesen*, 491 F.3d 852 (8th Cir. 2007), the court held that circumstantial evidence of the defendant's knowledge that procedures were not medically necessary was sufficient to convict the defendant of conspiracy to defraud Medicare.  *Id.* at 858.  The defendant worked as office manager and administrator of his brother's medical clinic.  The clinic used codes for medical procedures and physicians' services.  A doctor entered the codes for the procedure or service performed and the defendant reviewed the codes and submitted the claims.  The indictment charged that the clinic "billed codes 31237 and 69150 when those procedures were not performed, and performed code 92588 when it was not medically necessary."  *Id.* at 854.  At trial, the government presented evidence that the defendant was trained in coding and billing.  A clinic employee testified that the defendant was aware that many patient billing complaints involved code

31237.  A former clinic physician testified that the defendant terminated her and threatened not to pay her benefits after she resisted assisting in a surgery she did not believe was medically necessary. *Id.* at 856.  The defendant told the clinic's audiologist that she would be fired if she confronted his brother about the overuse of a certain test.  *Id.*  The defendant continued billing code 69150 after a consultant told him that patient notes did not support that procedure.  After a major insurer dropped the clinic as a participating provider, the defendant said "it was a good run while it lasted, but now we're going to have to find something else."  *Id.* at 856–57.  The district court granted the defendant's motion for judgment of acquittal, finding that the defendant's statements raised suspicion, but were not evidence of intent to defraud.  *Id.* at 857.  The appellate court reversed, holding that "[c]onspiracy may be proved by circumstantial evidence and 'may be implied by the surrounding circumstances or by inferences from the actions of the parties.'"  *Id.* (internal citation and quotation omitted).  The court held that the evidence allowed a jury to infer that the defendant "knowingly and willfully executed a scheme to defraud a health care program, acting in a conspiracy with [his brother]."  *Id.* at 858.

These cases show that there was sufficient evidence for a jury to infer that both Wesam and Mazen Abdallah knew that ambulance transport was not medically necessary for some of the patients Americare was transporting.  *See also United States v. Hunt*, 521 F.3d 636, 645–46 (6th Cir. 2008) (affirming convictions for health care fraud and conspiracy to commit health care fraud where the evidence showed that the defendant, a doctor, submitted claims to Medicare for tests that had not been determined to be medically necessary because the jury could reasonably infer that the doctor knew the patients had not been examined by him or a licensed nurse practitioner under his supervision); *United States v. Shpirt*, 2007 WL 2044723, at *1 (9th Cir. July 16, 2007) (finding the

evidence sufficient to sustain conviction for health care fraud where DME company owner caused claims to be submitted to Medicare for equipment that patients did not use); *Forcada*, 206 Fed. App'x at 971 (affirming convictions for health care fraud and conspiracy to commit health care fraud where the defendant "demonstrated his awareness of the conspiracy on numerous occasions, but nonetheless continued to participate in and benefit from it," including by directing his assistant to "go along with the unjustified dilution of patients' medical infusions with saline, participat[ing] in telling a patient how to collect money for his visit to the clinic, and advis[ing] a nurse that he knew the infusion sheets reflected improper dosages").

Finally, the Abdallahs argue the evidence was insufficient to find that they agreed to make or made false representations to Medicare. The Abdallahs contend that they did not represent patient conditions to Medicare because they did not fill out the run sheets and they did not send the bills to Medicare. They contend that recruiting patients from Metro-Lift, paying patients to ride with Americare, paying Washington for dialysis patients brought to SLNH, and "arranging" to have Washington obtain CMNs from Drs. Merkelz and Thacker do not amount to an agreement to misrepresent patient conditions to Medicare to obtain payment for unnecessary ambulance transports. The Abdallahs contend that evidence of agreeing to pay kickbacks is insufficient proof of conspiracy to commit health care fraud. They rely on *United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007), in which the court held that "kickbacks alone is not sufficient to establish health care fraud." *Id.* at 1297. In that case, the government argued that a kickback was sufficient to establish the falsity required to defraud Medicare, even if the service was medically necessary and actually performed. *Id.* at 1299. The court rejected this argument, holding that paying kickbacks does not amount to health care fraud in the absence of a false or fraudulent representation to

44

Medicare. *Id.* The court stated that "[t]he mere fact that [medical supply companies] submitted prescriptions with forged signatures to Medicare is insufficient to establish fraud without some evidence that individuals at [these companies] knew of the forgeries or forged the prescriptions themselves." *Id.* at 1299. The court also stated that testimony by patient recruiters for the companies stating that they were paid to bring in patients, in violation of the antikickback statute, did not show health care fraud, absent "evidence that a patient did not . . . need what was delivered." *Id.* The court held that "[t]o be interpreted as health care fraud . . . there must be some evidence present in the record that shows the patients were not legitimately prescribed the oxygen concentrators, or that [defendants] made false or fraudulent representations to Medicare." *Id.* In the present case, the government did present evidence that Wesam Abdallah knew of the forged prescriptions. Vargas and Stevenson were transported by Americare with false CMNs obtained from Washington at SLNH. Wesam had envelopes of false CMNs delivered to him from SLNH and knew that Washington was being paid to deliver patients to Americare. The government also presented evidence that Wesam Abdallah knew that patients did not need ambulance transport. In the video encounter between Wesam and Ray Stevenson, Stevenson walked unaided and told Wesam Abdallah that his doctors had refused to sign a CMN for ambulance transport. Wesam Abdallah recruited patients who could use Metro-Lift and automatically told Evelyne Almasri that every patient she asked about was bed-confined without making any inquiry or investigation. As to Mazen Abdallah, the evidence showed that Americare transported Marine Hanchett on prescriptions with the signature of Dr. Merkelz, even though she was never seen by this doctor. Hanchett's name was on "the list" of patients found in Mazen Abdallah's home, under the heading "Kelvin Washington." (Government's Trial Exhibit 1.9). Mazen Abdallah paid Kelvin Washington to obtain clients to ride

on Americare ambulances.  Mazen Abdallah had also mentioned the possibility of forging unsigned CMNs to Fallah, and a signed CMN appeared the next day.  The evidence included lists of clients recruited from Metro-Lift to ride Americare ambulances.  The evidence also showed that Mazen Abdallah visited a Metro-Lift customer to recruit her to ride with Americare.  And the evidence allowed the jury to reasonably infer that Mazen Abdallah knew that at least two other patients, Brooks and Didsbury, did not need ambulance transport.  In short, the evidence missing in *Medina* was presented in this case.

The argument that the Abdallahs did not agree to misrepresent patient conditions to Medicare because they personally did not fill out run sheets or submit bills to Medicare is not persuasive.  The jury was instructed that "a representation is 'false' if it is known to be untrue or is made with reckless indifference as to its truth or falsity. A representation is also 'false' when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud."  (Docket Entry No. 325, at 14); *see United States v. Dillman*, 15 F.3d 384, 393 (5th Cir. 1994) (approving nearly identical instruction in bank fraud case).  By obtaining false CMNs for patients who did not qualify for ambulance transport, and by billing Medicare for ambulance transports for these patients, Mazen and Wesam Abdallah agreed to falsely represent the conditions of these patients and their medical eligibility for Medicare coverage for the ambulance service.  The forged CMNs for patients who did not qualify made the bills submitted to Medicare materially false. *See Hunt*, 521 F.3d at 645 (affirming convictions for health care fraud and conspiracy to defraud Medicare where the defendant "caus[ed] claims to be submitted for tests that had not been determined to be medically necessary").  The fact that the CMNs the Abdallahs obtained for clients riding on Americare ambulances were kept at Americare and not submitted to Medicare is irrelevant.

46

Medicare covers services under Part B only if they are medically "reasonable and necessary" for the beneficiary.  By submitting claims to Medicare for payment, Americare was representing to Medicare that ambulance transport was medically required for these patients when it was not.  *See Beverly*, 284 Fed. App'x at 40 (holding that jury could reasonably infer that defendant's "misrepresentations were contained in the claims submitted" to Medicare for patients whom the defendant had been informed were ineligible); *Hunt*, 521 F.3d at 646 (holding that health care fraud is established when a defendant causes "claims to be submitted on the false pretenses that they had been determined to be medically necessary by a qualified medical professional").

The Abdallahs argue that evidence of "commissions" Mazen Abdallah paid to Washington is not the same as evidence that Mazen Abdallah paid Washington for false CMNs for those clients. Washington did more than provide Americare with SLNH patients who rode on Americare ambulances to and from regularly scheduled dialysis treatments. Washington also provided America with false prescriptions for clients, signed by Dr. Merkelz and Dr. Thacker, for patients they never saw and who were not even SLNH residents.  The jury could reasonably infer that Mazen Abdallah's payments to Washington were in part for the false CMNs that he provided.  In addition, there is evidence that would allow the jury to infer that Mazen Abdallah knew that the patients being recruited from Metro-Lift and patients like Brooks and Didsbury did not medically qualify for ambulance transport.

Viewing the evidence in the light most favorable to the government, a reasonable jury could conclude that both Mazen and Wesam Abdallah agreed to defraud Medicare by paying Washington for false CMNs for patients that they knew did not qualify for ambulance transport, by successfully recruiting patients that they knew did not qualify for ambulance transport, and by submitting claims

47

to Medicare for those patients.

Mazen Abdallah argues that his acquittal on the substantive health care fraud counts, coupled with Wesam's convictions for the counts relating to Vargas and Stevenson, "undermines [the] attempt to show the evidence was sufficient to convict" him of conspiracy. (Docket Entry No. 387, at 11). Mazen Abdallah notes that for the health care fraud counts, the jury was instructed that the defendants could be convicted of either health care fraud or aiding and abetting health care fraud. With respect to aiding and abetting, the jury was instructed, "The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished by him through direction of another person as his agent, or by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise." (Docket Entry No. 325, at 18). Mazen Abdallah asserts that directing or acting in concert with is an easier standard for the government to satisfy than conspiracy. He argues that "the jury's failure to find that he aided and abetted anyone to commit health care fraud under principles that are broader than those that permit conviction for conspiracy is a very strong indication that the evidence was too insubstantial to sustain a conviction." (Docket Entry No. 387, at 11–12). This argument is unavailing. Inconsistent verdicts are not a bar to conviction so long as there is sufficient evidence to support the jury's determination of guilt. *See*, *e.g*, *United States v. Gieger*, 190 F.3d 661, 664 (5th Cir. 1999) (jury verdict acquitting defendants on substantive counts of healthcare fraud did not bar conviction for conspiracy to submit false Medicare claims for ambulance services); *United States v. Sylvester*, 143 F.3d 923, 930 (5th Cir. 1998) (inconsistent verdicts not a bar to conviction). "Each count in an indictment is regarded as a separate indictment, and inconsistency is not a reason to reverse a jury's verdict. Moreover, a review for evidence sufficiency is performed independent of the jury's determination that evidence on another count was

sufficient."  *United States v. Johnson*, 83 Fed. App'x 577, 578 (5th Cir. 2003) (internal citations omitted); *see also United States v. Posadas-Rios*, 158 F.3d 832, 861 (5th Cir. 1998) ("Inconsistent verdicts do not impact the sufficiency of the evidence analysis.").  A conviction on one count and acquittal on other counts shows that the jury followed the instructions to consider the evidence separately as to each defendant and count.  *See United States v. Neal*, 27 F.3d 1035, 1045 (5th Cir. 1994) ("Acquittals as to some defendants on some counts support an inference that the jury sorted through the evidence and considered each defendant and each count separately.") (quotation omitted).  Mazen Abdallah's acquittal on the substantive health care fraud counts does not require a finding that there was insufficient evidence to convict him of conspiracy to commit health care fraud.

The Abdallahs's motions for judgment of acquittal on the conspiracy charge are denied.

### 2. The Evidence Was Sufficient to Convict Wesam Abdallah on the Substantive Counts Alleging Health Care Fraud

Counts 3 and 4 alleged that Wesam Abdallah submitted false claims to Medicare and Medicaid based on transporting Yolanda Vargas to dialysis treatments on November 23, 2006 and January 11, 2007 because the "claim states bed-confined and unable to ambulate; however patient ambulatory."  (Docket Entry No. 126).  Counts 31 and 32 alleged that Wesam Abdallah submitted false claims to Medicare and Medicaid based on transporting Ray Stevenson to dialysis treatments on November 7, 2006 and December 2, 2006 because the "claim states stretcher required, unable to ambulate and bed-confined; however, patient ambulatory."  (*Id.*).  Wesam Abdallah argues that there was insufficient evidence that he knew Vargas did not qualify for ambulance transport.  He also argues that the jury could not reasonably find that ambulance transport for Stevenson was not medically required.  He argues that the "false CMN theory" does not show he committed health care

49

fraud because the CMNs were not actually submitted to Medicare and because Evelyne Almasri relied on the run sheets, not the CMNs, in preparing the bills submitted to Medicare. Wesam Abdallah argues that he did not fill out the run sheets for Vargas and Stevenson and he did not submit the billing statements for these patients to Medicare, making the evidence insufficient to show health care fraud as to these clients. He argues that the evidence was insufficient for a reasonable jury to find that he knew the billings Americare submitted were false because Evelyne Almasri had set up the billing software to show that each patient was "bed-confined."

Wesam Abdallah relies on *United States v. Jackson*, 220 Fed. App'x 317 (5th Cir. 2007), which involved physical-therapy clinics engaging in health care fraud by billing for services that were never performed. The clinics's owner hired a consultant to assist in the clinic's transition to providing services primarily funded by Medicare/Medicaid. *Id.* at 320. The court found the evidence insufficient to convict the consultant of health care fraud based on the fact that the clinic billed Medicare for services provided to a patient after that patient was no longer receiving the services. The court found that the billing had been "set up to be done automatically" and that the consultant did not know that it continued after a particular patient was no longer receiving therapy. *Id.* at 323–24. There was no evidence that the consultant knew that these therapy services had not actually been performed as represented in the bills to Medicare. As a result, there was no basis to support the conviction for health care fraud. *Id.*

To support a conviction for health care fraud under 18 U.S.C. § 1347, the government must prove that the defendant (1) knowingly and willfully executed, or attempted to execute, a scheme or artifice to (2) defraud a health care benefit program or to obtain by false or fraudulent pretenses any money or property under the custody or control of a health care benefit program, (3) in

connection with the delivery of or payment for health care benefits, items, or services. The evidence was sufficient for a reasonable jury to conclude that Wesam Abdallah defrauded Medicare. Vargas rode Americare ambulances to and from regularly scheduled dialysis treatments using false CMNs Wesam obtained through Washington. Vargas's treating physician testified he refused to sign a CMN because ambulance transport was not medically required for Vargas. The jury saw a videotape of Vargas walking on the day of a transport. Vargas testified that she walked to the store while waiting for a dialysis treatment. The jury could reasonably conclude that ambulance transport was not medically required for Vargas and that Wesam Abdallah had obtained false CMNs for Vargas from Washington, who was paid by Americare. *See Morgan*, 505 F.3d at 342 (finding sufficient evidence to sustain health-care fraud conviction where doctor was paid to sign CMNs for patients she never saw and who did not need motorized wheelchairs). Stevenson also rode Americare ambulances on the basis of false CMNs. Wesam Abdallah knew that Stevenson could walk and sit unaided. His doctors had refused to find ambulance transport medically necessary. Wesam Abdallah told Stevenson that if he could not obtain a CMN from his doctor, Abdallah would get him a CMN so Stevenson could be transported by Americare and Medicare would cover the benefit. False CMNs for Stevenson signed by Dr. Merkelz were obtained. The fact that Medicare was billed for the ambulance trips for Stevenson with the misrepresentation that he was bed-confined and that the trips were medically necessary supported Wesam Aballah's conviction for health care fraud. The fact that the false CMNs for Stevenson were not submitted to Medicare does not make the evidence insufficient or undermine the conviction. *See Beverly*, 284 Fed. App'x at 40 (holding that the "misrepresentations [to Medicare] were contained in the claims submitted" for ineligible patients).

The facts in *Jackson* are readily distinguishable from the evidence the government presented against Wesam Abdallah. The defendant in that case had no knowledge that services automatically billed to Medicare were not in fact provided. *Jackson*, 220 Fed. App'x at 323. In this case, the government presented evidence Wesam Abdallah knew that the CMNs obtained for Vargas and Stevenson were from doctors who had never seen them. The government also presented evidence that Wesam Abdallah would routinely tell Evelyne Almasri that a patient was "bed confined" without checking the patient's records or otherwise investigating. Evelyne Almasri testified that if a run sheet did not indicate that the patient was bed-confined, she would call Wesam and ask him whether that patient was bed-confined. Evelyne testified that Wesam Abdallah never told her that he would have to check the patient's records and tell her later, but always immediately responded that the patient she had asked about was bed-confined.

Viewing this evidence in the light most favorable to the government, a rational jury could have found beyond a reasonable doubt that Wesam Abdallah knowingly and willingly executed a scheme to defraud a health care benefit program by receiving payments from Medicare for false ambulance transport claims for Vargas and Stevenson. *See Shpirt*, 2007 WL 2044723, at *1 (affirming health care fraud conviction of part-owner and supervisor of durable medical equipment company where company submitted claims for patients who did not qualify for equipment). Wesam Abdallah's motion for acquittal of his conviction on Counts 3, 4, 31, and 32 of the superseding indictment is denied.

## III.    The Motion for New Trial

### A.    The Legal Standard

Rule 33 permits the district court to grant a new trial if "necessitated by the interests of

justice." *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005); FED R. CRIM. P. 33(a).

Unlike the Rule 29 analysis, in considering a Rule 33 motion, the "trial judge may weigh the

evidence and may assess the credibility of the witnesses . . . ," *United States v. Robertson*, 110 F.3d

1113, 1117 (5th Cir. 1997), but must not "set aside a jury's verdict because it runs counter to [the]

result the district court believed was more appropriate." *Tarango*, 396 F.3d at 672; *United States*

*v. Collins*, 243 Fed. App'x 56, 58 (5th Cir. 2007).   The power to grant a new trial "should be

exercised infrequently by district courts, unless warranted by 'exceptional' circumstances."

*Tarango*, 396 F.3d at 672.   If the court "finds that a miscarriage of justice may have occurred at trial,

. . . this is classified as such an 'exceptional case' as to warrant granting a new trial in the interests

of justice." *United States v. Sipe*, 388 F.3d 471, 493 (5th Cir. 2004).

### B.  Analysis

The Abdallahs allege misconduct by the government and the prosecution as well as a litany

of errors by this court as the bases for granting a new trial.   Each allegation is analyzed below.

### 1.  The Allegations of Government Misconduct

The Abdallahs reassert several arguments previously raised and rejected by this court.   They

argue that the FBI misled Mazen Abdallah into purchasing Americare while it was under criminal

investigation and misused its authority through the Texas Department of State Health Services

("TDSHS"), to gather evidence.   They also argue that the FBI agent in charge of the investigation

and a paid confidential informant violated the criminal provisions of the Health Insurance Portability

and Accountability Act (HIPAA).

The Abdallahs first raised these arguments in their motions to dismiss the indictment or, in

the alternative, to suppress statements and evidence based on alleged government misconduct,

(Docket Entry Nos. 260, 277, 285), and now ask this court to reconsider its prior rulings, (Docket Entry No. 349, at 45).   The Abdallahs argue that the government "conscripted a state agency, TDSHS, to effectively deny that Americare was under any investigation, criminal or civil." (*Id.*, at 46).   They point to FBI Special Agent Christine Arciola's March 2006 request to the TDSHS for Americare's business and licensing records.   The TDSHS faxed Arciola Americare's incorporation information, dba information, EMS permit application, and EMS permit.   The Abdallahs assert that this is evidence that the FBI and TDSHS were working together to investigate Americare.   Before purchasing Americare, Mazen Abdallah asserts that he asked Raed Elmasri to obtain a letter showing that the company was not under investigation.   Raed requested such a letter from the TDSHS.   On June 6, 2006, Michael Hay of the TDSHS stated by letter that there was "no pending investigative action by the Texas Department of State Health Services."   (Docket Entry No. 349, Ex. D).   The Abdallahs assert that this statement was misleading because the FBI was investigating Americare at that time.   They assert that "[t]he misleading statements that were transmitted through Hay's TDSHS Letter drew Mazen Abdallah into an enterprise that he would not have engaged in at all had the Government not lied to him about the criminal investigation that Americare was under when he purchased the company."   (Docket Entry No. 349, at 47).   The Abdallahs argue that this "deceit" warrants dismissal or suppression.   (*Id.*).   This court rejected this argument, concluding that the facts alleged did not show that the government misled Mazen Abdallah about the existence of a federal criminal investigation into Americare.   And, as described above, there was sufficient evidence that Mazen Abdallah engaged in fraudulent conduct both before and after purchasing Americare.

The Abdallahs also argue that after Hays's letter, the TDSHS continued to facilitate the FBI's investigation into Americare.   They assert that TDSHS employee Joey Ancelet asked Mazen

Abdallah, under the pretense of a civil or administrative inquiry, whether he kept Americare records at his home.  Mazen Abdallah responded that he did.  Agent Arciola used Ancelet's testimony as part of the evidence to establish probable cause for a warrant to search Mazen Abdallah's home. The Abdallahs argue that this was deceptive conduct that requires dismissal or suppression of the evidence obtained during the search.  This court rejected this argument, concluding that the facts alleged did not show that the FBI acted in bad faith or misused civil authority to gather evidence.

The Abdallahs also reassert their argument that dismissal or suppression is appropriate because government agents violated the criminal provisions of HIPAA.  HIPAA prohibits receiving and utilizing protected health information.  The Abdallahs argue that Ayman Fares, a paid confidential informant, stole run sheets from Americare and gave them to FBI Agent Arciola.  They assert that Arciola violated HIPAA because she did not report Fares's crime, but instead used the run sheets to further the criminal investigation of Americare.  The Abdallahs assert that Arciola "failed to inform the magistrate that she relied on stolen evidence and covered up the crime" and that "probable cause was dependent in part on information provided by a paid informant."  (Docket Entry No. 349, at 48).  This court rejected these arguments, relying on cases holding that the FBI and other law enforcement agencies are not covered entities under HIPAA.  *See United States v. Mathis*, 377 F. Supp. 2d 640, 645 (M.D. Tenn. 2005) ("HIPAA applies to 'a health plan,' 'a healthcare clearinghouse,' or 'a healthcare provider who transmits any health information in an electronic form in connection with a transaction referred to in Section 1320d-2(a)(1) of this title.'  The FBI does not fit within any of these categories."); *see also State v. Straehler*, 745 N.W.2d 431, 435 (Wis. App. 2007) (police officer is not a "covered entity" under HIPAA); *State v. Downs*, 923 So.2d 726, 731 (La. Ct. App. 2005) (district attorney is not a "covered entity" under HIPAA).

The allegations of entrapment and HIPAA violations were addressed on the record and the Abdallahs have provided no reason for this court to revisit those rulings.

### 2. The Allegations of Prosecutorial Misconduct

The Abdallahs contend that they are entitled to a new trial because of prosecutorial misconduct. Specifically, they argue that the prosecution withheld exculpatory and/or impeachment evidence, violated this court's sequestration order, and made false representations during its closing argument. The Abdallahs also argue that the government's misrepresentations of the law resulted in misleading testimony, intimidated witnesses, and interfered with doctor-patient relationships.

#### a. Did the Government Withhold Evidence?

The Abdallahs contend the government withheld evidence that one month before trial, an Americare EMT named Cynthia Mejias contacted FBI agent Christine Arciola and  disclosed exculpatory evidence. The Abdallahs assert that Mejias told Arciola that Tarek Afifi was the office manager at Americare until it was shut down in June 2007, when he began working in the same capacity at American Care. According to the Abdallahs, Mejias told Arciola that at American Care, Afifi "was selling Medicare patients, writing false ambulance run sheets and manipulating or doctoring Certificates of Medical Necessity." (Docket Entry No. 349, Ex. E, Affidavit of Cynthia Mejias).[3] The Abdallahs contend that the government withheld the FBI interview memorandum documenting this conversation between Mejias and Arciola, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). They argue that this information was material because the government introduced evidence at trial that the Abdallahs had photocopied CMNs and

---

[3]   The Abdallahs interviewed Mejias in preparation for trial and called her as a witness during their case-in-chief. They assert that Mejias did not tell them about the interview because she was under the impression that her statements were confidential.

obtained forged CMNs from Washington at SLNH.

The Abdallahs also argue that FBI agent Stormy Kelly's testimony about discovering photocopied CMNs misrepresented the genesis of the government's false CMN theory.  They contend that the government devised this theory from Mejias's report about what Afifi was doing at CMN and used it to incriminate the Abdallahs at trial, in violation of *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).[4]  The Abdallahs assert that because the government had this FBI interview memorandum that implicated Afifi as the person responsible for creating false CMNs, the prosecutors sponsored testimony which they knew was false or misleading.  The Abdallahs argue that a new trial is appropriate because the evidence the government withheld and the misleading testimony the government presented was reasonably likely to affect the jury's decision.  They contend that, in the alternative, this court should strike the testimony of Kelly and Agent Tsui[5] "in its entirety, along with all Government exhibits making reference to forged CMNs or to CMNs allegedly procured by the Defendants from non-attending physicians."  (Docket Entry No. 349, at 37).

The government asserts that there was no *Brady* violation.  The government argues that it did not interview Mejias (or Afifi) and there is no FBI interview memorandum that was withheld.  The government asserts that it unsuccessfully attempted to interview Mejias, and that the prosecutors provided the defense with all the information they had about this witness.  After Mejias testified for the defense, the prosecutor cross-examined her about an internal FBI e-mail relaying a telephone

---

[4]  *Giglio* involved a violation of due process predicated upon a failure, pre-trial, to disclose material evidence favorable to the defense, which then led to the prosecution's presentation of evidence contrary to the favorable evidence at trial.  *Giglio*, 405 U.S. at 151-53, 92 S.Ct. 763.

[5]  Agent Tsui testified about the CMNs signed by Drs. Merkelz and Thacker of SLNH.

conversation with Mejias.  The e-mail is from Patricia Bean, a support employee at the FBI, to Agent Christine Arciola.  The e-mail is dated March 5, 2008 and states: "I took a call from Cynthia Mejias . . . regarding American Care EMS . . . she wanted to talk with the person assigned to the case.  She stated she knows 6-7 Medics that are willing to testify who worked for the company." (Docket Entry No. 382, at 1).  In this telephone conversation, Mejias told Bean that one company (Americare) had been closed, a new company (American Care) had been formed, and the patients had been transferred from the old company to the new company.  Mejias also said that if Americare patients wanted to be transported by a different company, "they were being told that they will lose their benefits."  (*Id.*).  The government provided a copy of this e-mail to the Abdallahs after Mejias testified.  On cross-examination, Mejias denied what was stated in the e-mail and insisted that she told the FBI about Afifi and his role in the CMN fraud.

To establish a *Brady* violation, the Abdallahs must show that: 1) evidence was suppressed; 2) the suppressed evidence was favorable to the defense; and 3) the suppressed evidence was material to either guilt or punishment.  *United States v. Runyan*, 290 F.3d 223, 245 (5th Cir. 2002).  In determining materiality, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler v. Greene*, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

The record does not support the allegation of a *Brady* or *Giglio* violation.  The record does not show that the government withheld exculpatory or impeaching evidence with respect to Mejias or Afifi.  The government did not interview Mejias and there is no FBI interview memorandum.  The e-mail summarizing Mejias's telephone call to the FBI was neither exculpatory nor impeaching and the government produced it as soon as she testified.  The record shows no evidence that the

58

government had, and withheld, information implicating Afifi as someone responsible for manipulating or doctoring CMNs at Americare or American Care. The record does not support the allegation that the government sponsored false or misleading testimony about forged or photocopied CMNs at Americare. FBI agent Stormy Kelly testified about her method of detecting that physician signatures on CMNs at Americare were photocopied. The jury was free to assess the weight and credibility of this evidence. There is no basis to strike the testimony of agents Kelly and Tsui and the government exhibits concerning CMNs.

> b.    Did the Prosecution Violate the Order Sequestering Witnesses?

The Abdallahs argue that newly discovered evidence of the government's violation of this court's sequestration order merits a new trial. To receive a new trial based on newly discovered evidence, the defendant must show: (1) the evidence is newly discovered and was unknown at the time of trial; (2) the failure to detect the evidence was not due to a lack of diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence, if produced at a new trial, would probably result in the defendant's acquittal. *United States v. Reedy*, 304 F.3d 358, 372 (5th Cir. 2002). If the defendant fails to establish any of these elements, known as the *Berry*[6] factors, the motion for new trial must be denied. *United States v. Freedman*, 77 F.3d 812, 817 (5th Cir. 1996).

When trial began, the parties invoked the rule. *See* FED. R. EVID. 615 ("At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion."). During the trial, the government called EMT Kathleen Bell as a witness. She testified on April 17–18, 2008. On April 17, before trial

---

[6]  *Berry v. State*, 10 Ga. 511 (1851).

proceedings began for the day and before Bell was sworn, FBI agent Christine Arciola showed Bell

run sheets that the prosecutor planned to ask her about.  Counsel for the defendants brought this to

the court's attention before Bell testified and urged that there was a violation of Rule 615 and that

Bell should be excluded as a witness.  This court considered the contact between Arciola and Bell

and found "no basis for not permitting [Bell] to testify."  (Docket Entry No. 353, at 12:13–14).  This

court gave additional instruction that the parties could not approach Bell as long as she was a

witness in the case.  The next day, Bell testified that several Americare patients who were not named

in the indictment could walk and sit in wheelchairs.  During cross-examination, defense counsel

asked Bell if she had met with any government personnel after her first day of testimony.  (Docket

Entry No. 354, at 77:21–78:13).  Bell testified that she had not.  (*Id.*).

The Abdallahs submitted two affidavits with their motion for new trial.  One is from

Katherine Samuel, Bell's friend.  Samuel's affidavit describes a conversation with Bell on May 22,

2008.  According to Samuel, Bell said that after the first day of testimony, "a male agent interviewed

her for approximately three hours in a government office."  (Docket Entry No. 350, Ex. F).  The

second affidavit is from Ann Hinrichs, defense counsel's office administrator.  This affidavit states

that Hinrichs was present during a speaker-phone conversation between defense counsel and Bell

on September 5, 2008.  (Docket Entry No. 398, Ex. G).  According to Hinrichs, Bell said that after

her first day of testimony, "she was asked by [a prosecutor] to go over the statement she had given

to" the government in the prosecutor's office and that they spoke "about her statement for 15 to 20

minutes."  (*Id.*).[7]  The Abdallahs contend that the prosecutors defied this court's order invoking the

---

[7]   The Abdallahs assert that they attempted to obtain an affidavit from Bell before filing their motion for new trial, but that Bell was ill and "essentially unavailable."  (Docket Entry No. 398, at 24).  They claim that they were also unable to obtain an affidavit from Bell before filing a reply to the government's response because

rule and that this violation "expanded the pool of beneficiaries that the Government attempted to show had been transported and fraudulently billed." (Docket Entry No. 349, at 39). The Abdallahs contend that the government failed to correct Bell's testimony that she had not met with the prosecutors after the first day of her testimony, allowing her to mislead the jury about the government's role in shaping her testimony. The Abdallahs argue that the failure to inform the court of the false testimony violated *Giglio*, 405 U.S. 150.

The government denies that it violated the rule. The government contends that the Abdallahs cannot meet the third, fourth, or fifth *Berry* factors, emphasizing that "recanting affidavits and witnesses are viewed with extreme suspicion by the courts." *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996) (quotation omitted). The government argues that this court should not disregard Bell's sworn trial testimony in favor of after-the-fact hearsay impeaching affidavits, which are insufficient to warrant a new trial. *See United States v. Wall*, 389 F.3d 457, 470–71 (5th Cir. 2004) (holding that newly discovered impeachment testimony that was hearsay was not a basis for granting a new trial); *Reedy*, 304 F.3d at 372 (upholding district court's denial of motion for new trial based on newly discovered impeachment evidence). Moreover, according to the government, the information in these affidavits is not material and would not have affected the outcome if discovered during the trial.

The newly presented affidavits are offered in part to impeach Bell's trial testimony, but are also offered in an to attempt to prove a violation of this court's order sequestering witnesses. In rare circumstances, violation of such an order may require a new trial if the defendant suffered

---

"Bell seems to have evacuated due to the hurricane, which has interrupted communications generally." (*Id.*).

"sufficient prejudice" from a witness's testimony that was based on an out-of-court conversation. *See United States v. Wylie*, 919 F.2d 969, 976 (5th Cir. 1990) (noting that a violation of Rule 615 may warrant reversal of conviction if district court abused its discretion in allowing testimony and if sufficient prejudice is shown, but holding that no prejudice and no abuse of discretion occurred in that case); *see also United States v. Stephenson*, 987 F.2d 772, 1993 WL 67139, at *5 (5th Cir. Mar. 5, 1993) (unpublished) (observing that a violation of a sequestration order by the prosecutor could result in a new trial, but holding that the standard for reversal was not met by the defendant); *United States v. Womack*, 654 F.2d 1034, 1040 (5th Cir. 1981) (same), *cert. denied*, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982). The testimony must be "either tailored or less than candid" and the defendant must have been denied the opportunity to explore this possibility through cross-examination. *Wylie*, 919 F.2d at 976.

The present record, however, does not support the relief sought. The two affidavits the Abdallahs have submitted are not recanting affidavits, in that Bell herself does not disavow or retract the substance of her testimony. The affidavits are offered to contradict Bell's statement at trial that she did not meet with the government between the two days on which she testified. But the affidavits not only contradict Bell's sworn testimony at trial, they contradict each other. Samuel's affidavit says that Bell told her that "a male agent interviewed [Bell] for approximately three hours in a government office." (Docket Entry No. 350, Ex. F). Hinrichs's affidavit states that Bell said she met with a prosecutor for "15 to 20 minutes." (Docket Entry No. 398, Ex. G). It is difficult to rely on such internally inconsistent hearsay affidavits, given Bell's testimony. *See Wall*, 389 F.3d at 470–71. Even assuming the truth of the affidavits, the standard for a new trial is not met. The "newly discovered evidence" is not exculpatory. And there is no basis to conclude that Bell's

62

testimony was tainted or less than candid, or that the information in the affidavits would have affected the outcome.  Finally, Bell's testimony was not critical in the sense that the jury heard a significant amount of other, similar evidence.  The allegations that the sequestration order was violated do not warrant a new trial.

          *c.*     *Did the Prosecution Make False Statements During Closing Argument?*

Mazen Abdallah alleges that during closing arguments, the prosecutor falsely represented that Metro-Lift manifests were found in his car in the garage of his home during the search of the home.  The agent who supervised the search testified that the manifests were found in the garage but was not asked and did not reveal that the manifests were on the car seat.  Mazen Abdallah argues that the incorrect statement justifies a new trial.

To receive a new trial based on alleged improper remarks by the prosecutor, a defendant must show that 1) the remarks were in fact improper, and 2) the remarks prejudicially affected his substantial rights.  *See United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999).  In making that determination, this court considers: (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instructions; and (3) the strength of the evidence of Mazen Abdallah's guilt.  *See United States v. Goff*, 847 F.2d 149, 165 (5th Cir.), *cert. denied sub nom. Kuntze v. United States*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 (1988).  The question is whether the remarks cast serious doubt on the correctness of the jury's verdict.  *Goff*, 847 F.2d at 165.  "If the evidence to support a conviction is strong, then it is unlikely that the defendant was prejudiced by improper arguments of the prosecutor and reversal is not required."  *United States v. Casel*, 995 F.2d 1299, 1308 (5th Cir.) (citation omitted), *cert. denied*, 510 U.S. 978, 114 S.Ct. 472, 126 L.Ed.2d 424 (1993).  "The magnitude of the prejudicial effect is tested in part by looking at the

prosecutor's remarks in context, and attempting to elucidate their intended effect." *Id.* (citations omitted). "Even if a prosecutor's statement constitutes error, the error is harmless if examination of the entire record suggests that the defendant was not substantially prejudiced by the prosecutor's statement." *Id.* at 1308 n.6 (citing *United States v. Morris*, 568 F.2d 396, 402 (5th Cir. 1978)).

Mazen Abdallah submitted an affidavit in which he stated that on the date of the search, his car was parked outside on the street, not in his garage. (Docket Entry No. 398, Ex. D). He states that the key to his car was inside a drawer in his house, and it was still there when he was released on bond later that day. (*Id.*). Mazen Abdallah's sister, Linda Abdallah, also submitted an affidavit stating her brother's car was not in the garage. (*Id.*, Ex. E). Linda Abdallah stated in her affidavit that the car was parked curbside when she left the house in the morning. When she returned home that afternoon and found law-enforcement officials at the house, she saw no vehicle in the garage and saw her brother's car still parked on the street. (*Id.*). This affidavit testimony contradicted the agent's trial testimony that Mazen Abdallah's car was in the garage and searched as part of the search of the house.

On September 26, 2008, the Abdallahs moved for postverdict disclosure of exculpatory and impeachment evidence. (Docket Entry No. 402). They sought to obtain, *inter alia*, photo and video records of the June 13, 2007 search of Mazen Abdallah's home to disprove the closing-argument statements that Metro-Lift manifests were found in his car in the garage. On October 2, 2008, the government produced photos and a videotape taken during the search that show Mazen Abdallah's car parked in the garage. The government asserts that Mazen and Linda Abdallah's affidavits stating that the car was not in the garage are false.

Mazen Abdallah also contends that the Metro-Lift manifest to which the prosecutor referred

in closing argument, Exhibit 119, was not found in his car but on his computer, and that this document was never admitted into evidence.  Mazen Abdallah argues that the prosecutor "knew exactly what [he] was arguing from, as well as where and when, the documents in the proposed exhibit were found." (Docket Entry No. 349, at 42).  Mazen Abdallah cites *Gallardo-Trapero*, 185 F.3d at 320, which held that "a prosecutor's closing argument cannot roam beyond the evidence presented during trial," and asks for a new trial.  Mazen Abdallah accuses the prosecutor of purposeful deception, arguing that the misuse of incriminating documents not in evidence was "knowing, deliberate and calculated." (Docket Entry No. 349, at 42).  Mazen Abdallah argues that the closing argument statement that the manifest was found in his car – as opposed to in his garage – was inaccurate and closely linked the manifests to him and created the impression he was actively recruiting patients who were able to use Metro-Lift.

Mazen Abdallah argues that he moved into his home in the fall of 2006 and did not live there from November 2006 to April 2007.  On June 13, 2007, the date of the search, "the house was still filled with a disarray of boxes and documents from the move, and others that had been transferred from the limited space at Americare's offices while Mazen Abdallah was away." (Docket Entry No. 398, at 5 n.2).  He argues that Exhibit 1.15 was not found in his car, as the government stated, and was not admitted into evidence, and a new trial is appropriate because that exhibit "was the Government's entire case for health care fraud against [him]." (Docket Entry No. 349, at 43).

FBI Agent Marguerite Hackney testified that she recovered what was later marked as Exhibit 1.15, a file folder containing Metro-Lift manifests, during the search of Mazen Abdallah's home. Hackney identified the file and testified that it was found in the garage:

> Q.    Let me show you what's been marked for identification as
>        Government's Exhibit 1.15 and ask if you can tell me if this

65

>is a document that was seized from the residence of Mr.
>Abdallah on that day.
>
>A.     Yes, it is.
>
>Q.     And how do you know that?
>
>A.     This is actually a file that I seized from the residence that day.
>
>. . . .
>
>Q.     Where in Mr. Abdallah's residence was that document – that
>folder?
>
>A.     This folder was found in the garage of the Abdallah
>residence.

(Docket Entry No. 368, at 15:13–22, 17:12–15).

The record does show that the prosecutor was wrong when he described what the evidence at trial showed about where the Metro-Lift manifest was found during the search of Mazen Abdallah's home.  When referring to the manifest in his closing argument, the prosecutor told the jury that Agent Hackney had found it in Mazen Abdallah's car in the garage:

>In fact, ladies and gentlemen, it was Special Agent Marguerite
>Hackney who testified before you that she found the folder that was
>– she found this Manila folder which was entitled "Addresses of
>Patients" in the car found in Mazen Abdallah's garage.

(Docket Entry No. 361, at 26:5–9).  The defendants objected.  The following exchange occurred at the bench:

>Mr. Hilder:    Yes, Judge. There is absolutely no evidence anything was found in
>Mr. Abdallah's car.  There's no search – there's no inventory of a
>search warrant.
>
>Mr. Balboni:   I was referring to Government's Exhibit 1.15 that the agent said was
>found on the seat in Mazen Abdallah's car inside the garage.
>
>Mr. Hilder:    There is nothing to support that.

66

| The Court: | There is evidence in the record that is consistent with what he's described. |
|---|---|
| Mr. Hilder: | Respectfully, I disagree. I didn't hear that, and there's no inventory that the car was searched. There is – his residence was searched. We have an inventory to support that. |
| The Court: | This is in the garage though. |
| Mr. Hilder: | I understand that. |
| The Court: | And it was lying on the seat? |
| Mr. Balboni: | Yes, Your Honor, I believe that's correct. And it was Marguerite Hackney who testified to – that she found it. |
| The Court: | All right. I'm going to allow it. The jury has heard the evidence and they can decide. |

(Docket Entry No. 361, at 25:5–25). After the bench conference concluded, this court stated, "The objection is overruled. The jury has heard the evidence, the jury will decide." (*Id.*, at 26:3–4). In response to the motion, the government states that "[w]hile the folder was in truth found in the car – in the garage of Defendant Mazen Abdallah's home – the prosecutor stopped one question short and failed to get that fact into evidence." (Docket Entry No. 381, at 9 n.6).

The record shows that the Metro-Lift manifest was admitted into evidence. Agent Hackney testified that "B"signifies the box number the evidence was placed into, (Docket Entry No. 368, at 13:21–14:16), so Exhibit 1.15, which is Bates-labeled "AMS-R-B13-001032" to "AMS-R-B13-01059," came from Box #13. The search inventory shows that Box #13 contained items found in Mazen Abdallah's home office. The index of locations searched shows that the garage was represented by the letter "O." Three groups of material were seized from the garage and placed in Box #8, as follows:

67

| O-1 | 8 | Black bag in plastic box | Metro lift name tag "W. Aballah, First Transit, Inc. (Metro) Employees Standards and Work Rules, Americare – Airgas Southwest receipt, Document containing handwritten notes with "Workplace issues" typed on it. |
| O-1 | 8 | Left side | Fax coversheet and Confirmation sheet "Capital One." |
| O-1 | 8 | Above Plastic Box | Package "Americare Client Survey," Misc. Americare documents and empty manila folders. Manila envelope for OSAS, manila envelope with Americare on it contains documents, Americare notepad – blank, Americare magnet, Black notebook with "To Do List" notes in it. |

(Docket Entry No. 398, Ex. B). A handwritten note attached to the typed inventory mentioned two additional items but did not state where they were found. These two items were 1) a folder containing patient addresses and 2) Americare medical service folder with blank patient sheets. (*Id.*, Ex. F).

The Metro-Lift manifest at issue, referred to in the prosecutor's closing argument, was part of Exhibit 1.15. In addition to the Metro-Lift manifest, Exhibit 1.15 also contained a type-written list of Americare clients and potential clients with hand-written notations about attempts to contact them, their medical condition, and their willingness to sign up with Americare. It was admitted into evidence. The manifest was not part of Exhibit 119, which was found on Mazen Abdallah's computer, as Mazen Abdallah argues. That exhibit was a type-written list of Americare clients and potential clients. It did not have any hand-written notations. Nor did it contain any Metro-Lift manifests. The argument that the manifest was not admitted into evidence is not supported by the

68

record.

Agent Hackney testified that all of the documents comprising Exhibit 1.15 were found together in a folder in the garage and then sequentially Bates-numbered.  The fact that items from Mazen Abdallah's home office were placed in Box 13 does not mean that all items placed in Box 13, including Exhibit 1.15, came from that office.  Agent Hackney testified that she personally found Exhibit 1.15 in the garage.  The jury could reasonably infer that Exhibit 1.15 was the folder containing patient addresses described in the handwritten note attached to the inventory and could credit Agent Hackney's testimony as to the location where that folder was found.  The fact that the prosecutor misstated that Exhibit 1.15 was found in his car, as opposed to his garage or even office, did not prejudicially affect Mazen Abdallah's substantial rights.  The presence of the manifest in Mazen Abdallah's home, whether car or garage, was the significant fact, not where in the home it was found.

The Abdallahs' argument that the prosecutor was deliberately lying because the car was not in the garage, as the prosecutor stated, but on the street, fails.  The videotape of the search shows the car in the garage during the search.

Contrary to Mazen Abdallah's assertion, the manifest was not the government's entire case against him.  The prosecutor's incorrect statement that Agent Hackney testified the manifest was found in the car in the garage, and not merely in the garage, is not a basis for granting a new trial.[8]

---

[8]   The Abdallahs also argue that if FBI agents retrieved Exhibit 1.15 from Mazen Abdallah's car, they did so illegally, without a warrant.  This accusation lacks merit.  The FBI had a valid warrant to search Mazen Abdallah's residence, and the description of the residence in that warrant includes the garage.  It is well-settled law that a warrant describing the premises includes vehicles parked on the property.  *See United States v. Singer*, 970 F.2d 1414, 1417-18 (5th Cir. 1992) ("This court has consistently held that a warrant authorizing a search of the premises includes vehicles parked on the premises."); *United States v. Napoli*, 530 F.2d 1198, 1200 (5th Cir. 1976) (holding that search of camper was authorized by warrant because "the

69

### d.    Did the Government Intimidate Witnesses?

Lastly, the Abdallahs argue that the government's "reckless misrepresentations" of the law and regulations intimidated witnesses, interfered with doctor-patient relationships, and resulted in misleading testimony.  They point to Mary Martinez's testimony on cross-examination that the lead prosecutor told her that she should stop using ambulance services to get to dialysis treatment because her condition did not make those services medically necessary.  According to the Abdallahs, "[u]nderlying this advice was the threat – certainly implicit if not voiced – that Mary Martinez might be prosecuted for seeking ambulance service."  (Docket Entry No. 349, at 43).  They argue that the government jeopardized Martinez's health because it made her use a walker to come to court and testify, instead of allowing her to use a wheelchair.  The Abdallahs assert that the government told doctors that ambulance transport is only covered by Medicare if the patient is bed-confined and transportation by other means is contraindicated, ignoring the other prong of the regulation that allows Medicare coverage if the patient's medical condition is such that ambulance transport is medically required.  They contend that this narrow interpretation of the regulation caused Drs. Merkelz and Gopal to testify that they would not have authorized ambulance transport for their patients had they known this position.  They accuse the government of intentionally eliciting this testimony by the doctors, "which [it] had engineered by incompetent misinformation," in violation of due process.  The Abdallahs also argue that the government intimidated EMTs and chilled their testimony on behalf of the defendants by instructing them that accepting a commission for recruiting a patient was a crime.  They assert that this instruction was false because EMTs can legally accept

---

reference to 'on the premises known as 3027 Napoleon Avenue' was sufficient to embrace the vehicle parked in the driveway of those premises.").

commissions from their employer for recruiting patients.

The record does not support these serious allegations of prosecutorial misconduct. On redirect examination, Martinez testified that she did not recognize the prosecutor. There was no evidence that the government "made" Martinez use a walker instead of a wheelchair in court or that her health was jeopardized. Other witnesses for the government came into court and testified from a wheelchair. There is no evidence in the record suggesting that the government treated Martinez differently.

The record does not support the argument that government agents told EMTs who were testifying that receiving a commission from their employer was a crime. To the contrary, EMT Bell testified that no one had ever told her receiving a commission from her employer for referring a patient was wrong. (Docket Entry No. 354, at 73:16–18). The Abdallahs have not produced any statements by Americare EMTs that their testimony was chilled or affected as a result of anything government agents told them. With respect to EMT Mahalec, who testified under a grant of immunity, the fear of criminal liability was not created by the government but by her own offer to pay Stevenson if he switched to Americare, a clear violation of the antikickback statute.

The record does not support the allegation that the government interfered with doctor-patient relationships. Dr. Merkelz signed CMNs for individuals who were never his patients; no doctor-patient relationship existed at to them. Dr. Gopal, who signed prescriptions for Mary Martinez, signed CMNs but testified that he never read the regulations governing ambulance transports and did not understand the criteria for prescribing such transports for Medicare coverage.

The Abdallahs's allegations of intimidation and interference are not supported by the record and do not support the request for a new trial.

71

### 3.      The Alleged Trial Errors

The Abdallahs allege a host of errors as the basis for a new trial.  They contend that the proof at trial materially varied from the indictment, that the jury instructions were erroneous, and that this court erred by: admitting Medicare manuals into evidence; allowing Patterson to remain in the courtroom; allowing Griffith to testify as an expert; permitting Griffith and Patterson to apply law to the facts without firsthand knowledge; and limiting the cross examination of Griffith and Patterson.  Each argument is examined below.

#### a.      *Material Variance*

The Abdallahs assert that it was error to permit the government to present evidence of Americare clients who rode on Americare ambulances to and from dialysis on a regularly scheduled, nonemergency, repetitive basis, despite a lack of medical need or a valid CMN for the ambulance transport, if those transports and clients were not specifically alleged in the indictment.  The superseding indictment alleged that Anderson, Batiste, Guzman, Martinez, Stevenson, and Vargas were Americare clients who did not have medical conditions that qualified them for Medicare coverage for nonemergency scheduled repetitive ambulance service and who did not have valid CMNs for such service.  The Abdallahs argue that the government was erroneously permitted to present evidence that several other Americare clients, not specifically identified in the indictment, were ineligible for Medicare-covered ambulance service.  The Abdallahs contend that this is a variance warranting a new trial.[9]

---

[9]   While a claim of material variance is sometimes treated as a challenge to the sufficiency of the evidence, *see United States v. Bolivar*, 532 F.3d 599, (7th Cir. 2008) ("we treat a claim of fatal variance the same as an attack on the sufficiency of the evidence"), a claim of variance can also serve as the basis for granting a new trial.  *See United States v. Manzella*, 782 F.2d 533, 539 (5th Cir.) (holding that once defendants prove material variance, they are entitled to a new trial if they show that their substantial rights were affected by

A variance exists when the evidence at trial proves facts different from those alleged in the indictment, as opposed to facts that, although not specifically mentioned in the indictment, are consistent with its allegations. *See*, *e.g.*, *Berger v. United States*, 295 U.S. 78, 81, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935) (fatal variance exists when the indictment charged a single conspiracy and the evidence demonstrated two different and disconnected smaller conspiracies); *United States v. Guthartz*, 573 F.2d 225, 228 (5th Cir.), *cert. denied*, 439 U.S. 864, 99 S.Ct. 187, 58 L.Ed.2d 173 (1978) (fatal variance exists when "an indictment enumerates the particular facts alleged to constitute the element of a charged crime and the proof makes out the elements in a different manner").

There was no variance in this case. The evidence that Medicare beneficiaries not named in the indictment rode on Americare ambulances and did not have medical conditions necessary for Medicare coverage for ambulance service was consistent with the indictment's allegations that the Abdallahs engaged in conspiracy to commit health care fraud by submitting bills to Medicare for ambulance transport for beneficiaries who did not medically qualify for the service. In a prosecution for health care fraud, "acts and transactions constituting a part of [the scheme to defraud] are admissible as proof of the criminal enterprise." *United States v. Kirkham*, 129 Fed. App'x 61, 73 (5th Cir. 2005). Evidence that other beneficiaries did not qualify for ambulance transport was both relevant and intrinsic to the health care fraud.

The Abdallahs received notice and were aware that the government had evidence about Americare clients for whom ambulance transport was not medically required and who were not

---

the variance), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986); *and* CHARLES A. WRIGHT *et al*, FEDERAL PRACTICE & PROCEDURE § 556 (3d ed.2004) ("any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial").

included in the indictment.  In a conspiracy case, the government is not limited to presenting evidence of the substantive counts charged in the indictment, but may offer proof of acts and uncharged crimes that are outside the scope and counts of the indictment to establish the elements of conspiracy.  *See*, *e.g.*, *United States v. Lokey*, 945 F.2d 825, 834 (5th Cir. 1991) (holding evidence of similar crimes committed outside the temporal scope and substantive counts of the indictment admissible "because it was relevant to establish how the conspiracy came about, how it was structured, and how each appellant became a member"); *United States v. Nichols*, 750 F.2d 1260, 1264–65 (5th Cir. 1985) (holding evidence of defendant's involvement in uncharged crimes admissible as it was intrinsic to the government's case in proving the existence of a conspiracy).

b.      *The Jury Instructions*

The Abdallahs challenge the jury instructions on the governing Medicare regulation, 42 C.F.R. §410.40(d).  The relevant part of the jury instructions are as follows:

A federal regulation, Title 42 C.F.R. § 410.40, describes the requirements for establishing the medical necessity of ambulance transport that is covered by Medicare.  The regulation states as follows:

(d) Medical necessity requirements—

(1) General rule.  Medicare covers ambulance services . . . only if they are furnished to a beneficiary whose medical condition is such that other means are contraindicated.  The beneficiary's condition must require both the ambulance transportation itself and the level of service provided in order for the billed service to be considered medically necessary.  Nonemergency transportation by ambulance is appropriate if either the beneficiary is bed-confined, and it is documented that a beneficiary's condition is such that other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required.  Thus, bed confinement is not the sole criterion in determining the medical necessity of ambulance transportation.  It is one factor that is considered in a medical necessity determination.  For a beneficiary to be considered bed-

74

confined, the following criteria must be met:

> (i) The beneficiary is unable to get up from the bed without assistance.

> (ii) The beneficiary is unable to ambulate.

> (iii) The beneficiary is unable to sit in a chair or wheelchair.

> (2) Special rule for nonemergency, scheduled, repetitive ambulance services.   Medicare covers medically necessary nonemergency, scheduled, repetitive ambulance services if the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements or paragraph (d)(1) of this section are met.  The physician's order must be dated no earlier than 60 days before the date the service is furnished.

> You are instructed that this Medicare regulation does not state that an ambulance company that transports patients to and from dialysis on a nonemergency, scheduled, repetitive basis has to obtain more than a valid physician's certificate of medical necessity to demonstrate that a particular ambulance transport was medically necessary.

(Docket Entry No. 325, at 16–17).  The Abdallahs argue that because the government's proof at trial largely ignored the second prong of the medical necessity definition – "if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required" – the jury had to be "disabused of the idea that the beneficiaries' ability to use other forms of transportation was an essential component of the definition of the benefit."  (Docket Entry No. 349, at 67).  The Abdallahs requested a separate instruction defining eligibility for nonemergency ambulance transportation.  They assert that the instruction that this court gave – a verbatim recitation of subsections (d)(1) and (d)(2) – was erroneous because it "could create confusion at best and further harm the Defendants at worst."  (*Id.*, at 68).  They argue that without a separate instruction, "the jury would clearly assume that no matter what prong was applied, the benefit was available only

75

to beneficiaries who could not possibly take other forms of transportation." (*Id.*).

The Abdallahs also argue that this court erred by not instructing the jury on terms found in the regulation, 42 C.F.R. § 410.40(d).  The Abdallahs assert that the following terms required definition:  "documentation"; "medically required"; "contraindicated"; "certificates of medical necessity"; "unable to sit in a chair or wheel chair"; and "qualified" or "eligible" for ambulance service.  At trial, the Abdallahs submitted proposed jury instructions that included the following instruction about documentation requirements:  "Title 42 U.S.C. § 410.40(d), subsections (1) the General Rule and (2) the Special Rule regarding non-emergency ambulance transportation do not require providers of non-emergency scheduled repetitive ambulance transportation to keep records or document the conditions of the patients that they transport."  (Docket Entry No. 318, Defendant's Proposed Jury Instructions, at 7).  For "medically required," the Abdallahs sought this definition: "A treatment or activity is medically required if the treatment or activity is in the best interest of the patient, or if in the absence of the treatment or activity, the patients' conditions or symptoms present a risk to the health or safety of others.  Non-emergency ambulance transportation is medically required for a patient on days that a patient is to undergo dialysis if it is in the best interest of the patient to use non-emergency ambulance transportation to dialysis on those days; or non-emergency ambulance transportation is medically required . . . if transporting the patient by means other than ambulance presents a risk to the health or safety of others."  (*Id.*, at 4).  The Abdallahs sought to have this court instruct the jury that "contraindicated" means: "'to make (the indicated, or expected treatment) inadvisable: said of a symptom or condition.'  Hence, other means of transportation are contraindicated, or other methods of transportation are contraindicated due to the conditions or symptoms of a beneficiary if the conditions or symptoms of the patient makes other means, or other

methods, of transportation inadvisable." (*Id.*, at 3).  For "certificates of medical necessity," the Abdallahs proposed this instruction: "If the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements of paragraph (d)(1) of 42 C.F.R. § 410.40 are met, and the physician's order is dated no earlier than 60 days before the date the service is furnished, then that CMN is sufficient for Medicare to cover nonemergency, scheduled, repetitive ambulance services during the 60 day period for the patient for whom the service is medically necessary. However, it is not necessary, according to the terms of 42 C.F.R. § 410.40(d)(2), that the ambulance provider obtain a certificate of medical necessity before transporting a patient to or from dialysis, or before submitting a bill to Medicare for ambulance service provided to the patient." (*Id.*, at 6). And the Abdallahs sought the following definition of "unable to sit in a chair or wheelchair": "A person is 'unable to sit in a chair or wheelchair' if the person is unable to sit in a chair or wheelchair safely, or is unable to sit in a chair or wheelchair without the assistance of another in transferring to or from the chair or wheelchair." (*Id.*, at 5).  The Abdallahs did not propose definitions for the terms "qualified" or "eligible for ambulance service."

The Abdallahs also argue that this court erred by not instructing the jury that nonemergency scheduled repetitive ambulance services do *not* require a CMN.  The Abdallahs contend that the government misstated the law governing ambulance transportation by stating that a CMN is necessary for transport.  The Abdallahs argue that an instruction was necessary to disabuse the jury of the notion that transporting beneficiaries without a CMN was a *per se* violation of the regulation. They assert that under §410.40(d)(2), a CMN is sufficient but not necessary for Medicare coverage for ambulance transports for regularly scheduled, nonemergency, repetitive ambulance services, and

that this court should have given an instruction to that effect.

Lastly, the Abdallahs argue that the government erroneously interpreted the regulation to impose a document retention requirement on providers of nonemergency scheduled repetitive ambulance transports.  They contend that a jury instruction was necessary to clarify that no such requirement applied to Americare or the Abdallahs.

Each of these  contentions lacks merit.  "[A] district court retains substantial latitude in formulating its jury charge, and . . . will [be] reverse[d] only if the requested instruction is substantially correct; was not substantially covered in the charge as a whole; and if the omission of the requested instruction seriously impaired the defendant's ability to present a given defense." *United States v. Cain*, 440 F.3d 672, 674 (5th Cir. 2006) (internal quotations and citations omitted). Any error is subject to harmless error review.  *United States v. Nguyen*, 493 F.3d 613, 622 (5th Cir. 2007).  "The trial court may decline a suggested charge which incorrectly states the law, is without foundation in the evidence, or is stated elsewhere in the instructions."  *United States v. Robinson*, 700 F.2d 205, 211 (5th Cir. 1983).

This court's instruction on the regulation that applies to Medicare coverage for nonemergency regularly scheduled repetitive ambulance transports to and from dialysis was correct, and on the proper role of the regulation in proving health care fraud, was correct.  Under the "general rule," which applies by its terms to ambulance services in general, "Medicare covers ambulance services . . . only if they are furnished to a beneficiary whose medical condition is such that other means are contraindicated."  42 C.F.R. § 410.40(d)(1).  Medicare coverage is present "if *either* the beneficiary is bed-confined, *and* it is documented that a beneficiary's condition is such that other methods of transportation are contraindicated; *or*, if his or her medical condition,

regardless of bed confinement, is such that transportation by ambulance is medically required." *Id.* (emphasis added).  The special rule is that for Medicare coverage for nonemergency repetitive scheduled ambulance services, an "ambulance provider or supplier, before furnishing the service to the beneficiary," must obtain "a written order from the beneficiary's attending physician certifying that the medical necessity requirements or paragraph (d)(1) of this section are met.  The physician's order must be dated no earlier than 60 days before the date the service is furnished."

The jury instructions set out this regulation.  The instructions also carefully informed the jury that failure to meet the regulations was not sufficient to meet the government's burden of proving a violation of the healthcare fraud statute.  This court instructed the jury that "[a] violation of a regulation is not in itself a criminal offense," and that only if the jury first found that a defendant committed the acts charged in the indictment could it then "consider the evidence of a violation of a regulation for the limited purpose of determining whether that defendant had the required state of mind or intent necessary to commit the crimes charged."  (Docket Entry No. 325, at 17–18).  *See United States v. Butler*, 429 F.3d 140, 150–51 (5th Cir. 2005) (approving nearly identical instruction in fraud case); *United States v. Brechtel*, 997 F.2d 1108, 1115 (5th Cir. 1993) ("[W]e and our colleagues in other circuits have recognized the value of limiting instructions in attenuating any improper effect of such evidence when used for a permissible purpose.") (citing *United States v. Cordell*, 912 F.2d 769, 777 (5th Cir. 1990); *United States v. McElroy*, 910 F.2d 1016, 1023–24 (2d Cir. 1990); *United States v. Smith*, 891 F.2d 703, 710 (9th Cir.) *cert. denied*, 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990); *United States v. Stefan*, 784 F.2d 1093, 1098 (11th Cir.) *cert. denied*, 479 U.S. 855, 107 S.Ct. 193, 93 L.Ed.2d 125, 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 706 (1986)). The instructions were accurate and did not as a whole mislead or misinform the jury.  *See United*

*States v. McPhilomy*, 270 F.3d 1302, 1310 (10th Cir. 2001) (finding no error in jury instructions that stated regulation verbatim and as a whole adequately informed jury of relevant law).

The Abdallahs' argument that the court erred in failing to define the terms "documentation," "contraindicated," "certificates of medical necessity," and "unable to sit in a chair or wheel chair," is unpersuasive. "A trial court need not define specific statutory terms unless they are outside the common understanding of a juror or are so technical or specific as to require a definition." *Nguyen*, 493 F.3d at 624 (quoting *United States v. Chenault*, 844 F.2d 1124, 1131 (5th Cir. 1988)); *see also United States v. Dixon*, 201 F.3d 1223, 1231 (9th Cir. 2000) (holding that "the court did not err by failing to define 'commercial advantage' and 'private financial gain' because these are common terms, whose meanings are within the comprehension of the average juror"); *United States v. Moore*, 921 F.2d 207, 210 (9th Cir. 1990) (holding that, "since 'violence' is a concept within the jury's ordinary experience, there is no prejudice in failing to define it"). The terms at issue are within the jury's common understanding and were not so technical or specific as to require definition. "Documentation" and "contraindicated" are clear terms and their undisputed meaning was made clear in the testimony. The term "certificates of medical necessity" was similarly defined and explained, without dispute, in the testimony. The terms "qualified" or "eligible" for ambulance service were defined in the medical necessity requirements of the regulation set forth in the instructions. The term "unable to sit in a chair or wheelchair" is clear and needed no additional explanation. No additional instruction was needed to define "medically required" because it was used consistent with its common meaning and the jury had sufficient guidance from the testimony, specifically that of Dr. Patterson and Dr. Evans, to determine whether ambulance transport was medically required for the patients at issue. *See United States v. Thierman*, 76 F.3d 390, 1996 WL

18638, at *10 (9th Cir. 1996) (unpublished table decision) (district court did not err when it instructed jury on the crime of selling adulterated drugs by failing to maintain current good manufacturing processes but did not define the processes because jury had guidance from testimony as to what constituted such processes).

The Abdallahs's requested instruction that a CMN is sufficient but not necessary for Medicare coverage for nonemergency scheduled repetitive ambulance transport to and from dialysis was properly denied because it incorrectly stated the law.  The Medicare Act plainly states that Medicare covers a claim under Part B, which includes ambulance services, "only if . . . a physician certifies . . . that . . . such services are or were medically required."  42 U.S.C. § 1395n(a)(2)(B); *see also United States v. Convalescent Transports, Inc.*, 2007 WL 2090210, at *2 (E.D.N.C. July 19, 2007) (interpreting, in False Claims Act case, 42 C.F.R. § 410.40(d)(2) to require a CMN for nonemergency, scheduled, repetitive ambulance services).

The Abdallahs's proposed instruction that "medically required" means "in the best interest of the patient" was also an incorrect statement of the law.  The regulations do not phrase "medically required" in terms of a patient's best interest.  The regulations clearly state: "Nonemergency transportation by ambulance is appropriate if either: the beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required."  42 C.F.R. § 410.40(d)(1).

The Abdallahs argue that government witnesses incorrectly stated that the document-retention requirement of § 410.40(d)(3)(v), which is not, on the face of the statute, part of the special

rule for nonemergency repetitive scheduled ambulance transports, applied.[10]  The jury instructions specifically stated that for nonemergency scheduled repetitive ambulance services, the provider does not have to obtain anything more than a valid CMN to demonstrate that a particular ambulance transport was medically necessary.   This instruction was sufficient to cure any erroneous interpretation of the regulation by the government in terms of document retention.

The jury instructions correctly stated the law and are not grounds for granting the Abdallahs a new trial.

### c.    *Admission of Medicare Manuals Into Evidence*

The Abdallahs argue that it was error to admit into evidence the 2006 and 2007 ambulance manuals published by Medicare's contractor, Trailblazer Health, Inc.  The Abdallahs contend that the probative value of the manuals was substantially outweighed by the danger of unfair prejudice and confusion because the manuals "had the misleading appearance of official Government publications when they actually were composed by a Government contractor," (Docket Entry No. 349, at 54), and misinterpreted the regulation governing non-emergency scheduled repetitive ambulance service.  They contend that the manuals disregarded the "medically required" prong of 42 C.F.R. § 410.40(d)(1), falsely implied that ambulance service was medically necessary only if other forms of transportation were contraindicated, and misinterpreted the regulation to require document retention and a CMN for providers of nonemergency scheduled repetitive ambulance service.  The Abdallahs argue that Griffith and Patterson based their opinions that Medicare would

---

[10]    Although the document-retention provision of §  410.40(d)(3)(v) on its face applies to nonemergency transports that are either unscheduled or on a nonrepetitive basis, Medicare regulations also require that, upon request, ambulance suppliers "provide additional information and documentation as required."  42 C.F.R. § 410.41(c)(3).  The policy statement in the Medicare manual requiring ambulance providers to provide documentation in addition to a CMN to support a claim is consistent with §410.41(c)(3).

have denied claims submitted by Americare on the manual's erroneous interpretations. They assert that a new trial is warranted because the government's introduction of the manuals and sponsorship of testimony based on the manuals "recklessly mislead [sic] the jury," (Docket Entry No. 349, at 55), in violation of *Giglio*, 405 U.S. at 150.

The admission of the Medicare manuals was not error and does not warrant granting a new trial. Other courts have upheld the admission of Medicare manuals as relevant evidence in cases involving health care fraud. *See United States v. Gold*, 743 F.2d 800, 815–16 (11th Cir. 1984) (conspiracy to commit health care fraud); *United States v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1357–58 (11th Cir. 2005) (False Claims Act); *see also State v. Romero*, 533 So.2d 1264, 1275 (La. App. 3 Cir. 1988) (holding that the "trial court did not err in admitting [Medicaid] provider manual into evidence"), *writs granted*, 541 So.2d 879, 880 (La. 1989). In *Gold*, the court held that a similar Medicare manual was "highly relevant" in determining those claims payable under Medicare because the manual "directly reflected the interpretation of those statutes and regulations by government officials who were charged with administering the programs involved." 743 F.2d at 815–16. The ambulance manuals were relevant. They set out the agency's interpretation of the medical necessity requirements and other conditions for Medicare coverage. *See also Keefe v. Shalala*, 71 F.3d 1060, 1065 (2d Cir.1995) (provisions of Medicare manual "are valid interpretive rules and are promulgated by the Secretary under the authority of [the Medicare statute]") (citing *Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986) for the proposition that "an 'agency's construction of its own regulations is entitled to substantial deference" and *St. Mary's Hospital v. Blue Cross & Blue Shield Ass'n*, 788 F.2d 888, 890 (2d Cir. 1986) for the proposition that "Medicare Provider Reimbursement Manual is an 'interpretive'

document entitled to persuasive weight").

Defense counsel vigorously cross-examined the government's witnesses on their interpretation of the Medicare regulations and on the manuals. The court's instructions carefully told the jury that a valid CMN was required for Medicare coverage for the type of ambulance service at issue and that this was the only document that had to be obtained by the service provider. The jury instructions did not say that Americare or the Abdallahs were subject to any other document-retention requirement. The manuals were admissible evidence, the jury was free to assess their persuasive weight, and the admission does not provide a basis for granting a new trial.

### d. Alleged Errors Concerning Griffith and Patterson

The Abdallahs argue that this court erred by allowing Christine Griffith, the coverage policy manager for TrailBlazer Health Enterprises, a Medicare contractor, to testify as an expert witness. They argue that Griffith was not qualified under Rule 702 to render opinion evidence on the rules and regulations governing the payment of ambulance transports for dialysis patients. The Abdallahs contend that Griffith was not qualified because she was not employed by Medicare but by a Medicare contractor and never worked in the billing department at TrailBlazer. They assert that "Griffith's familiarity with Medicare's rules and regulations was grossly deficient" because she opined that CMNs were required for nonemergency scheduled repetitive ambulance service and that providers were also required to maintain supporting documentation on file. They also argue that Griffith was not qualified to testify about the significance of medical records because she does not have medical expertise.

Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." As a threshold matter, the trial judge must determine whether the proffered witness is qualified to give the expert opinion he seeks to express. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, training, or education. FED. R. EVID. 702. The Fifth Circuit has stated that an expert must have expertise in the general area in which he testifies, but need not have expertise in the specialized area directly pertinent to the issues in question. *United States v. Marler*, 614 F.2d 47, 50 (5th Cir. 1980). The court must determine whether the proposed expert's training or experience are sufficiently related to the issues and evidence before the court that the expert's testimony will assist the trier of fact. *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562-63 (5th Cir. 2004).

The party offering the expert testimony has the burden to establish by a preponderance of the evidence that it is admissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). The party offering the challenged expert opinions need not, however, prove "that the expert's testimony is correct." *Id.* The district court must also make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [the reliability criterion] and of whether the reasoning or methodology can be applied to the facts at issue [the relevance analysis]." *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert*, 509 U.S. at 592-93). The district court's responsibility is "to make certain

85

that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The court "must ensure that the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

Contrary to the Abdallahs' arguments, Griffith was qualified to testify about Medicare rules and regulations governing payment of ambulance transports for dialysis patients. Griffith had 23 years of experience working for Medicare contractors. The argument that Griffith is not qualified because she works at TrailBlazer – a Medicare contractor – and not for Medicare itself is unavailing. The Medicare program is implemented by private contractors that act as agents of HHS to process, review, and pay claims submitted to Medicare for payment. While working for Medicare contractors, Griffith has processed claims, corresponded with medical providers about reviewing claims, worked as a hearing officer specializing in Medicare coverage for ambulance services, trained other hearing officers on Medicare coverage for ambulance services, worked as a coverage policy specialist, and now serves as a manager at TrailBlazer. Griffith assisted in drafting the Medicare-provider manuals and participates in provider education, including seminars and teleconferences, concerning claims, documentation, and payment for ambulance services. She was amply qualified by experience and training.

Furthermore, Griffith's testimony was both relevant and reliable. At trial, Griffith testified about the Medicare payment system and how it functioned, helping the jury understand the rules and regulations under which Americare submitted its claims. *See United States v. Strange*, 23 Fed. App'x 715, 717 (9th Cir. 2001) (observing that testimony regarding Medicare regulations and

reimbursement procedures was "entirely appropriate for an expert"). Griffith's expertise in reviewing medical records for TrailBlazer in the process of reviewing claims allowed her to help the jury understand the diagnoses shown on the Americare run sheets and whether they supported a claim for payment. Griffith's opinions were based on Americare's records; Medicare's interpretation of the applicable regulations, including §410.41(c)(3); her lengthy experience in processing and reviewing ambulance transport claims; and her review of medical and other records relating to the Americare clients. Griffith reliably applied Medicare's interpretation of the regulation to the claims and documents submitted by the Abdallahs to opine that these claims would not have been paid had TrailBlazer conducted a prepayment review. Courts have permitted such testimony in similar cases. *See*, *e.g.*, *United States v. Universal Rehabilitation Services, Inc.*, 1996 WL 297575, at *10 (E.D. Pa. May 31, 1996) (permitting expert testimony by Medicare contractor employee who offered opinion as to whether the documents submitted by provider supported claims for payment by Medicare).

Second, the Abdallahs argue that this court erred by allowing Griffith and Patterson to testify about facts that they did know on a first-hand basis. They argue that Griffith never conducted a prepayment review and was not competent to testify about what TrailBlazer would have done had it conducted a prepayment review. The Abdallahs contend that Patterson's testimony that Americare's claims were not covered by Medicare was not based on her medical expertise, but "was the result of Patterson applying regulations she badly misunderstood to facts supplied by the government." (Docket Entry No. 349, at 58). These arguments lack merit. Griffith and Patterson did not purport to testify exclusively from first-hand knowledge and were not required to do so. "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those

that are not based on first-hand knowledge or observation." *Daubert*, 509 U.S. at 591.  After reviewing the individual case files that were presented during trial, Griffith and Patterson offered their opinions about whether the documents supported the ambulance-transport claims billed to Medicare.  Griffith and Patterson testified based on their lengthy experience with and knowledge of  Medicare regulations and claims review.

To the extent the Abdallahs challenge the opinions of Griffith and Patterson about whether Medicare would have paid the claims, "[i]t is well established that Fed. R. Evid. 704 permits a witness to express an opinion as to an ultimate issue that must be decided by the trier of fact." *See United States v. Gold*, 743 F.2d 800, 817 (11th Cir. 1984) (citing *United States v. Miller*, 600 F.2d 498, 500 (5th Cir.), *cert. denied,* 444 U.S. 955 (1979)).  In *Gold*, the court held that because the trial judge carefully instructed the jury about the weight that should be given expert testimony such as that offered by a witness who had received special training on Medicare, admission of the expert's opinion as to whether particular claims filed by defendants charged with Medicare fraud were eligible for reimbursement under Medicare was proper.

Third, the Abdallahs argue that this court erred by failing to exclude Patterson from the courtroom, in violation of Rule 615 of the Federal Rules of Evidence.  Rule 615 directs that upon a party's request or upon its own motion "the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses" subject to certain exceptions.  The exceptions include "(3) a person whose presence is shown by a party to be essential to the presentation of the party's cause."  The Abdallahs contend that Patterson was not essential to the government's case because her testimony and opinion was redundant of Griffith's.  Relying on *Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625, 629 (4th Cir. 1996), the Abdallahs also contend that the exception does not apply

to Patterson because she also served as a fact witness regarding disputed issues in the case.

The government responds that Patterson was appropriately allowed to listen to testimony because Federal Rule of Evidence 703 "provides that an expert may base his opinions on facts or data obtained 'at or before the hearing.'" *Mayo v. Tri-Bell Industries, Inc.*, 787 F.2d 1007, 1013 (5th Cir. 1986). In *Mayo*, the court held that it was permissible for the defendant's expert witness to testify after having discussed the evidence with defense counsel during a break in trial. Citing Rule 703, the court concluded that expert witnesses "would be testifying solely as to their opinion based on the facts or data in the case, and, accordingly, were properly exempted from the order excluding witnesses. Because the experts were not witnesses whose recollections might have been colored by accounts of prior witnesses, there was no prejudice." *Id.* (internal citations omitted).

Some courts have rejected the government's argument that, consistent with Rule 703, Rule 615(3) does not cover expert witnesses who express opinions based on the facts of the case. *See*, *e.g.*, *Opus 3*, 91 F.3d at 629; *Woodson v. McGeorge Camping Ctr., Inc.*, 42 F.3d 1387, 1994 WL 667052, at *3 (4th Cir. 1994) (unpublished table decision); *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1373–74 (5th Cir. 1981); *Morvant v. Const. Aggregates Corp.*, 570 F.2d 626, 630 (6th Cir. 1978). In *Miller*, the Fifth Circuit agreed with the *Morvant* court that "Rule 703 does not furnish an automatic basis for exempting an expert from sequestration under rule 615 . . . . Whether or not it would be reasonable for a trial court to exempt an expert witness from a sequestration order, there is no required exemption implied under rule 615." 650 F.2d at 1374.

The Abdallahs' reliance on *Opus 3* is misplaced. The district court excluded the witness in that case "not because he was an expert who would not benefit from testimony, but because he was a key fact witness." 91 F.3d at 629. Patterson was not a fact witness in this case, much less a key

89

fact witness, but gave opinion testimony based on her review of the run sheets and medical records. Although Rule 703 does not provide a blanket exemption  from Rule 615, Patterson was appropriately exempted from Rule 615 in this case, along with Dr. Evans, the Abdallahs' expert. Expert witnesses who either respond to the theories of an adversary's expert or base their opinions on facts adduced by witnesses at trial are infrequently excluded from the courtroom during trial.  *See Morvant*, 570 F.2d at 629–30 ("Theoretically at least, the presence in the courtroom of an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others hardly seems suspect and will in most cases be beneficial, for he will be more likely to base his expert opinion on a more accurate understanding of the testimony as it evolves . . . .").  It is within the trial judge's discretion to except from the rule expert witnesses who may base their opinions in part on witness testimony.  *Id*. at 630.  Patterson was appropriately exempted from the Rule 615 order.

Finally, the Abdallahs argue that this court improperly limited their ability to cross-examine Griffith and Patterson about the structure and meaning of the regulation.  The Confrontation Clause of the Sixth Amendment provides a criminal defendant with the right to confront and cross-examine witnesses presented against him at trial.  *Cruz v. New York*, 481 U.S. 186, 189, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987).  "[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."  *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).  The Confrontation Clause does not, however, mean that defense attorneys are allowed limitless opportunity to cross-examine witnesses.  Trial judges retain the discretion to impose reasonable limits on cross-examination "based on concerns about, among other things, harassment, prejudice, confusion

90

of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.*

At trial, after Griffith testified about nonemergency scheduled repetitive ambulance transports and about § 410.40(d)(2), the prosecutor asked Griffith "to look at what is marked as small v in the second column. Would you read that particular section of the regulations for the jury?" Section 410.40(d)(3)(v) states, "In all cases, the provider or supplier must keep appropriate documentation on file and, upon request, present it to the contractor. The presence of the signed certification statement or signed return receipt does not alone demonstrate that the ambulance transport was medically necessary. All other program criteria must be met in order for payment to be made." After Griffith read that section, defendants objected, saying that "the interpretation that she's testifying to is not the appropriate standard, and it's confusing to the jury." In response, this court overruled the objection and told the jury that "instructions on the law are going to come from me. They are not going to come from the witness stand. You will receive those instructions at the end of the case." On cross-examination, defense counsel pointed out to Griffith that §410.40(d)(3)(v) was placed under the rule for nonemergency ambulance services that are either unscheduled or that are scheduled on a nonrepetive basis and asked Griffith whether the requirements of that subsection applied to nonemergency scheduled repetitive ambulance transports, which are described in §410.40(d)(2). The government objected on grounds that Griffith is not an expert in statutory construction, and this court asked defense counsel to rephrase the question.

91

Defense counsel proceeded to question Griffith about her qualifications and experience to interpret the regulation.  After several similar questions, the government objected on the grounds that the last question asked had been asked and answered.  This court asked defense counsel to move on.

Later during trial, the prosecutor asked Patterson to read a policy statement from the Medicare manual, which stated: "It is important to note that the mere presence of the signed physician certification statement does not by itself, demonstrate that the transport was medically necessary and does not absolve the ambulance provider from meeting all other coverage and documentation criteria." (Docket Entry No. 311, at 7:8–18).  The prosecutor then asked Patterson whether "for nonemergency regularly scheduled transports, that particular section of the code that we know as (3)(v), does it scoop up this policy statement here that's in the manual?"  Patterson responded that "It's been our understanding and our instruction from CMS, that it does."  (*Id.*, at 8:8–13).  On cross-examination, defense counsel asked Patterson whether she was an expert in regulatory interpretation, to which Patterson responded that she was neither a lawyer nor a judge.  Defense counsel asked Patterson if she had testified about subsection (d)(3)(v), and Patterson said "I believe the prosecutor asked me to read that section."  Defense counsel then stated that this subsection applied to nonemergency services that are either unscheduled or scheduled on a nonrepetitive basis, and Patterson agreed that the transports at issue in this case were nonemergency scheduled repetitive services.  Defense counsel went on to elicit statements from Patterson that she was not a lawyer and not trained in principles of regulatory construction.  After defense counsel asked Patterson whether regulatory construction was outside her "comfort zone," this court sustained the government's objection that the question had been asked and answered.

While Griffith and Patterson were some of the government's principal witnesses, the

92

challenged limits on their cross-examinations did not deny the jury information necessary to assess the Abdallahs' theory of the case. The Abdallahs were allowed to question Griffith and Patterson about the regulations and their qualifications to interpret them. This court limited cross-examination of these witnesses only to the extent that the questions were cumulative to "avoid needless consumption of time." *See* FED. R. EVID. 611(a). The jury instructions correctly set forth Medicare's requirements in terms of document retention and CMNs. There was no violation of due process or the Confrontation Clause. *See United States v. Sims-Robertson*, 16 F.3d 1223, 1994 WL 12212, at *10 (6th Cir. 1994) (unpublished table decision) (trial court did not abuse discretion by limiting cross-examination of expert into standard of care where jury instruction set forth the appropriate standard of care). The Abdallahs are not entitled to a new trial.

## IV.   Motion for Postverdict Disclosure of Exculpatory and Impeachment Evidence

The Abdallahs seek posttrial disclosure, under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), of all information impeaching the government's "new theory" that Mazen Abdallah paid Kelvin Washington to procure CMNs for Americare clients.[11] The Abdallahs assert that they attempted to obtain information from Washington, but that Washington refused to be interviewed because he was a target of the government's health-care fraud investigation. Washington informed defense counsel that he would invoke his Fifth Amendment right if subpoenaed to appear at trial. The Abdallahs contend that the government effectively suppressed any available evidence from Washington by making him a target of the criminal investigation and

---

[11]   As stated above, the Abdallahs also sought posttrial disclosure, under *Giglio*, of all photographic and videographic records of the search of Mazen Abdallah's home to impeach or disprove the government's allegation that Exhibit 1.15 was found in Mazen Abdallah's car in the garage. The government provided this evidence to the defendants on October 2, 2008. The evidence showed that Mazen Abdallah's car was parked in the garage on the day of the search.

refusing to grant him immunity to testify, even after the investigation was completed.  They assert that this court denied their request to compel immunity for Washington.  According to the Abdallahs, the prosecutors interviewed Washington on one or more occasions.  They assert that "[a]ny statements by Washington denying that he agreed to procure CMNs illicitly or denying that he was paid or offered payment for this service would impeach" the government's theory and "directly exculpate Mazen Abdallah." (Docket Entry No. 402, at 4).  "[D]isclosure naturally should include assertions by Washington that he only met with Mazen Abdallah on one or a few occasions, and assertions indicating that the only business arrangement he made related to Americare involved referring beneficiaries for ambulance service." (*Id.*).  The Abdallahs also argue that the government should reveal any statements that tend to exonerate Washington himself, statements that Washington thought any fee arrangement for patient referrals he had with the Abdallahs was legal, and any statement that patient referrals were the only thing he ever discussed with the Abdallahs.  (*Id.*).  The Abdallahs contend that this information is unavailable from any other source.  They assert that any claim of attorney work-product protection would not preclude *Brady* disclosure of the prosecutor's notes or documents memorializing statements made by Washington.  *See Dickson v. Quarterman*, 462 F.3d 470, 480 n.6 (5th Cir. 2006) ("the work-product immunity for discovery in Rule 16(a)(2) prohibits discovery under Rule 16 but it does not alter the prosecutor's duty to disclose material that is within *Brady*") (quoting CHARLES A. WRIGHT *et al*, FEDERAL PRACTICE & PROCEDURE § 254.2 (3d ed. 2000)).

The government argues that the allegations about Washington's role in providing Americare false CMNs for nonemergency repetitive scheduled transport for Americare clients are not part of a "new theory."  The government points to the superseding indictment, which states:

> It was further a part of the conspiracy that Defendants . . . would and did falsely present prescriptions to nursing home staff in order to secure staff physician's signatures for ambulance transports of dialysis patients who had never been under the care of the nursing home or who had not been nursing home patients for many months or years. . . .

(Docket Entry No. 126, at ¶ 16).  The government argues that the Abdallahs had ample notice of its theory of Washington's role in the conspiracy.  The government notes that this request for Washington's statements was not made during trial, despite the fact that the indictment itself refers to the role of a nursing home administrator in the conspiracy and in the five weeks of trial, there was extensive testimony and evidence about payments to Washington by Mazen Abdallah, Washington's role in providing clients to Americare, and the false CMNs that Americare received from doctors at SLNH.  Citing *United States v. Wall*, 389 F.3d 457 (5th Cir. 2004),  the government asserts that "[w]hen a defendant becomes aware of evidence early in a trial, the defendant must seek a continuance or demonstrate efforts to obtain the evidence before it will be considered newly discovered."  *Id.* at 469.  The government further asserts that the Abdallahs never requested witness immunity for Washington and that this court never ruled on a motion to compel immunity for Washington.  The government contends that  the Abdallahs' *Brady* request is a "fishing expedition" because it is speculative and conclusory.  *See United States v. Edwards*, 442 F.3d 258, 267-68 (5th Cir. 2006) (denying evidentiary hearing to investigate purely speculative *Brady* claim).

*Brady* claims are reviewed using a three-part test.  The defendant must show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment.  *See Mahler v. Kayo*, 537 F.3d 494, 499–500 (5th Cir. 2008).  "When information is fully available to a defendant at the time of his trial and his only reason for not obtaining and presenting the evidence to the court is his lack of

reasonable diligence, the defendant has no *Brady* claim." *United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997) (quotation omitted).

Of the *Brady* elements, materiality "is generally the most difficult to prove." *Mahler*, 537 F.3d at 500. "Evidence is material under *Brady* when there is a 'reasonable probability' that the outcome of the trial would have been different if the evidence had been disclosed to the defendant." *United States v. Runyan*, 290 F.3d 223, 247 (5th Cir. 2002) (citing *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "A 'reasonable probability' is established when the failure to disclose the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555). "[M]ateriality does not require the defendant to demonstrate by a preponderance of the evidence that omitted evidence would have resulted in acquittal." *DiLosa v. Cain*, 279 F.3d 259, 263 (5th Cir.2002) (citing *Kyles*, 514 U.S. at 434–37, 115 S.Ct. 1555). "The defendant must establish that the suppression of exculpatory evidence by the government undermines confidence in the outcome of the trial." *Runyan*, 290 F.3d at 247 (internal quotation marks omitted).

Materiality depends "almost entirely" on the value of the suppressed evidence relative to evidence the government disclosed. *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004). "Thus, 'when the undisclosed evidence is merely cumulative of other evidence [in the record], no *Brady* violation occurs.'" *Id.* (quoting *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996)). "Similarly, when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material." *Id.* (citing *Wilson v. Whitley*, 28 F.3d 433, 439 (5th

Cir. 1994)).  "Conversely, if the impeaching evidence 'would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material.'"  *Id.* (quoting *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989)).

The record does not show that the Abdallahs sought to obtain witness immunity for Washington so that they could interview him before trial.  The record shows that the Abdallahs requested witness immunity for Will Smith but not for Washington.  The government denied the request to give Smith immunity, and this court denied the defense motion to compel immunity.  It is well established that a defendant has no absolute right to have a witness granted immunity.  *See*, *e.g.*, *United States v. Straub*, 538 F.3d 1147, 1166 (9th Cir. 2008); *United States v. Diaz*, 176 F.3d 52, 115 (2d Cir. 1999); *United States v. Fricke*, 684 F.2d 1126, 1130 (5th Cir. 1982) (defendant cannot "compel the government to grant use immunity to witnesses he desires to call").  In the absence of intimidation or deliberately distorting the facts by causing some witnesses to invoke their Fifth Amendment privilege and granting immunity to others, the failure to immunize a witness does not raise a *Brady* issue.  *See United States v. Patterson*, 819 F.2d 1495, 1505–06 (9th Cir. 1987) (failure of government to grant immunity to witness who allegedly would have exculpated defendant, but who refused to testify on Fifth Amendment grounds, does not constitute suppression within *Brady* doctrine); *United States ex rel. Tatman v. Anderson*, 391 F.Supp. 68, 72 (D. Del. 1975) (same); *cf. United States v. Morrison*, 535 F.2d 223, 227 (3d Cir. 1976) (prosecutor's intimidation of the defendant's primary witness to the point where she invoked her Fifth Amendment privilege was a violation of due process).  There is no evidence of such intimidation or selective granting of immunity in this case.

97

The Abdallahs also assert that the government may have withheld attorneys' notes of its interviews with Washington inconsistent with the government's theory that Mazen Abdallah paid Washington not only to obtain clients but also to obtain CMNs.  The government submitted to this court, for *in camera* review, all notes and documents memorializing statements by Washington. After conducting a review of these documents, this court concludes that the government should have disclosed at least some portion of these documents, but that a new trial is not warranted because this evidence does not "put the whole case in such a different light as to undermine confidence in the verdict."

The documents submitted by the government include a typewritten interview memorandum prepared by an agent of the Office of Inspector General at HHS, the agent's handwritten notes from that interview, and a prosecutor's handwritten interview notes from a separate interview with Washington.  The government's argument that this evidence is not "newly discovered" because the Abdallahs were aware of Washington's role in the government's theory of the case and yet did not diligently seek this type of evidence confuses the *Brady* obligation with the standard for granting a new trial based on newly discovered evidence under the *Berry* factors.  When a motion for new trial based on newly discovered evidence raises a *Brady* claim, the court applies the three-prong *Brady* test to determine whether a new trial is appropriate.  *See*, *e.g.*, *Runyan*, 290 F.3d at 247 (citing *United States v. Gonzales*, 121 F.3d 928, 946 (5th Cir. 1997) (applying the three-prong *Brady* test in assessing a motion for new trial based on an alleged *Brady* violation); *United States v. Conley*, 249 F.3d 38, 45 (1st Cir. 2001) (noting that the three-part *Brady* test-rather than the five-part test governing motions for new trial-is applicable "where a defendant claims that the newly-discovered evidence should have been produced under *Brady*"); *United States v. Quintanilla*, 193 F.3d 1139,

1149 n.10 (10th Cir.1999) ("Evaluation of a *Brady* claim asserted in a motion for a new trial involves an application of the three [ *Brady* ] elements identified above, and not the five-prong . . . test utilized in typical newly discovered evidence claims.")).  Moreover, the Supreme Court has made clear that the prosecutor's obligation under *Brady* is not dependent on a defendant's timely request for favorable or exculpatory evidence.  *See, e.g.*, *Kyles*, 514 U.S. at 433–34 (holding that "*regardless of request*, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different") (emphasis added) (citing *Bagley*, 437 U.S. at 682, 105 S.Ct. 3375).  And the evidence the Abdallahs seek, interview memoranda and notes in the government's possession, was not "fully available" to them at the time of trial such that a lack of diligence would preclude them from moving for a new trial based on an alleged *Brady* violation.

Much of what is in the documents submitted for *in camera* review is neither favorable nor exculpatory.  In fact, they contain information inculpating the Abdallahs: "AMS [Americare] brought CMNs in letter size envelopes. 'Give to Kelvin for doctor signature.' Contained only CMNs. KW usually put envelopes in doctors 'in' box.  KW also gave doctor DNRs for signature – only occasionally[;] usually amb. transport forms, M'care cert forms for therapies [,] etc.  Just gave docs a stack of papers w/o explaining."  The notes continued: "Back to Ayad – pmt? Offered $ for dialysis pts (from SLHCC) transported to treatment."  The notes described the introduction of Mazen Abdallah and Wesam Abdallah as "POC" and Wesam Abdallah's assurance to "KW" that "everything would stay same."  The notes recording Washington's statements are consistent with the testimony at trial about Washington being paid "commissions" to bring dialysis patients at

99

SLNH and have them all ride with Americare, and to provide Americare with CMNs signed by Drs. Merkelz and Thacker.  The government did not have a *Brady* obligation to produce the prosecutor's handwritten notes of the Washington interview.

The typed HHS interview memorandum and the notes on which the memorandum is based, however, do include some information that is favorable to the Abdallahs.  The memorandum states that Washington first denied that Americare paid him any commissions for referring dialysis patients.  After Washington was shown two checks from Americare made out to him, he admitted that he had been paid by Americare, but asserted that these payments were for "marketing" activities and not for referring patients.  Washington stated that he did marketing for Americare at several nursing centers and hospitals, including Mariner First Colony, Southwest Hospital, Triumph Hospital, and Methodist Hospital. According to Washington, he talked to these facilities about using Americare for their patients' ambulance transports and left "brochures and business cards after his visits."  He stated that Americare paid him "based on the number of visits" he made, but did not recall "if there was a specific amount per visit."  He told the agent that each of the checks he received from Americare were for around $1,000.  After being shown "The List," Washington "denied that the checks he received were commissions for recruiting those patients as indicated on 'The List'" and stated that he "was paid for marketing only."

The HHS interview memorandum also contained inculpatory evidence that Americare paid Washington commissions.  The memorandum also stated Washington identified a fax he was shown "as being like ones he received [from Americare] requesting doctor's signatures for ambulance transportation."  "There is support for the view that evidence that is both exculpatory and inculpatory does not qualify as 'favorable' under *Brady*."  *Sipe*, 388 F.3d at 482 n.25 (citing *United*

*States v. Polland*, 994 F.2d 1262, 1267 (7th Cir. 1993) (*Brady* does not require disclosure of evidence that is "more inculpatory than exculpatory"); *United States v. Gonzales*, 90 F.3d 1363, 1369 (8th Cir. 1996) ("If the evidence is inculpatory, then *Brady* is not violated, regardless of the effect at trial of the nondisclosure.")).  But other courts have come to the opposite conclusion.  *See*, *e.g.*, *United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000) ("That the information withheld may seem inculpatory on its face in no way eliminates or diminishes the government's duty to disclose [exculpatory] evidence of a flawed police investigation).

Even assuming that the memorandum and notes meet the "favorable evidence" prong of the *Brady* test, however, the record does not reveal a reasonable probability that, had they been disclosed, the outcome of the trial would have been different.  When the material withheld in a conspiracy case would only impeach the testimony of a witness and there is other evidence corroborating that witness's testimony, the evidence is not material.  *See*, *e.g.*, *Moses v. United States*, 1998 WL 255401, at *9 (S.D.N.Y. 1998) ("Because Petitioner's role in the conspiracy was overwhelmingly established by the testimony of his co-conspirators, and the Government presented evidence concerning the surveillance of the transaction through a DEA source other than Grabowski . . . the *Brady*/*Giglio* material withheld would not have undermined the most essential evidence presented by the Government in its case.").  Fallah and Almasri testified that they paid Washington to bring patients to SLNH and that this practice continued after Mazen Abdallah bought Americare.  This testimony was strongly corroborated by other evidence at trial.  There was evidence that Mazen Abdallah signed several $1,000 checks made out to Washington for "commissions."  SLNH patients were on "The List" of patients for whom payment was made to Washington.  And several Americare clients were transported based on CMNs signed by Drs. Merkelz and Thacker, for individuals they

101

had not treated or seen, which were obtained from Washington after Mazen Abdallah and Wesam Abdallah operated Americare.  There is no evidence in the record to corroborate Washington's statement that he only provided "marketing services" for Americare at other nursing centers and hospitals.  To the contrary, all the testimony at trial about Washington's activities for Americare focused on getting dialysis patients to SLNH and providing Americare with signed CMNs for patients even if those patients had not been seen by SLNH doctors.  The government's nondisclosure of the HHS interview memorandum and agent notes does not undermine confidence in the outcome of the trial.  The *Brady* motion is denied.

## V.    Conclusion

The evidence was sufficient to convict Mazen and Wesam Abdallah of conspiracy to commit health care fraud and to convict Wesam Abdallah of health care fraud.  None of the grounds alleged warrants a new trial.  The motions for acquittal and new trial are denied.  The *Brady* motion is denied.

SIGNED on April 29, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge